**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE**, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO.  1:15-cv-605 |
| | * | |
| **MIAMI UNIVERSITY**, **et al.,** | * | |
| Defendants | * | |
| | * | |

---

### First Amended Complaint

Plaintiff John Doe ("John Doe"),[1] by his attorneys, complains as follows against Defendants: (a) Miami University ("Miami"), (b) Jane Doe ("Jane Doe"), (c) Miami Vice President of Student Affairs Dr. Jayne Brownell ("VP Brownell"); (d) Miami's Office of Ethics and Student Conflict Resolution's ("OESCR") Director Susan Vaughn ("Director Vaughn"); (e) Miami Asso. Professor Alana Van Grudy-Yoder ("Van Grudy-Yoder"); (f) Miami Professor Steven Elliot ("Elliot"); and (g) Miami's Appeals Board Chair Rose Marie Ward ("Ward").  (VP Brownell, Director Vaughn, Van Grudy-Yoder, Elliot, and/or Ward collectively referred to as "State Defendants").

---

[1] *See generally, John Doe's Motion To Allow the Parties to Use Pseudonyms* (containing the basis for John Doe's request for using pseudonyms in this proceeding).

1

## NATURE OF THE ACTION

1.      John Doe seeks damages and injunctive relief to remedy emotional, mental, economic, and physical harm caused by Defendants.

2.      John Doe's harm stems from discipline Miami and State Defendants imposed on John Doe after Jane Doe falsely accused John Doe of engaged in sexual misconduct on or about September 14, 2014 while both were students at Miami.

3.      John Doe did not engage in sexual misconduct on September 14, 2014.  Rather, Jane Doe initiated all relevant physical contact with John Doe on that date when she knew or should have known John Doe lacked the capacity to consent because he was incapacitated by alcohol.  Jane Doe's initiation of this contact includes, but is not limited to, the following actions or admissions by Jane Doe:

   a.  Jane Doe admits that prior to September 14, 2014  she _both_: (i) "had made out with" John Doe; and (ii) "dated" John Doe's roommate Nik";

   b.  Prior to encountering John Doe on September 14, 2014, Jane Doe believed John Doe and Nik were "both a little drunk" based on "snapchatting pictures" Nik sent to Jane Doe;

   c.  Jane Doe met up with John Doe and Nik in part because she wanted to get away from a "creepy" guy who had wanted to "take [her] back" to his room the "weekend before" and she "wasn't interested;"

   d.  Jane Doe stated she "kinda sobered up" when she arrived at John Doe and Nik's room and "decided to stay there" after John Doe and Nik told her she could "pick a bed" and stay the night;

   e.  Jane Doe stated she "picked [John Doe's] bed because [she] thought that would be less weird" and "just kind of assumed [John Doe and Jane Doe] might make out again;"

   f. Initially, Jane Doe expected Nik was going to leave the room. When that did not occur, she stated she "got in bed [with John Doe] and turned of[f] the lights" until she thought "Nik was asleep;"

   g. At this point, Jane Doe stated John Doe "started kissing me and that was okay and what I expected and fine." John Doe asked Jane Doe if he could "finger" her and Jane Doe said "fine"; and

   h. At some point, Jane Doe alleges John Doe performed oral sex on Jane Doe. In her written statement, she stated "I never said no. I pushed him away. He rolled over and went to sleep." *See generally, Exhibit* A, ¶2 (authenticating *Exhibit 1* which contains Jane Doe's statement with John Doe and Jane Doe's names redacted).

4. When Jane Doe and John Doe awoke in the morning, Jane Doe stated that her phone did not work. Because John Doe believed he was the last person to handle the phone, John Doe went to the store with Jane Doe where John Doe purchased Jane Doe a new phone.

5. Sometime during the time it took to purchase the new phone, Jane Doe told John Doe that, although he did stop, he did not immediately stop when she requested that he not perform oral sex. Jane Doe stated John Doe immediately "apologized." *Exhibit 1.* Jane Doe admits she accepted John Doe's apology because "[b]y the end of the car ride [she] had forgiven him and still wanted to be friends with him" because she "was fine with that." *Id.*

6. The only information John Doe possesses regarding his interactions with Jane Doe in his bed on September 14, 2014 come from Jane Doe because John Doe's alcohol intake caused him to become incapacitated prior to Jane Doe entering his bed.

7. Nevertheless, during the fall of 2014, Miami engaged in a gender biased investigation of John Doe which culminated in John Doe's suspension from Miami even though Miami possessed facts proving Jane Doe initiated all relevant physical contact with John Doe when she knew or should have known John Doe lacked the capacity to consent because he

3

was incapacitated by alcohol.  In doing so, Miami and/or State Defendants violated Miami's policies, John Doe's Due Process rights, and Title IX.

## PARTIES, JURISDICTION, VENUE

8.  Although John Doe was a student at Miami in the fall of 2014, he currently resides in the State of Connecticut.

9.  Defendant Miami is an instrumentality of the State of Ohio with its principal place of business in Butler County, Ohio.

10. Upon information and belief, Defendant Jane Doe is a current student at Miami and resides at Miami's campus in Oxford, Ohio.

11. During time periods relevant to this Complaint, Defendant VP Brownell was employed by Miami as Vice President of Student Affairs.

12. During time periods relevant to this Complaint, Defendant Director Vaughn was employed by Miami in Miami's OESCR office.

13. During time periods relevant to this Complaint, Defendant Van Grudy-Yoder was employed by Miami as faculty member.

14.  During time periods relevant to this Complaint, Defendant Elliot was employed by Miami as faculty member.

15. During time periods relevant to this Complaint, Defendant Ward was employed by Miami as faculty member.

16. This Court has diversity and supplemental jurisdiction pursuant to, among other things, 20 U.S.C. §§1681-1688; 28 U.S.C. § 2201, 28 U.S.C. § 2202, 42 USC §1983, and 28 U.S.C. § 1651 because (a) John Doe and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interests, and (b) John Doe's

state law claims are so closely related to his federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

17. This Court has personal jurisdiction over Defendants on the grounds that Defendants reside and/or conduct business within the State of Ohio.

18. Venue rests with this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

## Facts Common to All Counts

19. John Doe is from Connecticut where he worked diligently in high school, graduated with a good academic record and scored in the top percentiles on the SAT, a standardized college entrance examination.

20. Setting his sights on a college education from a top ranked college, John Doe was excited to accept an offer to attend Miami which was the alma mater of his father. John Doe was accepted into Miami's Honors program and began his studies in the fall of 2013.

21. While at Miami, John Doe met Jane Doe and they kissed several times on different occasions prior to September 14, 2014. At all times, their physical encounters were wholly consensual.

22. Around 8:00pm on September 13, 2014, John Doe and his roommate Nik went to a party where John Doe consumed approximately six beers. On or about 12:00pm, John Doe joined his friends at a bar and drank at least two more beers and four shots of alcohol before leaving the bar in the early morning hours of September 14, 2014. Prior to leaving the bar, John Doe became disoriented, his speech was slurred, and he was exhibiting a loss of equilibrium. John Doe has no clear recollection of when he left the bar or what occurred while walking back to his dorm.

23.    Based on the subsequent review of his cellphone, John Doe knows he called Jane Doe and exchanged text messages with Jane Doe during the early morning hours of September 14, 2014.

24.    John Doe recalls Jane Doe joining him in bed on the early morning hours of September 14, 2014.  But, John Doe has no independent recollection of what occurred between the time Jane Doe entered his bed and when he awoke the next morning in part because his excessive alcohol consumption caused him to become incapacitated.

25.    As detailed above, when Jane Doe expressed anxiety about her phone being ruined, John Doe apologized to Jane Doe because he blacked out and had no recollection of what happened to her phone.  Because John Doe believed that he had been the last person to handle Jane Doe's phone, John Doe offered to buy her a new one.

26.    During conversations that occurred while John Doe and Jane Doe went to purchase the phone, Jane Doe informed John Doe that she was uncomfortable that he began to perform oral sex on Jane Doe.  John Doe immediately apologized and informed Jane Doe that he was so intoxicated that he had no recollection of any of the interactions he had with Jane Doe earlier in the morning.   After John Doe purchased a new phone for Jane Doe, she told him that she forgave him and still wanted to be friends.

27.    On September 14, 2014, Jane Doe and John Doe exchanged the following text messages:

    Jane Doe:  "[y]ou know I'm not mad at you right"

    John Doe:  "I know [e]veryone else is mad at me."

    John Doe:  "Im sorry about everything [Jane Doe] I truly am."

    Jane Doe:  "I know, I'm not mad.  I'm just upset about it."

6

> John Doe:  "So am I [t]hats not me Im disgusted with myself."  *See generally, Exhibit* A, ¶3 (authenticating *Exhibit 2* containing said text messages from which John Doe and Jane Doe's names have been redacted).

John Doe sent the text messages above in part because he had no recollection what happened the night before and could not believe he engaged in the conduct described given his affection for Jane Doe and desire to honor her wishes regarding their relationship.

28. Upon information and belief, on or about September 14, 2014 the following events occurred: (a) Jane Doe told a male friend ("Friend#1") that Jane Doe was uncomfortable with her interaction with John Doe, but asked Friend#1 not to say anything to anyone about the issue; (b) Friend#1 told a female friend of Jane Doe (Friend#2) that John Doe sexually assaulted Jane Doe; (c) Friend#2 then told a Miami Resident Advisor ("RA#1") and myriad others that John Doe sexually assaulted Jane Doe.

29. On or about September 14, 2014, RA#1 asked John Doe what happened with Jane Doe and John Doe stated he did not remember the night because he was under the influence of alcohol.  RA#1 told her superiors at Miami that RA#1 was concerned that the allegations that John Doe had assaulted someone might cause him to harm himself.

30. At 4:59 pm on September 16, 2014, Miami Associate Vice President of Dean Of Students Michael Curme ("Dean Curme") provided John Doe with *Exhibit 3* which informed John Doe that Miami would hold a "summary suspension hearing" at 2:30pm the next day.  Dean Curme informed John Doe that this "summary suspension hearing" stemmed from a "report alleging that you sexually assaulted a female student on Sunday September 14, 2014."  *See, Exhibit* A, ¶4 (authenticating *Exhibit 3* from which John Doe's names have been redacted).

31. At 2:30pm on September 17, 2014, Dean Curme audiotaped a conversation with John Doe. During this audiotaped conversation, Dean Curme informed John Doe of the results of the

7

"summary suspension hearing" which included, but were not limited to, the following prohibitions contained in *Exhibit 4*: "[y]ou are to have no further contact with [Jane Doe] or [RA#1] by telephone, mail, or email, internet, in-person or through another person and remain at least 150 feet away from [Jane Doe] and [RA#1] at all times.  If you find you are enrolled in the same courses as [Jane Doe] or [RA#1], you are to contact the Office of Ethics and Student Conflict Resolution immediately . . . ."  *Exhibit* A, ¶5 (authenticating *Exhibit 4* from which John Doe's names have been redacted).

32.     After discussing the issues detailed in the preceding paragraph, Dean Curme turned off the recording device being used to audiotape the conversation.  Dean Curme's eyes then became watery while he told John Doe how Dean Curme believed an unfortunate misunderstanding occurred between John Doe and Jane Doe.  Dean Curme also stated he hoped John Doe would continue his education at Miami and that if he chose to leave Miami it would be Miami's loss.

33.     John Doe repeatedly requested Miami provide him a copy of the audio recording of his September 17, 2014 conversation with Dean Curme, but Miami failed to provide John Doe a copy of this audio recording. In withholding this audio recording, Miami and/or State Defendants violated John Doe's due process rights and/or rights under Title IX.

34.     On or about September 19, 2014, John Doe met with Miami's Emergency Case Manager Tim Parsons ("CM Parsons") who told John Doe that disciplinary proceedings would likely begin immediately and that CM Parsons would answer John Doe's questions about the proceedings.

35.     On or about September 22, 2014, John Doe again met with CM Parsons to find out what was going on because nobody had contacted John Doe.  CM Parsons stated it was very

unusual that John Doe had not been contacted and that it was possible Miami would decide not to subject him to disciplinary proceedings.

36.     Between September 17, 2014 and September 23, 2014, John Doe experienced depression, anxiety, and isolation after fellow students began talking about how he allegedly sexually assaulted Jane Doe.  As a result, John Doe stopped going to classes, did not eat for several days, when he did eat, he ate most meals alone at locations across campus.  John Doe also isolated himself from others and began spending time alone in a cemetery near Miami's campus.

37.     Because of the psychological and emotional trauma John Doe suffered, he filed a Medical Leave of Absence request with Miami based on treatment provided between September 17, 2014 and September 23, 2014 by Dr. Jennifer Young a licensed psychologist Ph.D.   John Doe continues to receive treatment for psychological and emotional trauma related to Defendants' conduct in his home state of Connecticut.

38.     *Exhibit 5* details how Dean Curme granted John Doe's Medical Leave of Absence at 4:15 pm on September 24, 2014.  This Medical Leave of Absence took effect on September 23, 2014 pursuant to Miami policies.  *Exhibit* A, ¶6 (authenticating *Exhibit 5* from which John Doe's names have been redacted).

39.     At 5:10 pm on September 23, 2014, John Doe received a "Notice of Alleged Violation" from ("Director Vaughn").  This notice –contained in *Exhibit 6* - informed John Doe that Miami might impose "sanctions" against him if he failed to appear at a "Procedural Review" less than 24 hours later on September 24, 2014.  *Exhibit* A, ¶7 (authenticating *Exhibit 6* from which John Doe's names have been redacted).

40.    The Notice of Alleged Violation in *Exhibit 6* alleged John Doe violated the "sexual assault" prohibitions in Miami's Student Conduct Regulation §103.  The notice described this violation as follows:  ". . . on September 14, 2014 it is alleged that you sexually assaulted a female resident *while both of you were intoxicated*." *Id.* (emphasis added).

41.    The Notice of Alleged Violation in *Exhibit 6* did not advise John Doe of his right to have an attorney present at the Procedural Review.  *Id.*  In so doing, Miami and/or State Defendants violated John Doe's due process rights and/or rights under Title IX.

42.    When John Doe appeared at the September 24, 2014 Procedural Review, he received  the form in *Exhibit 7* which stated that if he accepted "responsib[ility]" for sexually assaulting Jane Doe that he  would, among other things,  be "suspended from Miami [] from September 24, 2014 to May 1, 2015." *See generally, Exhibit* A, ¶8 (authenticating *Exhibit 7* from which John Doe's names have been redacted).

43.    Instead of accepting responsibility, John Doe: (a) denied he violated Miami's Student Conduct Regulation §103; and (b) requested the charges against him be adjudicated by an Administrative Hearing Panel.  *Id.*

44.    The charge lodged against John Doe - an alleged violation of Miami's Student Conduct Regulation §103 - is found in §2.1.C of Miami University's Student Handbook ("MUSH") contained in *Exhibit 8*.  *Exhibit* A, ¶9 (authenticating *Exhibit 8* which contains the 2014-15 version of MUSH).

45.    MUSH § 2.1.C.2 states "Miami University also has developed a **Title IX Protocol** that explains how incidents of sexual misconduct are handled." *Id.* (emphasis in original).

46.    Miami's Title IX Protocol - contained in *Exhibit 9* - mandates allegations of sexual assault be addressed in a "fair and impartial" manner.  *Exhibit* A, ¶10 (authenticating *Exhibit 9*).

But, as detailed in this Complaint, Miami and/or State Defendants' unlawful discipline of John Doe was corrupted by gender based bias which resulted in his being denied a "fair and impartial" disciplinary proceeding at Miami.

47.     Upon information and belief, Jane Doe initially did not want Miami to subject John Doe to disciplinary procedures, but eventually succumbed to pressure by yet to be identified Miami employees who convinced Jane Doe to participate in said disciplinary procedures. Evidence supporting this allegation includes: (a) *Exhibit 10* which contains a document Jane Doe signed stating she "did not want the Miami University Police Department to pursue a criminal investigation" of John Doe.  *Exhibit* A, ¶11 (authenticating *Exhibit 10* which contains a document Miami produced in response to John Doe's public records request from which Jane Doe's name has been redacted); and (b)

48.     Upon information and belief, Jane Doe initially did not want Miami to subject John Doe to disciplinary procedures, but eventually succumbed to pressure by yet to be identified Miami employees who convinced Jane Doe to participate in said disciplinary procedures. Evidence supporting this belief includes, but is not limited to, September 24, 2014 text messages Jane Doe sent John Doe which stated:

> Jane Doe:  "[c]an we please talk"
>
> Jane Doe:  "I don't care what anyone says.  I have to talk to you." *See, Exhibit 2.*

Although John Doe wanted to talk to Jane Doe, he did not respond to Jane Doe's text in part because he feared he would be subjected to further discipline by Miami if he did.

49.     Upon information and belief, in order to secure Jane Doe's cooperation in Miami's prosecution of John Doe, Miami offered Jane Doe "amnesty" for her underage

consumption of alcohol which is detailed in MUSH §2.1.C.2 which defines  a "Limited Amnesty" as follows:

> "[w]hile the University does not condone underage drinking or violation of other University policies, it considers reporting sexual misconduct to be of paramount importance. To encourage reporting and adjudication of sexual misconduct, ***Miami University will extend limited amnesty to a student who has been the alleged victim of sexual misconduct. The University will generally not seek to hold the student responsible for his/her own violations of the law (e.g., underage drinking) or the Code of Student Conduct in which he or she may have been involved during the period immediately surrounding the sexual misconduct***." *Exhibit 8,* (emphasis added).

50.  At 3:14 pm on October 1, 2014, Miami presented John Doe with the "Notice of Hearing" in *Exhibit 11* which gave John Doe less than 43 hours to produce the following: "1. A list of witnesses you intend to present to provide information to the Hearing Panel; 2. Any supporting documents you want the Hearing Panel to consider including, but not limited to, audio recordings, social media messages/postings (Facebook, Twitter, Instagram) police reports, photographs, videos, etc.; 3. Any written statements you want the Hearing Panel to consider including, but not limited to, statement of the complainant or the accused or witness statements."  *See, Exhibit* A, ¶12 (authenticating *Exhibit 11* from which John Doe's name has been redacted).  Providing John Doe less than 43 hours to produce these documents and/or information violated John Doe's due process rights and/or rights under Title IX.

51.  Although Jane Doe's Notice of Hearing in *Exhibit 12*  established October 3, 2014 as the deadline for her to submit "written statements" for "the Hearing Panel to consider," Miami engaged in gender bias by allowing Jane Doe's "written statement" in Exhibit 1 to be presented to the Hearing Panel even though Jane Doe did not submit Exhibit 1 to Miami

until October 6, 2014.  *Compare, Exhibit 1,* with *Exhibit* A, ¶13 (authenticating *Exhibit 12* from which Jane Doe's name has been redacted).

52. *Exhibit 11* also violated John Doe's due process rights and/or rights under Title IX because it gave John Doe insufficient time to raise bias concerns regarding the following three Miami employees that would sit on his Administrative Hearing Panel ("Hearing Panel"): (1) Director Vaughn; (2) Yoder; and (3) Elliot.  *See, Exhibit 11.*

53. Because of time constraints, John Doe was unable to investigate bias concerns regarding Hearing Panel members.

54. Upon information and belief, Van Grundy-Yoder holds gender biased views against male students. Evidence supporting this belief includes Dr. Van Gundy's research which focuses on feminist criminological theory and the implementation of gender-specific policy and procedures within the American system of corrections.   Van Grundy-Yoder is also an affiliate of Womens, Sexuality & Gender Studies (and) authored book entitled *Feminist Theory, Crime, and Social Justice* which has been described as offering "an insightful look at the primarily masculine-driven perspective on crime and justice through the lens of feminist theory."  Van Grundy-Yoder' research has also been described as advancing the existence of "gender-specific differences in crimes committed by men and women."

55. On October 7, 2014 a hearing was conducted in front of the Hearing Panel and this hearing was recorded via an audio recorder.

56. John Doe repeatedly requested Miami provide him a copy of the audio recording of October 7, 2014 hearing, but Miami failed to provide John Doe a copy of this audio recording.  In withholding this audio recording, Miami and/or State Defendants violated John Doe's due process rights and/or rights under Title IX.

57.    Similarly, John Doe's Due Process rights and/or Title IX rights were violated in part because prior to the Hearing, John Doe was not provided the names and/or a summary of the testimony of witnesses to be used against him.

58.    John Doe's Due Process rights and/or Title IX rights were violated in part because Director Vaughn served as investigator, prosecutor, and judge of John Doe.  For example, John Doe was told that the delay in Miami's charging decision occurred because Director Vaughn was responsible for reviewing the evidence and making the charging decision.  In addition, Director Vaughn dominated John Doe's hearing with questions and comments designed to deflate John Doe's credibility while inflating Jane Doe's credibility.

59.    In allowing Director Vaughn to serve as investigator, prosecutor, and judge of John Doe, Miami and/or State Defendants violated Due Process concerns issued by U.S. Department of Justice's ("DOJ") Office in its May 9, 2013 findings in *Exhibit 13* which state: ". . . the dual role of [a university employee] in investigating [University of Montana] complaints and presenting the case on behalf of the University to the University Court creates a potential conflict that can deprive . . .  an adequate, reliable, and impartial investigation. . . [therefore prohibiting] the same official playing these dual roles of investigator and 'prosecutor' . . . will ensure that individuals who play a role in . . . processing student complaints . . . do not have any actual or perceived conflicts of interest in the process." *See generally, Exhibit* 1, ¶14 (authenticating *Exhibit 13* with quoted material located at page 18).

60.    John Doe's Due Process rights and/or Title IX rights were violated in part because Vaughan's conduct during the Hearing exhibited gender-bias against males such as John Doe.  For example, Hearing Panel members and/or Vaughan: (a) asked questions and made

comments downplaying facts proving Jane Doe initiated physical contact with John Doe when she know or should have known he was incapacitated by alcohol; and/or (b) coaxed Jane Doe to provide testimony that reinforced gender biased stereotypes of male students such as John Doe wanting to initiate unwanted physical contact with females.

61.     At 5:29 pm on October 7, 2014, Director Vaughn sent John Doe *Exhibit 14* which informed John Doe that he was: (a) found responsible for violating Miami's Student Conduct Regulation §103; and (b) suspended "from Miami for the fall, winter term and spring term . . . [and that he] was eligible to apply for re-enrollment to Miami for classes beginning in the Summer of 2015."  *Exhibit* A, ¶15 (authenticating *Exhibit 14* from which John Doe's name has been redacted).  Director Vaughn also informed John Doe that if he returned to Miami after his suspension he would be placed on "disciplinary probation for one year . . . ."  *Id.*  Finally, Director Vaughn informed John Doe that he could be subjected to "further disciplinary action" if he had "any contact with" Jane Doe.  *Id.*

62.     On October 10, 2014, Hearing Panel member /Director Vaughn sent John Doe the letter in *Exhibit 15* which stated:

> Based on the evidence and statements presented, the panel found you responsible.  ***You stated both you and [Jane Doe] were friends and have spent time together in the past.  Both of you agreed to go to your residence room, where you engaged in consensual kissing and some consensual sexual contact***.  However, at some point, [Jane Doe] indicated she did not want you to have oral sex and asked you to stop but the act continued as a result, the following sanctions have been imposed.
>
> . . . . ***you are suspended from Miami University from October 7, 2014 to May 2015.  Please note that academic credit earned elsewhere during a period of disciplinary suspension will not be accepted in transfer.  You are to have no presence on any of the Miami University campuses during the period of suspension.***
>
> . . . . *You are to have no further contact with [Jane Doe] by telephone, email, internet, or in person.  You are to stay 150 feet away from her at all times.*

> *. . . you will be placed on disciplinary probation for one year upon your re-enrollment at Miami.*"  *Exhibit* A, ¶16 (authenticating *Exhibit 15* from which John Doe and Jane Doe's names have been redacted).

63. The Hearing Panel's decision violated John Doe's Due Process rights and/or Title IX rights in part because the testimony at the hearing proved by the preponderance of the evidence that: (a) John Doe had no independent recollection of what occurred between the times Jane Doe entered his bed and when he awoke the next morning in part because his excessive alcohol consumption caused him to lose consciousness and/or become incapacitated; (b) Jane Doe initiated physical contact with John Doe when she knew or should have known John Doe lacked the capacity to consent pursuant to Miami's policies; and (c) Jane Doe admitted initiating physical contact with John when she was neither intoxicated nor incapacitated.

64. At all times relevant to this Complaint, John Doe and Jane Doe were similarly situated in part because they were both students at Miami who consumed alcohol prior to engaging in physical contact with another student who consumed alcohol.

65. If Miami and/or State Defendants applied Miami's policies and procedures in a gender neutral manner, both Jane Doe and John Doe should have received the same discipline. Therefore, Miami and State Defendants' discipline of John Doe evidences gender-bias in part because Miami never disciplined Jane Doe while suspending John Doe.

66. The Hearing Panel's decision violated John Doe's Due Process rights and/or Title IX in part because of Director Vaughn's gender biased behavior at the Hearing which included, but was not limited to: (a)  Director Vaughn's allegation that John Doe regularly engages in the sexual assault of women via her accusation that "I'll bet you do this all the time;" and (b) Director Vaughn's body language suggesting she believed John Doe was lying

16

when he responded that he had not engaged in this type of activity previously and that he had only had one serious girlfriend previously.

67. Director Vaughn's conduct in the Hearing proves the gender neutral statements in Miami's sexual assault policies and/or training materials are a pretext for allowing discrimination against male students like John Doe. Evidence in support of this allegation exists in the contradiction between Director Vaughn's conduct in the Hearing and *Exhibit 16* which contains her 2014 Sexual Assault training PowerPoint presentation stating hearings afford the "right to a fair and impartial panel that will presume the accused is not responsible until all information has been considered." *Exhibit A,* ¶17 (authenticating *Exhibit 16* produced pursuant to John Doe's public records request and contain the referenced information on pages 45 and 47).

68. The Hearing Panel's decision violated John Doe's Due Process rights and/or Title IX in part because the preponderance of evidence proved he did not violate Miami's policies. For example, the Hearing Panel's decision was based on contradictory testimony regarding oral sex. On one hand, Jane Doe's written statement in *Exhibit 1* maintained the following regarding oral sex: "I never said no. I pushed him away. He rolled over and went to sleep." *Exhibit* 1. Yet, in *Exhibit 17*, the Hearing Panel identified its rationale for finding John Doe responsible for engaging in nonconsensual oral sex as follows: "[Jane Doe] indicated she did not want to engage in oral sex, said no, and stated the act continued." *Exhibit* A, ¶18 (authenticating *Exhibit 17* from which John Doe and Jane Doe's names have been redacted).

69. On or about October 13, 2014, John Doe exercised his rights under MUSH to appeal the Hearing Panel's findings and sanctions by presenting *Exhibit 18* to Miami's Appeal Board.

*Exhibit* A, ¶19 (authenticating *Exhibit 18* from which John Doe and Jane Doe's names have been redacted).  John Doe's appeal disclosed anti-male gender bias on the part of Hearing Panel.  This bias included, but was not limited to, the following statements from John Doe's appeal:

> . . . . . despite the fact that the evidence does not support the charges or the sanction imposed by the University, representatives of the University persisted in using the University's policy to inflict emotional harm and other harm on me:
>
> - The record clearly shows that ***I was intoxicated***, had no recollection of what occurred ***and*** was myself ***unable to consent to sexual contact pursuant to the University's own policy – nevertheless, the young woman in question was not charged with sexual assault***;
>
> - ***The Panel blatantly led the alleged victim at the hearing in an attempt to corroborate the charges against me***;
>
> - I have repeatedly requested audio tapes in my file and from the hearing, which have not been made available to me, to date;
>
> - This process has caused me great emotional distress and anxiety, as a result of which I requested a medical leave of absence on September 23, 2014 and I left campus to return home to Connecticut." *Id.* (emphasis added).

70.  John Doe's reference in *Exhibit 18* to "[t]he Panel blatantly [leading] the alleged victim at the hearing,"  includes, but is not limited to, Hearing Panel members and/or Vaughan coercing Jane Doe to provide testimony that reinforced anti-male gender biased stereotypes of male students initiating unwanted physical contact with females.  In engaging in this type of conduct, the Hearing Panel members and/or Vaughan violated John Doe's due process rights and/or rights under Title IX.

71.  On October 31, 2014, Miami sent *Exhibit 19* to John Doe which noted a "Judicial Hold" had been lodged against him and stated: "[a] disciplinary hold has been placed on your

ability to register.  Holds are placed most frequently for failure to complete a University sanction.  A disciplinary hold will not permit a student to register for a subsequent semester or change a current class schedule . . . You were required to complete a sanction because of a case of NON-ACADEMIC MISCONDUCT . . . ."  *Exhibit* A, ¶20 (authenticating *Exhibit 19* from which John Doe and Jane Doe's names have been redacted).

72.  The "Judicial Hold" addressed in *Exhibit 19* violated MUSH which states in pertinent part that: "**No sanction will be imposed until all appeals are completed**."  *Exhibit 8,* p.42 (bold in original).  This "Judicial Hold" violated John Doe's due process rights and/or rights under Title IX.

73.  On November 11, 2014, Ward sent *Exhibit 20* to John Doe which rejected his appeal without specifically addressing John Doe's factual basis for challenging the Hearing Panel's findings and sanctions on the basis of gender bias.  *Exhibit* A, ¶21 (authenticating *Exhibit 20* from which John Doe and Jane Doe's names have been redacted).

*74.*  Ward's rejection John Doe's appeal was based on gender bias in part because Ward knew or should have known Jane Doe violated Miami's policies by initiating physical contact with John Doe when he was incapacitated.  Ward possessed this knowledge in part because her research examines: (a) facets of college student alcohol consumption; (b) alcohol-related blackouts; and (c) how friendships relate to alcohol consumption and alcohol-related outcomes.  In addition, Ward's research focuses on student alcohol consumption and sexual assault from the perspective of protecting females from males.

75.  On or about November 14, 2014, John Doe exercised his rights under MUSH to appeal the Appeals Board decision to ("VP Brownell") by providing *Exhibit 21* to VP Brownell. *Exhibit A,* ¶22 (authenticating *Exhibit 21* from which John Doe and Jane Doe's names are

19

redacted).  John Doe's appeal disclosed gender bias on the part of Hearing Panel and the Appeal Board's refusal to address these issues.  *Id*.  For example, John Doe reiterated the bias he suffered by noting, among other things, the following:

> . . . No doubt you are aware of the growing body of evidence that suggests that the Title IX protocol, as carried out by Miami and other universities, is overreaching and unconstitutional.  An opinion piece in the October 15, 2014 edition of the Boston Globe, titled "Rethinking Harvard's Sexual Harassment Policy" noted that the procedures adopted by Harvard for "deciding cases of sexual misconduct lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and  are in no way required by Title IX law or regulation." Also, notably, Brett Sokolow, Executive Director of the Association of Title IX Administrators ("ATIXA"), in the ATIXA Tip of the Week Newsletter dated April 24, 2014 expressed grave concern about overzealous prosecution of Title IX violations on college campuses.  In my case . . . the University has gone far beyond the original intent of Title IX and has ignored the evidence in order to bolster its Title IX record . . . to my great detriment.  *Id.*

76. ATIXA's Tip of the Week discussed in the preceding paragraph – and contained in *Exhibit 22* - explains how five colleges "got it completely wrong" in finding male students responsible for "hook-ups" when alcohol was involved.  *Exhibit A, ¶23* (authenticating *Exhibit 22*).  ATIXA expressed concerns that these colleges are making "Title IX Plaintiffs" of the students who were wrongly accused.   And, ATIXA noted:

> "A common policy problem comes from failing to distinguish between intoxicated and incapacitated. Yet, the most serious issue comes from failing to implement a mens rea, if you will, within the definition. Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not an offense, there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation . . . ***there has to be something more than an intent to have sex to make this an offense. Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so. Without a knowledge standard, a respondent***

***will suffer an arbitrary and capricious application of the college's rules***." *Id.* (emphasis added).

77.    VP Brownell ignored ATIXA's Tip of the Week when she sent *Exhibit 23* to John Doe which slightly reduced John Doe's sanctions while not addressing John Doe's factual basis for challenging either: (a) the Hearing Panel's findings and sanctions; or (b) the Appeal Board's decision.  *Exhibit A,* ¶24 (authenticating *Exhibit 23* from which John Doe and Jane Doe's names are redacted).

78.    On January 19, 2015, John Doe sent *Exhibit 24* to VP Brownell detailing, among other things, how VP Brownell failed to remedy the gender bias John Doe suffered at the hands of Miami employees.  *Exhibit A,* ¶25 (authenticating *Exhibit 24* from which John Doe and Jane Doe's names are redacted).  For example, John Doe wrote:

> "your letter fails to respond to the fact that, pursuant to the University's own policy I was unable to consent to sexual contact, and yet the young woman in question was not charged with sexual assault.  It would seem, then, that the University's policies are not invoked for the protection of all students, after all." . . .  The manner in which this disciplinary process was conducted . . . is particularly devastating when the University is willing to very publically accept large donations from high profile alumni who have a known history of sexual assault." *Id.*

79.    Upon information and belief, Miami and/or VP Brownell's failure to remedy the gender bias John Doe suffered at the hands of Miami employees was caused in part by anti-male publicity related to the November 2014 *Rolling Stone* article entitled "*A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA*," which described the now-debunked tale of a female student who alleged she was a victim of gang rape at the University of Virginia. *See generally, Exhibit* 1, ¶26 (authenticating *Exhibit 25* which contains *Rolling Stone's* retraction of its article entitled *A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA*).

80.     Miami and/or State Defendants violated John Doe's Due Process rights and/or rights under Title IX in part because it applied MUSH § 2.1.C.1 in a gender biased fashion.  MUSH § 2.1.C.1 defines: "Sexual Misconduct" as: "[a]ny sexual conduct directed against another person, forcibly and/or against that person's will; or where the victim is incapable of giving consent."   Even though Miami and/or State Defendants knew or should have known Jane Doe violated this prohibition by initiating physical contact with John Doe when he was incapable of giving consent, neither Miami nor State Defendants disciplined Jane Doe. Instead, Miami and/or State Defendants unlawfully chose to prosecute the male victim of Jane Doe's sexual misconduct.

81.     Miami and/or State Defendants violated John Doe's Due Process rights and/or rights under Title IX in part because they applied another portion of MUSH § 2.1.C.1 in a gender biased fashion.   MUSH § 2.1.C.1 notes: "[a]n individual cannot consent who is substantially impaired by any drug or intoxicant . . . ." Even though Miami and/or State Defendants knew or should have known that under MUSH § 2.1.C.1 John Doe was incapable of consenting to the physical contact initiated by Jane Doe, neither Miami nor State Defendants disciplined Jane Doe.  Instead, Miami and/or State Defendants unlawfully chose to prosecute the male victim of Jane Doe's sexual misconduct.

82.     Miami and/or State Defendants violated John Doe's Due Process rights and/or rights under Title IX in part because they applied another portion of MUSH § 2.1.C.1 in a gender biased fashion.   MUSH § 2.1.C.1 states: there is no consent if " . . . .  [t]he victim's ability to judge the nature of or control their own conduct is substantially impaired . . . ."  Even though Miami and/or State Defendants knew or should have known that under MUSH § 2.1.C.1 John Doe was incapable of consenting to the physical contact initiated by Jane Doe,

neither Miami nor State Defendants disciplined Jane Doe.  Instead, Miami and/or State Defendants chose to unlawfully prosecute the male victim of Jane Doe's sexual misconduct.

83.     Since the evidence presented proved Jane Doe initiated physical contact with John Doe when she knew or should have known John Doe lacked the capacity to consent, Miami and/or State Defendants' discipline of John Doe evidences a gender-biased application of Miami's alcohol consumption policy.  This policy was described by Miami's Office of Equity and Equal Opportunity's ("OEEO") Asso. Director Tandy Hamm ("Hamm") who stated:  if a student consumes one alcoholic beverage there is no way to give true consent to physical contact with another student. ("Miami's One Drink Policy").

84.     Upon information and belief, Miami and/or State Defendants applied Miami's One Drink Policy in gender biased fashion which violated John Doe's Due Process and/or Title IX rights.   Evidence of this violation includes, but is not limited to the complaint filed by Miami student Matthew Sahm ("Sahm's Amended Complaint") which alleged Miami's gender-biased application of its alcohol policy contributed to Sahm being wrongly found responsible for violating Miami's prohibitions against sexual misconduct. *See generally,* Exhibit 1, ¶27-29 (authenticating *Exhibits 26-28* which contain Dockets 15, 20, and 20-1 from *Sahm v. Miami University*, United States District Court For The Southern District of Ohio, Western Division, Case No. 1:14-cv-698).[2]

---

[2] It should be noted this Court ultimately dismissed Sahm's complaint.  *Exhibit A,* ¶30 (authenticating *Exhibit 29* which contains Docket 21 from *Sahm v. Miami University*, United States District Court For The Southern District of Ohio, Western Division, Case No. 1:14-cv-698 ).  But, unlike the facts detailed in this Complaint, Sahm's complaint did not allege a "pattern of biased decision making by" Miami.  *Id.,* Page.Id.294.

85.   Evidence of gender bias at Miami includes, but is not limited, the information detailed in

the affidavit of Attorney Timothy J. Meloy which states:

> "Since 2013, I have represented numerous male Miami students who have
> been alleged to have violated Miami's policies and/or procedures regarding
> sexual misconduct with regard to their interactions with female Miami
> students.  In at least one of these cases, the male student alleged the female
> complainant violated Miami's policies and/or procedures by initiating
> physical contact with the male student when the he was unable to consent
> because of his level of intoxication.  In this case, Miami: (a) found the male
> student violated Miami's policies and/or procedures regarding sexual
> misconduct; and (b) to the best of my knowledge, neither investigated nor
> disciplined the female complainant for violating Miami's policies and/or
> procedures regarding sexual misconduct.  The male student I reference in
> this paragraph is not the Plaintiff in this lawsuit.
>
> Since 2013, I am aware of approximately 12 male Miami students that have
> been subjected to disciplinary procedures for allegedly violating Miami's
> policies and/or procedures regarding sexual misconduct with regard to
> interactions with female Miami students.  I am not personally aware of any
> situation where Miami alleged a female Miami student violated Miami's
> policies and/or procedures regarding sexual misconduct with regard to her
> interactions with a male Miami student.
>
> Based on my repeated encounters and interactions with Miami employees
> involved in disciplinary procedures, I believe these Miami employees
> impose a presumption of guilt on male students accused of sexual
> misconduct (and) that this presumption is based in part on: (a) the
> employees' gender biased stereotypical beliefs regarding sexual
> interactions between male and female students; and/or (b) pressure from the
> federal government and/or other organizations that appear interested in
> increasing the number of male students that Miami finds responsible for
> sexual misconduct even if the males' did not engage in misconduct."
> *Exhibit B*, ¶¶3-4.

86.   Upon information and belief, Miami and/or State Defendants' violations of John Doe's

Due Process rights and/or rights under Title IX occurred in part because of threats by the

federal government that Miami could lose federal funding or face other adverse

consequences if Miami did not find male students like John Doe responsible for sexually

assaulting female students.  Evidence of this pressure includes, but is not limited to, *Exhibit*

24

*30* which contains The White House's April 2014 report entitled "Not Alone" which includes: (a) references to Vice President Biden's "new Public Service Announcement" which encourages schools to combat the sexual assault of women on campuses; and (b) warnings that if colleges like Miami do not adhere to Title IX they "risk[] losing federal funds" and/or face potential lawsuits filed by DOJ. *Exhibit A,* ¶31 (authenticating *Exhibit 30* containing *The First Report of the White House Task Force To Protect Students From Sexual Assault* which was produced pursuant to John Doe's public records request to Miami and contains the quoted material on pages 5 and 22).

87. Similar federal mandates to aggressively discipline males (or) face the potential loss of federal funds are found in *Exhibit 31* which contains The White House Counsel on Women and Girls' January 2014 publication entitled *Rape and Sexual Assault: A Renewed Call to Action. Exhibit A,* ¶32 (authenticating *Exhibit 31* which was produced pursuant to John Doe's public records request to Miami).

88. In addition, *Exhibit 32* contains Title IX training that Miami employees received in September 2014 which detailed how federal officials disciplined universities for not exhibiting enough vigor in disciplining students alleged to have engaged in sexual misconduct. *Exhibit A*, ¶33 (authenticating *Exhibit 32* produced in response to John Doe's public records request which contains the cited material on pages 49-54). For example, this training warned that ODJ demanded universities *"[e]nsure victim-centered practices* in sexual assault response, investigations, and interviews." *Id.,* p.51 (emphasis added).

89. Upon information and belief, in response to federal pressure Miami started providing "[e]ducation and prevention programming informing the community about the risks and myths which contribute to violence. *Exhibit 10,* p.2. The programing Miami provided in

2014 to identify these risks included a gender biased documentary entitled "Bro Code" which Exhibit 33 states is a "documentary about rape culture . . . . and [h]ow *Contemporary Culture Creates Sexist Men*." *Exhibit A*, ¶34 (authenticating *Exhibit 33* containing *Student Affairs Counsel's February 20, 2013 Minutes* produced pursuant to John Doe's public records request which contain quoted material on page 2)(emphasis added).

90. Miami engaged in other examples of the gender biased stereotyping encouraged by federal authorities. For instance, *Exhibit 34* details how: "Miami join[ed] the national awareness initiative, 'It's On Us'" campaign. *Exhibit A,* ¶35 (authenticating *Exhibit 34*). This initiative - launched by President Obama and detailed in *Exhibit 35* - was created in part to address the assertion that: "[a]n estimated one in five women has been sexually assaulted during her college years." *Exhibit A,* ¶36 (authenticating *Exhibit 35*).

91. Similarly, *Exhibit 30* contains The White House' April 2014 report entitled "Not Alone" which also asserts: "[o]ne in five women is sexually assaulted in college." *Exhibit 30,* p.5.

92. *Exhibit 36* details how Miami's Sexual Assault Training for 2013 includes the assentation that 25% of college aged women reported surviving rape or attempted rape. *Exhibit A,* ¶37 (authenticating *Exhibit 36* produced pursuant to John Doe's public records request and containing referenced material on page 7).

93. Emily Yolffe's article in *Slate* – contained in *Exhibit 37* – discusses President Obama's and Miami's assertion that one in five women are sexually assaulted during their college years. *Exhibit A,* ¶38 (authenticating *Exhibit 37* with referenced material at page 4. Ms. Yolffe interviewed the lead author of the study often quoted as the source of the one and five statistic. Specifically, Ms. Yolffe asked the author - Christopher Krebs - whether the study represented the experience of the approximately 12 million female students in

America.  *Id.,* p.14.  Mr. Krebs stated those involved in the study, "don't think one in five is a nationally representative statistic." *Id.*  This was because Mr. Kreb stated his team's sampling of only two schools "[i]n no way . . .  make[s] our results nationally representative." *Id.*  Ms. Yolffe noted that if the "one-fifth to one-quarter assertion [regarding sexual assaults on college campuses were accurate that] would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a weapon of war." *Id.*

94.  Nevertheless, Miami has repeated relied on questionable statistics to create a hostile environment for male students like John Doe.  For instance, *Exhibit 38* contains the  *Final Report of the Task For The Prevention of Sexual Assault* chaired by Miami's Interim Director of OEEO and Title IX Coordinator, Kenya Ash  ("Ash") which states:

> "National statistics continue to point to the widespread prevalence of sexual assault on college campuses. The prevalence of rape among college women is 20% (Karjane et. al., 2002). ***Extrapolating national statistics to Miami, it can be predicted that as many as eight to nine women per week may be victims of sexual assault.***"  *Exhibit A,* ¶39 (authenticating *Exhibit 38* which contains the quoted material at p.5)(emphasis added)

95.  Similarly, Miami's 2012 "*Facts At A Glance*" publication contained in *Exhibit 39* states: "[i]n a study of undergraduate women, 19% experienced attempted or completed sexual assault since entering college."  *Exhibit A,* ¶40 (authenticating *Exhibit 39*).

96.  Miami's *Acquaintance Rape Resource Guide* in *Exhibit 40* cites a "2000 U.S. Department of Justice study" for the proposition that "280 rapes or attempted rapes each academic year" are expected "[o]n a campus of 10,000 women."  *Exhibit A,* ¶41 (authenticating *Exhibit 40* quoted material contained on page 1).

97.  *Exhibit 41* contains *Miami's Title IX Education & Awareness Program* from 2014 estimates between "1,600-2,000 women on the Oxford campus" are victims of sexual

misconduct a year.  *Exhibit A,* ¶42 (authenticating *Exhibit 41* produced pursuant to John Doe's public records request which contains the quoted material at page 7).

98.　　Miami's aforementioned assertions regarding the number of female Miami students being sexually assaulted evidences a hostile environment to males such as John Doe.  Evidence supporting this fact includes, but is not limited to, *Exhibit 42*  which proves that from 2011-2014 Miami disciplined only 19 students for alleged sexual misconduct prohibited by Miami's Student Conduct Regulation §103.  *See, Exhibit* A, ¶43 (authenticating *Exhibit 42* which contains a redacted copy of a document produced by Miami in response to John Doe's public records request which identifies students found responsible for §103A violation).

99.　　Upon information and belief, approximately 14,000 – 16,000 students were enrolled at Miami during each of the 2011-2014 academic years.  Therefore, Miami's aforementioned allegations of likely sexual assaults on Miami's campus is greatly exaggerated and creates a gender biased environment that caused Miami and/or State Defendants to unlawfully discipline John Doe.

100.　　Upon information and belief, Miami and/or State Defendants subjected John Doe to unlawful gender biased discipline in part to avoid bad press, an OCR complaint and/or litigation from female student(s) alleging Miami was not properly disciplining male students alleged to have engaged in sexual assaults.  Evidence in support of this allegation includes the November 2013 press releases in Exhibit 43 about the lawsuit in Exhibit 44.  *Exhibit A,* ¶44-45 (authenticating *Exhibits 43* and *44* which contain said lawsuit and three press articles regarding same).  These two exhibits discuss a lawsuit filed against Miami by a female student who alleged her sexual assault could have been avoided if Miami had

expelled the alleged attacker for prior misconduct.  *Id.*   The lawsuit also contains a January 30, 2013 email from Miami President David Hodges ("President Hodges") to the female students' father which articulated the steps Miami had taken – and will take – to increase its prosecution of sexual misconduct.  *Exhibit 44,* p.38.  President Hodges' email implicitly evidences Miami's intent to more severely discipline male students alleged to have sexually assaulted female students.

101.  John Doe's Due Process and/or Title IX rights were violated in part because Miami and/or State Defendants failed to adhere to Miami's policies for Title IX investigations which according to *Exhibit 45*:

> ". . . typically [are] conducted by a staff member from the Office of Equity and Equal Opportunity.  The investigation would involve interviewing the survivor, witnesses and the accused and obtaining copies of the survivor's statement, witness statements, the police report, and any other relevant documentation.  At the conclusion of the investigation, the investigator will make a determination, based on the preponderance of the evidence, whether there is reasonable cause to believe Miami's Policy Prohibiting Harassment and Discrimination has been violated.  Upon a reasonable cause finding, the investigator will send the report to OESCR for appropriate disciplinary action.  The investigator may be called as a witness to the hearing."  *Exhibit A*, ¶46 (authenticating *Exhibit 45* containing Ash's notes from August 12, 2014 presentation of Miami's "[o]bligations to OESCR hearing officer" produced in response to John Doe's public records request with quoted material located on page 3).

102.  While Miami has provided male students charged with sexual misconduct with full access to the OEEO investigation file detailed in the preceding paragraph, neither Miami nor State Defendants provided John Doe with any investigator's report or documents contained in the OEEO's file.  In withholding these documents, Miami and State Defendants violated John Doe's Due Process rights,  Title IX, and/or the following MUSH provisions: (a) MUSH §5.14.L which states, "[a]fter the OEEO report is issued . . . the accused [is] permitted to review the OEEO investigation file"; (b) MUSH §5.14.Q which states students

charged with sexual misconduct must be given:  "full access to the OEEO investigation file . . . ."; and (c) MUSH § 5.14.O which contemplates "transparent" disciplinary proceedings whereby students are  given "timely access to . . .  any information that will be used . . . during informal and formal disciplinary meetings and hearings."

103.  Miami and/or State Defendants' actions evidence gender bias in part because these actions refused to deem Jane Doe the aggressor who initiated sexual conduct with John Doe. Academic research conducted by University of Missouri Professor Dr. Bryana H. French in *Exhibit 46* addresses females acting as aggressors of sexual conduct. *Exhibit A,* ¶47 (authenticating *Exhibit 46* which contains Bryana H. French, Jasmine D. Tilghman, Dominique A. Malebrahche's article *Sexual Coercion Context and Psychosocial Correlates Among Diverse Males* from the *Journal of Psychology of Men and Masculinity*, 2015 Vol.16, No., 1 42-43).  Dr. French's research is addressed in also addressed in *Exhibit 47* which contains the article *Can Boys Be 'Coerced Into Sex* which reports:  "43 percent of high school boys and young college men . . .  reported they had an unwanted sexual experience and of those, 95 percent said a female acquaintance was the aggressor.'" *Exhibit A,* ¶48 (authenticating *Exhibit 47* which contains Lizzie Crocker's article *Can Boys Be 'Coerced Into Sex* from March 28, 2014 edition of *The Daily Beast*).  The article also quotes clinical psychologist Dr. Greenberg who stated: "I really do believe that girls are more aggressive sexually today than they were ten years ago, and I haven't seen the same trend in boys. I think it has a lot to do with the hook-up culture where there's this permission to get involved physically without getting involved emotionally. Boys were always expected to be the sexual initiators, and now girls are doing the initiating.'"  *Id.*

104.   Nevertheless, upon information and belief, Miami engages in a pattern and practice of disciplining males when female students initiate physical contact with male students. Evidence supporting this belief includes the allegations in Sahm's Amended Complaint in *Exhibits 26-28* (containing Sahm's Amended Complaint and related exhibits).  In addition, according to *Exhibit 42*, almost 90% of the Miami students disciplined for engaging in sexual misconduct between 2011 and 2014 had male first names.  *See, Exhibit 42* (containing document produced by Miami in response to John Doe's public records request which identifies students found responsible for §103A violation – with the last names of these students redacted).

105.   Instead of evaluating sexual misconduct allegations from a gender neutral vantage point, Miami imposes a pattern and practice of stereotyping male students as sexual aggressors who put female students at significant risk of being sexually assaulted.  One example of this pattern is found in *A Brief History of Miami's Response to Sexual Assault* – contained in *Exhibit 48* – which states:

> "[o]ne of the most highly publicized and troubling issues affecting today's college students, particularly at undergraduate residential institutions like Miami, is sexual assault. **The expression of this problem is shaped by a student culture that encourages heterosexual gender roles of male entitlement and conquest, and sends conflicting messages to women about the value of appearing sexually attractive/available but being sexually inexperienced**."  *Exhibit A,* ¶49, p.1 (authenticating *Exhibit 48*)(emphasis added).

106.   In addition, Miami employees and student organizations engage in numerous examples of gender biased stereotyping of male students like John Doe which: (a) appear designed to demonstrate to OCR, President Obama's Administration, and/or the public at large that Miami is taking aggressive disciplinary action against males accused of sexual assault; and/or (b) resulted in John Doe's unlawful discipline.

107. Examples of Miami's gender biased views include Miami's mandates that: (a) one "never blame the victim" who claims to have been sexually assaulted; and (b) "[m]en and women often speak different sexual scripts." *See, Exhibit A,* ¶50 (authenticating *Exhibit 49* which contains quoted material on page 1); *Id.,* ¶51 (authenticating *Exhibit 50* which contains quoted material on page 2). *See also, Id.,* ¶52-59 (authenticating *Exhibits 51-58* which contain additional Miami publications which suggest a pattern and/or practice of gender bias against male Miami students like John Doe).

108. Hearing Panel Member /Director Vaughn's conduct outside the disciplinary process also evidences gender bias which violated John Doe's Due Process and/or Title IX rights.  For example, only two weeks prior to the alleged assault, Director Vaughn was quoted in the *Dayton Daily News* contained in *Exhibit 60*. *Exhibit A,* ¶6 (authenticating *Exhibit 59* containing the *Dayton Daily News*' article entitled *Local Colleges React to California's Sex Assault Law*).  In this article, Ms. Vaughn claims Miami's policies regarding "consent" are "essentially" the same and/or "similar" to legislation passed by California's legislature regarding consent to sexual activity. *Id.*

109. Director Vaughn's comment about California's consent law contradicts Miami's Affairs Counsel's November 19, 2014 minutes in *Exhibit 60* which state "Ohio hasn't been looking into passing" anything like "California and New York's newly implemented 'Yes Means Yes'" consent legislation. *Exhibit A,* ¶61 (authenticating *Exhibit 60* produced pursuant to John Doe's public records request which contains quoted material at page 3).

110. California's affirmative "Yes Means Yes" consent law is far more restrictive than Miami's polices regarding "consent." *See e.g., Exhibit 9,* p.11 (containing Miami's Title IX

Protocol's discussion of consent); *Exhibit 8,* at *MUSH,* § 2.1.C.1 (containing MUSH's discussion of consent).

111. State Defendants and/or Miami applied gender biased stereotyping of male students like John Doe which was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity. This conduct also provides a basis for imputing liability to Miami.

112. The conduct of State Defendants and/or Miami established an unlawfully hostile and/or abusive environment at Miami for male students who include, but are not limited to, John Doe. *See e.g., Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007), *en banc.* (establishing the following four elements of a Title IX hostile environment/sexual harassment claim: (1) plaintiff was a student at an educational institution receiving federal funds, (2) he/she was subjected to harassment based on his/her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.); *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994)(rejecting a motion to dismiss Title IX claim filed by a male student alleging he was falsely accused of sexual assault in part because ". . . . statements by pertinent university officials, or patterns of decision-making that . . . tend to show the influence of gender."); *Zamora v. Jane Doe v. Erskine Coll.,* 2006 U.S. Dist. LEXIS 35780, *32-38 (Greenwood Div., N.C. May 25, 2006)(rejecting a motion for summary judgment in a Title IX claim where "a jury issue" was created with regards to "whether [the college] was deliberately indifferent" to Title IX discrimination); *Doe v. Bd. of Educ.,* 982 F. Supp. 2d 641, 652 (D. Md. 2012)(stating "severe or pervasive" harm can occur when Title IX plaintiff suffers "humiliat[ion] . . .

serious anxiety, fear, or discomfort . . . .")(citations omitted); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014)(rejecting a motion to dismiss Title IX claim filed by a male student alleging he was falsely accused of sexual assault).

113. Miami and/or State Defendants engaged in deliberate indifference in refusing to implement corrective measures to address John Doe's unlawful discipline detailed above.

114. The conduct of State Defendants, and/or Miami created an unlawfully hostile and/or abusive environment for male Miami students like John Doe in part because this conduct is similar to that addressed by legal scholars documenting bias against male students accused of sexual misconduct on college campuses. *See e.g.,* Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings, 47 Ga. L. Rev. 591, 594-599* (2013); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses,* 40 N. Ky. L. Rev. 49, 50-52 (2013).

115. In response to pressure from DOE, DOJ, and/or the White House, educational institutions like Miami are being counseled to severely limit procedural protections afforded male students like John Doe in sexual misconduct cases. For example, *Exhibit 61* contains ATIXA's "2014 Whitepaper" entitled *Equity Is Such A Lonely Word* which states: "victims have been historically been accorded 3/5 of the rights of an accused individual (or less), and *victims are typically women*, equity may require institutions to recalibrate the pendulum to right the historical imbalance. An equitable process on many campuses will force a victim focus, but only as a casualty of history." *Exhibit A,* ¶62 (authenticating *Exhibit 61* with quotation located on page 4)(emphasis added). In advocating for the reduction of due process rights for the accused, the ATIXA's Whitepaper states ORC's

2011 Dear Colleague Letter: "indicated that we must deconstruct part of the due process castle by more equitably employing remedies. Remedies are, by their nature, intended to restore the complainant to their pre-discrimination status . . . Equity requires fairness under the circumstances, which can and often should lead institutions to create skewed remedies that place more restrictions and requirements on respondents. Equity demands that complainants should be inconvenienced only as far as absolutely required to remedy the discrimination."). *Id.,* pages 5, 13-14.

116. A review of Miami's student policies proves Miami engaged in the practice detailed in ATIXA's Whitepaper by giving alleged sexual assault victims greater rights and protections than those accused of committing the assaults. For instance, the 2012-13 version of MUSH added the following provisions to the 2011-12 version of MUSH: "Miami University will extend limited amnesty to a student who has been the alleged victim of sexual misconduct. The University will generally not seek to hold the student responsible for his/her own violations of the law (e.g., underage drinking) or the Code of Student Conduct in which he or she may have been involved during the period immediately surrounding the sexual misconduct . . . Miami University will also make changes to the victim's academic and living conditions upon request . . . [c]onfidential medical/counseling records and information regarding the victim's sexual history will not be provided to the accused and is not admissible at any disciplinary proceeding." *Compare, Exhibit A*, ¶63 (authenticating *Exhibit 62* which contains selected pages of 2012-13 version of MUSH provided in response to John Doe's public records request), with *Exhibit A*, ¶64 (authenticating *Exhibit 63* which contains selected pages of 2011-12 version of MUSH provided in response to John Doe's public records request).

117. Similarly, during the 2014-15 academic year, Miami offered alleged victims of sexual assaults the following additional rights and protections which could be imposed even before the accused received a hearing:  "in addition to the summary suspension of the accused . . . . [the Dean of Students may] impose Interim Measures upon request of a complaint and request of the alleged victim.  Interim Measures include . . . [p]roviding the alleged victim with a temporary safe space within the University residence hall . . . [m]oving the accused student or the alleged victim so he/she does not share the same residence or dining halls . . . [c]hanging class assignments so that the accused and the alleged victim do not share the same classes . . . [p]roviding the alleged victim with academic support services, including tutoring . . . and/or [p]rohibiting the accused from having any contact with the accused victim.  *Compare, Exhibit 8* (containing 2014-15 version of MUSH) with *Exhibit A*, ¶65 (authenticating *Exhibit 64* which contains selected pages of the 2013-14 version of MUSH produce in response to John Doe's public records request).

118. According to *Exhibit 65* Miami implemented the aforementioned changes to the 2013-14 version of MUSH in response to the demands of the U.S. Department of Education ("DOJ").  *See e.g., Exhibit A,* ¶66 (authenticating *Exhibit 65* containing *Student Affairs Counsel's September 17, 2014 Minutes* produced pursuant to John Doe's public records request which states on page 2 that: the "[c]hanges []to the Student Code of Conduct last year under Section 2.1.C Sexual Misconduct . . . all relate to the Title IX regulation updates prepared by the U.S. Department of Education." ).

119. As a result, John Doe's Due Process rights and/or Title IX rights were violated in part because the procedural protections Miami and/or State Defendants afforded male students

like John Doe are unfair, inadequate, and/or designed to limit a male students' ability to obtain a fair and equitable result.

120.   John Doe's Due Process rights and/or Title IX rights were also violated in part because Miami and/or State Defendants' knew or should have known their actions would have adverse impact on male students alleged to have engaged in sexual misconduct with a female student (and) were deliberately indifferent to this impact.

121.   John Doe's Due Process rights and/or Title IX rights were also violated in part because Miami and/or State Defendants engaged in gender bias by not offering John Doe the aforementioned rights and protections that Miami Policies afforded alleged female victims of sexual assaults even though Miami and/or State Defendants knew John Doe was entitled to these rights and protections since Jane Doe engaged in physical contact with John Doe when he was incapacitated by alcohol.

122.   State Defendants' conduct violated John Doe's due process rights in part by irreparably damaging John Doe's "good name, reputation, honor, or integrity" with an unlawful disciplinary proceedings that will "seriously damage [his] standing . . . [and] interfere with later opportunities for higher education and employment."  *See, Goss v. Lopez*, 419 U.S. 565, 573-75 (1975).   Evidence of this damage to John Doe can be located in *Exhibits 66-69* which contain publications that document how falsely accused male college students suffered the same – or similar – harm as that suffered by John Doe.  *See, e.g., Exhibit A,* ¶67 (authenticating *Exhibit 66* containing Janet Halley's Feb. 12, 2015 article in the Harvard Law Review entitled *Trading the Megaphone for the Gavel in Title IX Enforcement*); *Id.,* ¶68 (authenticating *Exhibit 67* containing Robin Wilson's Sept. 3, 2014 article in The Chronical of Higher Education entitled *Presumed Guilty.*); *Id.,* ¶69

(authenticating *Exhibit 68* containing February 18, 2015 *Open Letter From Members of the Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants and The Accused At Universities*). *Id.,* ¶70 (authenticating *Exhibit 69* containing Oct. 15, 2014 *Open Letter From Members of Harvard Law School entitled Rethink Harvard's sexual harassment policy*).

## Count 1
## Defamation Per Se
(against Defendant Jane Doe only)

123.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

124.    Jane Doe orally and in writing defamed John Doe by falsely alleging he sexually assaulted Jane Doe ("Jane Doe's Allegations").  Jane Doe published Jane Doe's Allegations to Miami employees, Miami Students, and/or other third-parties not involved in Miami's disciplinary proceeding against John Doe.

125.    Jane Doe's Assault Allegations were made with the intent to be understood by those that received the allegations that John Doe committed an offense involving moral turpitude that subjected John Doe to potential infamous punishment and therefore imputes the defamatory character of the oral and written statements.

126.    Jane Doe's Assault Allegations were false and defamatory and were made with actual malice motivated by ill will, intent to deceive, improper motive, and/or an affirmative act to injure John Doe and/or reckless disregard for the truth or falsity of the oral and/or written statements.

38

127.     In the alternative, Jane Doe negligently made the aforementioned false and defamatory statements about John Doe.

128.     Jane Doe's Assault Allegations were made with the intent to harm John Doe's standing with Miami, his future educational and employment opportunities, and his standing and reputation at Miami and in the public at large.

129.     As a direct result of Jane Doe's Assault Allegations, the character and reputation of John Doe at Miami and in the community at large was impaired and he suffered and will continue to suffer mental anguish, personal humiliation, and a great loss of reputation.

130.     Jane Doe's conduct detailed above caused John Doe to seek medical help to address profound and ongoing psychological and mental anguish.

131.     As a further direct and proximate cause of Jane Doe's Assault Allegations, John Doe was unlawfully disciplined by Miami, which has or will result in, among other consequences and damages, difficulty in gaining entrance to another university comparable to Miami, reduced future earning capacity, and attorneys' fees.

**Count 2**
**Intentional Infliction of Emotional Distress**
(against Defendant Jane Doe only)

132.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

133.     When Jane Doe engaged in Jane Doe's Assault Allegations, she knew or should have known her actions would cause John Doe to suffer serious emotional injury, mental anguish, and/or a great loss of reputation.

134.    Jane Doe's Assault Allegations exhibited an intentional, reckless, and/or deliberate disregard of the high degree of probability that John Doe would suffer immediate and continuing emotional distress.

135.    Jane Doe's Assault Allegations caused John Doe to seek medical help to address profound and ongoing psychological and mental anguish.

136.    Jane Doe's Assault Allegations were malicious, willful and/or intentional.

137.    As a direct and proximate result of Jane Doe's aforesaid conduct, John Doe has suffered and will continue to suffer, severe and extreme emotional distress.

WHEREFORE, for Counts 1 and 2, John Doe demands judgment against Jane Doe as follows:

A.    Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe' past and future pecuniary and/or non-pecuniary damages caused by Jane Doe's conduct;

B.    Judgment for attorneys' fees, pursuant any applicable statute;

C.    Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

D.    Pre-judgment interest and/or post judgment interest as may be permitted by law and statute; and/or

E.    Such other and further relief as this court may deem just, proper, equitable, and appropriate.

### Count 3:
### Violation of Title IX –Hostile environment sexual harassment and/or discrimination
(against Miami only)

138.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

139.   Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

140.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

141.   Miami receives federal financial assistance and is thus subject to Title IX.

142.   Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

143.   Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

144.   Title IX mandates Miami afford equitable procedures and due process to John Doe which includes, but is not limited to:  (a) having proper jurisdictional authority to conduct an investigation; (b) providing adequate, reliable, and impartial investigation of complaints,

41

including the opportunity to present witnesses and other evidence, and/or (c) that Miami employees involved in the conduct of the procedures have adequate training.

145. Miami knew, or in the exercise of due care should have known, that Miami lacked jurisdiction under Miami policies to investigate and/or discipline John Doe for a physical encounter Jane Doe initiated with John Doe when he was incapacitated by alcohol.   For example, the testimony provided at the Hearing proved that John Doe exhibited the signs of acute intoxication contained in Miami's Sexual Assault Training for the Fall of 2014 which are found in *Exhibit 70*.   *See generally, Exhibit A,* ¶71 (authenticating *Exhibit 70* produced pursuant to John Doe's public records request which contains the referenced information on pages 58-59, and 62).  In addition, Miami's Sexual Assault Training for 2013 – contained in in *Exhibit 71* - highlighted the errors in prosecuting John Doe by stating:  it is "[e]stimated that between 55%-77% of all college rapes occurred when victims were so intoxicated that they were unable to consent."   *Exhibit A,* ¶72 (authenticating *Exhibit 71* produced pursuant to John Doe's public records request which contains the referenced material on page 8)(emphasis in original).

146. Upon information and belief, Miami knew, or in the exercise of due care should have known, Miami employees including, but not limited to, State Defendants  lacked training and ability to carry out their responsibilities under the disciplinary enforcement requirements of Title IX.  Evidence of this fact is located in *Exhibit 72* which suggests: (a) Van Grudy-Yoder did not receive either sections of Miami's training regarding MUSH §103 Sexual Assault Hearing Procedures during the academic year 2014-15; and (b) VP Brownel only received training in "Part 1" of these procedures.   *Exhibit A,* ¶73 (authenticating *Exhibit 72* produced in response to John Doe's public records request).

Additional evidence is located in Miami's Affairs Counsel's November 19, 2014 minutes in *Exhibit 73* which state: (a) members of hearing "panel[s] must complete required [Title IX] training to serve;" and (b) Ash "has been making the rounds to different departments for training." *Exhibit A*, ¶74 (authenticating *Exhibit 73* produced pursuant to John Doe's public records request with quoted material located on page 2).

147. Miami knew, or in the exercise of due care should have known, Miami employees including, but not limited to, State Defendants, held unlawful gender biased views which motivated the discipline of John Doe.

148. Miami's policies fail to meet the standards required by Title IX and/or Due Process safeguards in the United States Constitution as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings.

149. Upon information and belief, in virtually all cases of campus sexual misconduct by Miami students, the accused student is male and the accusing student is female. Evidence supporting this allegation is located in *Exhibit 74* which contains the sixty-two reported "sex offense[s]" identified by Miami's police department for the years 2011-2014. *Exhibit A*, ¶75 (authenticating *Exhibit 74* produced in response to John Doe's public records requests). Only one of these sixty-two alleged offenses identified a male as the victim (and) this alleged offense did not take place on Miami's campus or in Oxford Ohio. *Id.,* p.5. In addition, none of the "sex offense" records identify a female as the perpetrator of the alleged "sex offence." *Id.*

150. Miami and/or State Defendants possess a pattern and practice of discriminating against male students like John Doe in part because of Miami's policy in *Exhibit 75* of always "believ[ing]" the allegations of female students alleging sexual assault. *Exhibit A*, ¶76

(authenticating *Exhibit 75* containing *Miami's Title IX Education & Awareness Program* from May 2014 produced by Miami in response to John Doe's public records request which states on page 3: "Message for Survivors:  1. I believe you.  2. It's not your fault.  3. Resources are available.").

151. Upon information and belief, during the Fall of 2013 and the Spring of 2014, Miami and/or State Defendants found every male student who was accused by a female of violating Miami's sexual misconduct policy to be "responsible" for that alleged violation.  Evidence in support of this fact can be located in at least two documents: (1) *Exhibit 76* which contains Miami's Disciplinary Board's Annual Report for 2013-14 stating 10 disciplinary cases were heard by the Disciplinary Board during the fall of 2013 and spring of 2014; and (2) Exhibit 42 which identifies the male first names of students found responsible for §103A violations in 2013 and 2014.  *Compare, Exhibit* A, ¶77 (authenticating *Exhibit 76* produced by Miami in response to John Doe's public records request); with *Exhibit 42* (containing document produced by Miami in response to John Doe's public records request with the last names of students redacted).

152. As detailed throughout this Complaint, Miami created an environment in which male students accused of sexual assault, such as John Doe, are fundamentally denied due process as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male Miami students like John Doe of educational opportunities on the basis of sex.

153. Upon information and belief,  Miami's investigation and/or discipline of John Doe was taken in order to demonstrate to DOE, DOJ, OCR, President Obama's Administration, and/or the general public that Miami is aggressively disciplining male students accused of sexual assault.

154.   Miami has actual or constructive knowledge that Miami's investigation and/or discipline of John Doe posed a persuasive and unreasonable risk of gender discrimination with regard to John Doe.

155.   Miami's actions and inactions detailed above and below set in motion a series of events that Miami knew, or reasonably should have known, would cause male Miami students, such as John Doe, to suffer unlawful gender discrimination.

156.   Miami's investigation and/or discipline of John Doe is discriminatory and based upon or motivated by John Doe's male gender.

157.   The male gender discrimination by Miami against John Doe includes, but is not limited to, providing preferential treatment to Jane Doe.  This preferential treatment includes, but is not limited Miami's refusal to discipline Jane Doe pursuant to Miami's policies detailed above.

158.   Miami employees, including but not limited to State Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) Miami's violations of John Doe's rights under Miami policies, Title IX, and/or guidance promulgated by ORC; and/or (b) Miami's unlawful determination that John Doe violated Miami policies which Miami adopted pursuant to federal laws and regulations related to Title IX.

159.   Miami employees, including but not limited to State Defendants, exhibited deliberate indifference by refusing to remedy: (a) Miami's violations of John Doe's rights under Miami policies, Title IX, and/or guidance promulgated by ORC; and/or (b) Miami's erroneous determination that John Doe violated Miami policies which Miami adopted pursuant to federal laws and regulations related to Title IX.

160. Miami's deliberate indifference caused John Doe to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived John Doe of access to educational opportunities or benefits (and) caused other harms detailed above.

161. Upon information and belief, Miami possesses additional documentation evidencing Miami's unlawful pattern of gender biased decision making which favors female students over male students like John Doe who are falsely accused of sexual assault. Evidence supporting this allegation includes, but is not limited to, Miami's failure to produce the audio recordings of the Hearing and John Doe's meeting with Curme.

162. Miami's hostile environment sexual harassment and/or discrimination caused John Doe to be damaged in an amount to be determined at trial.

**Count 4:**
**Violation of Title IX – Deliberate Indifference**
(against Miami only)

163. John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

164. Miami employees, including but not limited to State Defendants, acted with deliberate indifference towards John Doe because of his male gender.

165. Miami employees, including but not limited to State Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) Miami's violations of John Doe' rights under Miami's policies, Title IX, and/or guidance promulgated by ORC; and/or (b) Miami's erroneous determination that John Doe violated Miami's policies which Miami adopted pursuant to federal laws and regulations related to Title IX.

166. Miami employees, including but not limited to State Defendants, exhibited deliberate indifference by refusing to remedy: (a) Miami's violations of John Doe' rights under Miami policies, Title IX, and/or guidance promulgated by ORC; and/or (b) Miami's erroneous determination that John Doe violated Miami policies which Miami adopted pursuant to federal laws and regulations related to Title IX.

167. Upon information and belief, Miami possesses additional documentation evidencing its employees and/or agents' manifest gender based deliberate indifference towards John Doe and/or other similarly situated male students.

168. Miami's deliberate indifference caused John Doe to be damaged in an amount to be determined at trial.

**Count 5**
**Violation of Title IX – Erroneous Outcome**
(against Miami only)

169. John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

170. Miami employees, including but not limited to State Defendants, unlawfully disciplined John Doe because of his male gender.

171. By erroneously disciplining John Doe, Miami violated Miami policies, Title IX, and/or guidance promulgated by ORC.

172. Miami employees, including but not limited to State Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) Miami's violations of John Doe' rights under Miami policies, Title IX, and/or guidance promulgated by ORC; and/or (b) Miami's erroneous determination that John Doe violated Miami policies which Miami adopted pursuant to federal laws and regulations related to Title IX.

47

173. Miami employees, including but not limited to State Defendants, exhibited deliberate indifference by refusing to remedy: (a) Miami's violations of John Doe' rights under Miami policies, Title IX, and/or guidance promulgated by ORC; and/or (b) Miami's erroneous determination that John Doe violated Miami policies which Miami adopted pursuant to federal laws and regulations related to Title IX.

174. Miami's conduct detailed above involved arbitrary and capricious violations of John Doe's Constitutional Due Process rights.

175. Upon information and belief, Miami possesses additional communications evidencing Miami's deliberate indifference in imposing unlawful discipline on John Doe on the basis of his gender.

176. Miami's wrongful discipline of John Doe caused John Doe to be damaged in an amount to be determined at trial.

WHEREFORE, regarding Counts 3-5, John Doe demands judgment and relief against Miami as follows:

A. Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe' past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

B. Order(s) requiring Miami expunge John Doe's official Miami files of all information related to his interactions with Jane Doe;

C. Judgment for attorneys' fees, pursuant any applicable statute;

D. Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

E.     Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

F.     Such other and further relief as this court may deem just, proper, equitable, and appropriate.

### Count 6
### Violation of the Procedural and Substantive Component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution Pursuant to 42 U.S.C. §1983
(Against State Defendants in their official capacities for injunctive relief (and) in their personal capacity for money damages)

177.   John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

178.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

179.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

180.   State Defendants are considered state actors who owe John Doe certain protections pursuant to the Fourteenth Amendments to the United States Constitution and other Constitution provisions.

181.   State Defendants' conduct detailed in this Complaint violated John Doe's Due Process rights in part by denying John Doe the "fundamentally fair [disciplinary] procedures" required by United States Supreme Court decisions such as *Goss v. Lopez*, 419 U.S. 565 (1975).

182.   State Defendants' conduct detailed in this Complaint violated John Doe's Due Process rights in part by irreparably damaging John Doe's right to pursue an education and future educational and employment opportunities and occupational liberty. *See e.g., Dixon v.*

*Alabama State Board of Education*, 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S. Ct. 368, 7 L.Ed.2d 193 (1961)(stating,  "[i]t requires no argument to demonstrate that education is vital and, indeed, basic to civilized society . . . [i]t is most unlikely that a public college would accept a student expelled from another public college of the same state. Indeed, expulsion may well prejudice the student in completing his education at any other institution. Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value.").

183. State Defendants' conduct violated John Doe's protected property interest in his education (and) right to pursue an education and future educational and employment opportunities and occupational liberty.

184. State Defendants violated John Doe's Due Process rights in part because John Doe was denied a review by a gender-neutral and impartial decision maker.

185. State Defendants violated John Doe's Due Process rights in part because John Doe was denied a "meaningful" opportunity to clear his name.  *See e.g., Matthews v. Eldridge,* 492 U.S. 319, 333 (1976)(requiring disciplinary procedures that take place "at a meaningful time and in a meaningful manner.").

186. State Defendants violated John Doe's Due Process and/or Title IX rights in part because the State Defendants' did not provide John Doe with the specifics of Jane Doe's allegations in Exhibit 1 until less than 24 hours before John Doe's hearing.

187. State Defendants violated John Doe's Due Process rights in part because State Defendants' prohibited John Doe from accessing information necessary for his defense and/or internal appeal.  This information, includes, but was not limited to, Miami's decision to prohibit John Doe's access the audio recording of his Hearing when he filed his appeal.

188. State Defendants violated John Doe's Due Process rights in part because State Defendants' conduct evidenced arbitrary and/or irrational behavior which was not justified by any governmental interest.

189. State Defendants violated John Doe's Due Process rights in part because State Defendants' conduct was motivated by ill will, bad faith, and/or an intent to injure John Doe.

190. State Defendants violated John Doe's Due Process rights in part because they engaged in the arbitrary abuse of executive power so egregious that it shocks the conscience of the public. Evidence of this fact is contained in publications criticizing academics for violating the Due Process rights of male college students in the same – or similar way – that State Defendants violated John Doe's Due Process. *See e.g., Supra,* ¶¶67, 114 (referencing said publications). *See also, Exhibit* A, ¶78 (authenticating *Exhibit 77* which contains Richard Dorment's Mar. 25, 2015 article in Esquire entitled *Occidental Justice: The Disastrous Fallout When Drunk Sex Meets Academic Bureaucracy*); *Id.,* ¶79 (authenticating *Exhibit 78* which contains Ashe Schow's July 14, 2015 article in the Washington Examiner entitled *Double-Standard on campus sexual assault hearings*); *Id.,* ¶80 (authenticating *Exhibit 79* which contains The Economist's Dec. 6, 2014 article entitled *Sex Crimes on Campus Professors as Judges: the folly of letting amateurs handle serious crimes*).

191. State Defendants violated John Doe's Due Process rights in part because John Doe would not have been disciplined had State Defendants acted in a gender-neutral manner.

192. State Defendants violated John Doe's Due Process rights in part because State Defendants' engaged in a gender-biased pattern and/or practice of disregarding and violating the rights of male students such as John Doe when these males were accused of sexually assaulting a female student.

193.    State Defendants acted, or failed to act, under color of law, to deprive John Doe's rights and privileges secured by the Fourteenth Amendments to the United States Constitution and other Constitution provisions.

194.    State Defendants' conduct evidenced an intentional, outrageous, and/or reckless disregard for John Doe's constitutional rights.

195.    State Defendants' conduct towards John Doe lacked any rational basis and/or was motivated by ill will or bad faith.

196.    As a result of State Defendants' Due Process violations, John Doe was suspended and suffers ongoing harm, including but not limited damage to his future educational and employment opportunities (and) and his standing and reputation which is marred in part by State Defendants' unlawful finding that John Doe engaged in sexual misconduct.

197.    State Defendants' investigation and/or discipline of John Doe deprive John Doe of his interests within the meaning of "life, liberty, or property" contained in U.S. Const. amend. XIV, § 1 in part because Defendants violate John Doe's property right to a transcript unmarred by Defendants' unlawful investigation and/or discipline of John Doe.

198.    Upon information and believe, State Defendants agreed to, approved, and/or ratified the various violations of John Doe's Due Process rights detailed in this Complaint.

199.    State Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive and unreasonable risk of deprivation of John Doe's rights under the Fourteenth Amendments to the United States Constitution.

200.    Because of State Defendants' unlawful actions, John Doe is entitled to injunctive relief that requires State Defendants expunge John Doe's official Miami student file of all information related his sexual encounter with Jane Doe.

201.    Because of State Defendants' unlawful actions, John Doe is entitled to declaratory relief that requires State Defendants' expunge John Doe's official Miami student file of all information related his encounter with Jane Doe.

**Count 7-**
**Violation of Equal Protection Clause**
**of the Fourteenth Amendment to the United States Constitution**
**Pursuant to 42 U.S.C. §1983**
(Against Individual Defendants in their official capacities for injunctive relief
(and) in their personal capacity for money damages)

202.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

203.    The Fourteenth Amendment to the United States Constitution prohibits gender discrimination.

204.    As evidenced by the facts and exhibits detailed above, gender discrimination improperly caused State Defendants to unlawfully find John Doe responsible for engaging in sexual misconduct with Jane Doe.

205.    Upon information and belief, female Miami students suffer no historical disadvantage regarding the discernment of consent to intimate physical relationships with male students which would allow State Defendants to validly discriminate against male students like John Doe.

206.    John Doe brings these claims pursuant to 42 U.S.C. § 1983 because State Defendants' actions were taken by State Defendants under color of state law.

207.    Because of these violations, John Doe has suffered considerable emotional distress, loss of present and future earnings, humiliation, and damage to his reputation as a result of State Defendants' actions.

WHEREFORE, regarding Counts 6-7, John Doe demands judgment and relief as follows:

A.    State Defendants be found liable in their official capacity to John Doe for injunctive relieve requiring Miami expunge John Doe's official Miami files of all information related to his interactions with Jane Doe;

B.    State Defendants be found liable in their personal capacity for money damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe' past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

C.    Judgment for attorneys' fees, pursuant any applicable statute;

D.    Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

E.    Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

F.    Such other and further relief as this court may deem just, proper, equitable, and appropriate.

## Count 8 - Injunctive Relief

208.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

209.    Based on the facts articulated above and below, John Doe is entitled to injunctive relief because Miami and/or State Defendants' discipline of John Doe is unlawful and violates John Doe' rights under Miami's policies, federal and/or state laws.

210.   Miami and/or State Defendants' unlawful discipline of John Doe will cause irreparable harm which is certain, great, actual and not theoretical.

211.   Miami and/or State Defendants' unlawful discipline of John Doe cannot be remedied by an award of monetary damages because of difficulty or uncertainty in proof or calculation.

212.   Based on the facts articulated above, John Doe is entitled to injunctive relief which includes, but is not limited to an Order requiring Miami and/or State Defendants expunge John Doe's official Miami files of all information related to his interactions with Jane Doe.

213.   The granting of injunctive relief will cause no harm to Miami and/or State Defendants because these defendants have no cognizable interest in the unlawful discipline of John Doe.

214.   The granting of an injunctive relief will advance a significant and appreciable public interest by protecting members of the public – like John Doe –from having their fundamental rights threatened by unlawful government action.

WHEREFORE, regarding Counts 8 John Doe demands judgment and relief against Miami and/or State Defendants as follows:

G.   Order(s) requiring Miami and/or State Defendants expunge John Doe's official Miami files of all information related to his interactions with Jane Doe;

H.   Judgment for attorneys' fees, pursuant any applicable statute;

I.   Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

J.   Pre-judgment interest as may be permitted by law and statute; and/or

K.   Such other and further relief as this court may deem just, proper, equitable, and appropriate.

Respectfully Submitted,

/s/ Eric J. Rosenberg
Eric J. Rosenberg (0069958)
Rosenberg & Ball Co. Lpa.
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
ericrosenb@gmail.com

## JURY DEMAND

John Doe hereby demand a trial by a jury in this matter.

/s/ Eric J. Rosenberg
Eric J. Rosenberg (0069958)