# Sexual Violence

## *Facts at a Glance* — *2012*

### Adults

In a nationally representative survey of adults:[1]

- Nearly 1 in 5 (18.3%) women and 1 in 71 men (1.4%) reported experiencing rape at some time in their lives.

- Approximately 1 in 20 women and men (5.6% and 5.3%, respectively) experienced sexual violence other than rape, such as being made to penetrate someone else, sexual coercion, unwanted sexual contact, or non-contact unwanted sexual experiences, in the 12 months prior to the survey.

- 4.8% of men reported they were made to penetrate someone else at some time in their lives.

- 13% of women and 6% of men reported they experienced sexual coercion at some time in their lives.

### College Age

- In a nationally representative survey of adults, 37.4% of female rape victims were first raped between ages 18-24.[1]

- In a study of undergraduate women, 19% experienced attempted or completed sexual assault since entering college.[2]

### Children and Youth

In a nationally representative survey:[1]

- 42.2% of female rape victims were first raped before age 18.

- 29.9% of female rape victims were first raped between the ages of 11-17.

- 12.3% female rape victims and 27.8% of male rape victims were first raped when they were age 10 or younger.

A 2011 survey of high school students found that 11.8% of girls and 4.5% of boys from grades 9-12 reported that they were forced to have sexual intercourse at some time in their lives.[3]

### Perpetrators

In a nationally representative survey:[1]

- Among female rape victims, perpetrators were reported to be intimate partners (51.1%), family members (12.5%), acquaintances (40.8%) and strangers (13.8%).

- Among male rape victims, perpetrators were reported to be acquaintances (52.4%) and strangers (15.1%).

- Among male victims who were made to penetrate someone else, perpetrators were reported to be intimate partners (44.8%), acquaintances (44.7%) and strangers (8.2%).

### Health Disparities

- Among high school students, 12.5% of American Indian/Alaska Natives, 10.5% of Native Hawaiian/Pacific Islander students, 8.6% of black students, 8.2% of Hispanic students, 7.4% of white students, and 13.5% of multiple-race students reported that they were forced to have sexual intercourse at some time in their lives.[3]

- Among adult women surveyed in 2010, 26.9% of American Indian/Alaska Natives, 22% of non-Hispanic blacks, 18.8% of non-Hispanic whites, 14.6% of Hispanics, and 35.5% of women of multiple races experienced an attempted or a completed rape at some time in their lives.[1]



**Exhibit 39, page 1**

# Sexual Violence Facts at a Glance

## Non-fatal Injuries, Medical Treatment, and Health conditions

- Among sexual violence victims raped since their 18th birthday, 31.5% of women and 16.1% of men reported a physical injury as a result of a rape. 36.2% of injured female victims received medical treatment.[4]

- During 2004-2006, an estimated 105,187 females and 6,526 males aged 10-24 years received medical care in U.S. emergency departments as a result of nonfatal injuries sustained from a sexual assault.[5]

- Based on 2005 data from the Behavioral Risk Factor Surveillance System (BRFSS), for both women and men, links were found between history of nonconsensual sex and high cholesterol, stroke and heart disease; female victims of nonconsensual sex were more likely to report heart attack and heart disease compared to non-victims.[6]

- Rape results in about 32,000 pregnancies each year.[7]

- Among female victims of partner violence who filed a protective order, 68% reported they were raped by their intimate partner and 20% reported a rape-related pregnancy.[8]

## References

1. Black MC, Basile KC, Breiding MJ, Smith SG, Walters ML, Merrick MT, Chen J, Stevens MR. The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 Summary Report. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention; 2011.

2. Krebs CP, Linquist CH, Warner TD, Fisher BS, Martin SL. College women's experiences with physically forced, alcohol- or other drug-enabled, and drug-facilitated sexual assault before and since entering college. Journal of American College Health 2009; 57(6):639-647.

3. Centers for Disease Control and Prevention. 1991-2011 High School Youth Risk Behavior Survey Data. Available at http://apps.nccd.cdc.gov/youthonline. Accessed on 8/24/2012.

4. Tjaden P, Thoennes N. Extent, nature, and consequences of rape victimization: Findings from the National Violence Against Women Survey. Washington: US Department of Justice; Publication No. NCJ210346; 2006.

5. CDC. Sexual and Reproductive Health of Persons Aged 10-24 years —United States, 2002-2007. MMWR 2009; 58(ss06):1-58. Available from: www.cdc.gov/mmwr/preview/mmwrhtml/ss5806a1.htm

6. Smith SG. Breiding MJ. Chronic disease and health behaviours linked to experiences of non-consensual sex among women and men. Public Health 2011; 125:653-659.

7. Holmes MM, Resnick HS, Kilpatrick DG, Best CL. Rape-related pregnancy: estimates and descriptive characteristics from a national sample of women. American Journal of Obstetrics and Gynecology 1996; 175:320-324.

8. McFarlane J, Malecha A, Watson K, Gist J, Batten E, Hall I, & Smith S. Intimate partner sexual assault against women: Frequency, health consequences & treatment outcomes. Obstetrics and Gynecology 2005; 105(1):99-108.



# *Acquaintance Rape Resource Guide*

Sexual assault is an unfortunate reality on this campus and on campuses nationwide. At Miami, a variety of programs are aimed at increasing awareness of sexual assault and supporting students who report sexual assaults. Unfortunately, many students are unaware that the overwhelming threat of sexual assault is not from strangers, but from individuals they know or have just met. This summary is designed to provide a basic guide to university resources regarding sexual assault.

## How severe is the problem?

The 2007 U.S. Department of Justice National Crime Victimization Study shows that 248,300 rapes were reported in the U.S. during that year—a statistic suggesting that every two minutes, someone is sexually assaulted in the U.S. Futhermore, sexual assaults are vastly underreported; it is estimated that only 5 to 40 percent of rapes are reported (Rape and Sexual Assault: Reporting to Police and Medical Attention; Bureau of Justice Statistics, 2000).

A 2004 study conducted at 119 colleges (http://archive.sph.harvard.edu/cas/Documents/rapeintox-pressRelease/) found that one in 20 college women reported being raped during the school year and almost 75 percent of victims said they were intoxicated when the assault occurred. The study was conducted by researchers at the Harvard School of Public Health Alcohol Study, Saint Joseph's University, and the University of Arizona.

National statistics vary, but officials agree that most college women know their attackers and that most attacks go unreported.

A 2000 U.S. Department of Justice study on the sexual victimization of college women reports that 2.8 percent of those surveyed were the victims of rape or attempted rape per academic year and about 90 percent knew their attackers. On a campus of 10,000 women, that's 280 rapes or attempted rapes each academic year. However, the study further found that less than 5 percent of sexual assaults are reported to police.

Miami provides complete information on crime statistics (../../annual-report/crime-stats/index.html) for all campuses as well as the City of Oxford. When reviewing statistics, remember that many more sexual assaults occur here and elsewhere than are reported.

## What can I do to reduce my risk of being sexually assaulted?

Educating yourself about the problem is a good first step! Programs established to promote awareness among men and women regarding sexual assault include the following:

- **Women Against Violence and Sexual Assault (WAVES)**\*—This student organization began during the

Exhibit 40, page 1

2007–2008 school year to promote awareness and education about issues surrounding sexual violence.

- **Men Against Rape and Sexual Assault (MARS)**\*—This program began during the 2001–2002 school year to address rape as a men's issue. Male students meet in small, all-male groups to discuss how men can make a difference.

- **Summer Orientation Programming**—In Summer 2001, a program for parents and students addressing sexual assault among college students was incorporated into orientation for first-year students. Stressing the fact that most sexual assaults on campus involve acquaintances, the program includes information on what constitutes consent and facilitates discussion of risk reduction and prevention. The student segment includes a skit portraying the dynamics involved in acquaintance rape situations.

- **Nighttime Door to Door**—This service provides a safe escort for students. An escort can be obtained from 6 p.m. to 2 a.m. Monday through Wednesday and until 4 a.m. the rest of the week. Call 529-2277.

- **Miami Police Victim Services**—Website information (http://www.units.miamioh.edu/police/safety-tips-resources-and-services/services-offered/victim-services) includes answers to questions commonly asked by sexual assault survivors.

- **Rape, Abuse, and Incest National Network**—This resource provides support for sexual assault victims and their loved ones through two hotlines: 800-656-HOPE and online.rainn.org (http://apps.rainn.org/ohl-bridge/).

\*Any student, staff, or faculty member can request an educational/interactive program by calling 529-1870.

# What if I'm sexually assaulted or know someone who is?

- **Seek medical help.** Your physical health should be your first priority. McCullough-Hyde Memorial Hospital in Oxford has specially trained sexual assault nurse examiners. Victims are not billed for services. Survivors of sexual assault at Miami are also strongly encouraged to report it to police. Even if you don't know whether you want to prosecute, reporting will ensure the collection of evidence and the documentation of facts while they are still fresh in your mind.

- **Check out police resources.** The Miami and Oxford Police have adopted a list of promises (http://www.units.miamioh.edu/police/safety-tips-resources-and-services/services-offered/victim-services) to survivors of sexual assault, including a pledge to treat every victim with respect and sensitivity and a pledge to take every case seriously and to investigate it thoroughly. Police also promise to assist victims as they navigate the legal system.

- **Find support through the Butler County Rape Crisis Program**. A service of the Community Counseling and Crisis Center, this program (http://www.communitycounselingandcrisiscenter.org/index.php?section=rape&page=home) provides confidential immediate and long-term support for sexual assault victims.

- **Contact the victim advocate on campus.** The coordinator of Sexual Assault Prevention and Response Programs can offer support and inform you of available options. Call 529-1870.

- **Seek counseling.** Counseling is available 24 hours a day by calling the Butler County Rape Crisis hotline

- Students may also seek assistance from Miami's Student Counseling Service by calling 529-4634. On-call counselors can be reached at any time through the university police dispatcher.

- **Report the crime.** Although victims are encouraged to pursue a criminal case, those who choose not to can still file a report with the Office of Ethics and Student Conflict Resolution (if the accused is a student). In either case, the reports are included in the university's crime statistics. Cases may be pursued simultaneously in criminal court and by the Office of Ethics and Student Conflict Resolution.

- **Know Miami protocol.** Pick up a copy of the brochure, "Important Information for Miami Students About Sexual Assault Programs and Services," available from any of the offices listed at the end of this publication. Working with the Women's Center, the Student Counseling Service, and Miami Police, the Office of Ethics and Student Conflict Resolution established protocol for working with sexual assault victims. It ensures that victims' medical needs are taken care of, that victims know what support services are available and that they are provided with information about various ways charges can be pursued (civil, criminal, campus judicial system).

## What are the differences between campus disciplinary and criminal proceeding?

Both Miami's code of conduct and the criminal system operate under the assumption that an accused is innocent until proven guilty. However, the standard of proof in disciplinary proceedings is "preponderance of evidence," a less stringent one than "proof beyond a reasonable doubt," which is required for criminal proceedings. Preponderance of evidence requires that the facts establish the likelihood that the offense was committed by the accused person, while certainty must be established to prove guilt beyond a reasonable doubt.

## What happens to charges of sexual assault that are handled in the university's judicial system?

Outcomes range from dismissal from the university to a finding of not responsible. For example, in a recent academic year, the university judicial system dealt with four alleged sexual misconduct violations. Two accused students were dismissed from the university; one was suspended, and the other was found not responsible. Criminal charges were pursued in two of the cases, but the grand jury did not return an indictment.

College disciplinary systems are not meant to be a substitute for the courts. They are a method for enforcing standards of behavior—standards that are often higher than those required by criminal law. Students who choose to pursue internal disciplinary action are informed of and urged to also seek redress via criminal proceedings. Criminal charges and internal disciplinary proceedings can occur simultaneously.

# Suggestions and Comments

Your suggestions and comments on programs to combat sexual assaults are encouraged. Please send them to sexualassaults@MiamiOH.edu (mailto:sexualassaults@miamioh.edu).

**Exhibit 40, page 3**

# For More Information

Coordinator of Sexual Assault Prevention and Response Programs: 529-1870

Miami Police: 529-2222

Office of Ethics and Student Conflict Resolution: 529-1417

Dean of Students: 529-1877

Women's Center: 529-1510

Student Counseling Service: 529-4634

Butler County Rape Crisis Program: (513) 381-5610 or tollfree, 877-889-5610

*Issued by the Institutional Response Team*

---

©2015 Miami University. All rights reserved.

Privacy Statement (http://miamioh.edu/about-miami/pubs-policies/privacy-statement/index.html)

Family Consumer Information (http://miamioh.edu/about-miami/pubs-policies/consumer-info/index.html)

Accessibility Needs (https://www.units.muohio.edu/oeeo/node/128)

Report a Problem With This Website (http://miamioh.edu/includes/problem/index.html)

Annual Security and Fire Safety Report (http://miamioh.edu/campus-safety/annual-report/index.html)

A to Z Listing (http://miamioh.edu/a-to-z/index.html)

Employment (http://miamioh.edu/jobs)

**PRINT**

**Tandy Hamm**

| | |
|---|---|
| **Subject:** | Armstrong Student Center Training |
| **Location:** | Anna Symmes/Carolyne Harrison Rooms, Shriver Center |
| **Start:** | Wed 1/22/2014 10:30 AM |
| **End:** | Wed 1/22/2014 12:30 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Organizer:** | Tandy Hamm |

Hi Tandy,

We have your session scheduled for 11am on Wednesday Jan 22 in the Anna Symmes/Carolyne Harrison Rooms in the Shriver Center. They will have a projector for you. I also probably have enough green folders (23) left over from the last session that I can bring for the students.

Let me know if you need anything else!

Thanks,
Chad

**Exhibit 41, page 1**

## Title IX Education & Awareness Program



MIAMI UNIVERSITY

---

## Contact Information

Sexual Assault Prevention & Response
Services
Health Services Center, 104
Oxford, OH 45056
getsonra@miamioh.edu

The Office of Equity & Equal Opportunity
Hanna House
219 E. Spring Street
Oxford, OH 45056-2816
(513) 529-7157
(513) 529-7158 (fax)
http://www.muohio.edu/oeeo

Rebecca A. Getson, RAAS
- Sexual Assault Response Coordinator
- Deputy Title IX Coordinator for
  Student Sexual Assault
- Advisor to WAVES

Kenya D. Ash
- Director of OEEO, Title IX Coordinator & Section
  504/ADA Coordinator

Tandy L. Hamm
- Associate Director



MIAMI UNIVERSITY

1

**Exhibit 41, page 2**

## Office of Student Wellness and Sexual Assault Prevention and Response Services

The Office of Student Wellness and Sexual Assault Prevention and Response Services ("SAPRS") offers consistent, relevant, and accurate risk reduction, awareness, and prevention information, resources, and education to the Miami University community; in order to prepare students for safe, effective, and caring leadership within and beyond the university. The SAPRS will respond promptly and effectively to reports of sexual assault, domestic violence, dating violence, and stalking.



MIAMI UNIVERSITY

## The Office of Equity and Equal Opportunity

The Office of Equity and Equal Opportunity ("OEEO") exists to provide an inclusive, equitable, working, living, and learning environment to members of the Miami University community. OEEO provides members of the community a place to obtain guidance for providing equal opportunity in personnel matters, and to resolve issues of harassment and discrimination.

Miami University Policy Information Manual 3.6, Policy Prohibiting Harassment and Discrimination states the University will not tolerate harassment or discrimination on the basis of sex (including sexual harassment, sexual violence, sexual misconduct, domestic violence, dating violence or stalking), race, color, religion, national origin, disability, age, sexual orientation, gender identity, pregnancy, military status, or veteran status.



MIAMI UNIVERSITY

2

**Exhibit 41, page 3**

## Why are we here?

**Why are we here?**

- Discrimination;
- Sexual Harassment;
- Sexual Misconduct (including Sexual Assault);
- Relationship Violence (including Domestic Violence and Dating Violence); and,
- Stalking.



MIAMI UNIVERSITY

## Learning Outcomes

**Learning Outcomes:**

- Identify types of abuse;
- Understand and be able to outline reporting procedure;
- Identify services provided by the Sexual Assault Prevention and Response Services and Title IX; and,
- Understand the functions of the student groups associated with the Sexual Assault Prevention and Response Services.



MIAMI UNIVERSITY

3

**Exhibit 41, page 4**

## *Discrimination*

Discrimination:

Conduct that is based on a person's sex (including sexual harassment, sexual violence, sexual misconduct, domestic violence, dating violence, or stalking), race, color, religion, national origin, disability, age, sexual orientation, gender identity, pregnancy, military status, or veteran status that:

1. Adversely affects a term or condition of a person's employment, education, living environment or participation in a University activity; or

2. Is used as a basis for or a motivating factor in decisions affecting the person's employment, education, living environment or participation in a University activity.



MIAMI UNIVERSITY

## *Sexual Harassment*

Sexual Harassment:

Conduct that is based on a person's sex (including sexual harassment, sexual violence, sexual misconduct, domestic violence, dating violence, or stalking) that has the purpose or effect of unreasonably interfering with a person's employment or educational experience or creates an intimidating, hostile, offensive working, educational or living environment.



MIAMI UNIVERSITY

4

**Exhibit 41, page 5**

## Sexual Harassment

**Sexual Harassment:**

Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.

Sexual harassment is defined as unwelcome verbal, non-verbal, visual, written or physical conduct of a sexual nature that is so severe, pervasive or persistent that it affects the working, living, or learning conditions or creates a hostile working, living or learning environment.

Sexual harassment includes offensive and unwanted conduct based on the person's sex or sexual orientation, including requests for sexual favors and other physical or verbal conduct of a sexual nature, sexual violence including rape, sexual assault, sexual battery and sexual coercion.



MIAMI UNIVERSITY

## Sexual Harassment Examples

**Verbal:**
- Asking about sexual orientation;
- Obscene telephone calls;
- Sexually suggestive jokes, innuendoes, derogatory, degrading, or sexist remarks about person's body, clothing or sexual activities;
- Suggestive or insulting sounds, whistles, catcalls; and,
- Unwelcome demands, propositions or subtle pressure for sexual favors.

**Non-Verbal Conduct:**
- Inappropriate display of sexually suggestive objects, pictures, videotapes, audio recordings, and/or literature;
- Leering, gazing, sneering in a sexually suggestive manner;
- Making obscene gestures and/or facial expressions of a sexual nature;
- Sexual exhibitionism; and,

**Physical Conduct:**
- Assault, impeding or blocking movement; inappropriate touching of a person or person's clothing; kissing, hugging, patting, stroking and handholding;
- Attempted rape or rape;
- Back rubs or "shoulder massages,"
- Invading another person's personal space; and,
- Forced sexual activity of any kind.



MIAMI UNIVERSITY

5

**Exhibit 41, page 6**

## Sexual Harassment Examples Continued

**Written:**
- Displaying of sexual objects, pictures, written materials, or cartoons;
- Graffiti;
- Sending, forwarding or soliciting sexually suggestive letters, notes, emails, or images; and,
- Use of sexual epithets, written references to sexual conduct, gossip regarding one's sex life.

**Visual Conduct:**
- Explicit films, videos, web-site printouts;
- Photocopies of genital or other body parts; and,
- Posters, drawings pictures, screensavers or emails of a sexual nature (e.g., pin-ups).



MIAMI UNIVERSITY

---

## Sexual Misconduct

- **Higher Education:**
  - 20-25% of women experience an attempted or completed rape during college.
    - 9 out of 10 know the perpetrator.
  - 1 in 33 men experience an attempted or completed rape in their lifetime.

- **Miami University:**
  - 16,000 students on Oxford Campus
  - If ½ are women........
    1,600-2,000 women on the Oxford campus...........

(NIJ, Bureau of Justice Stats)



MIAMI UNIVERSITY

6

**Exhibit 41, page 7**

## *Sexual Misconduct*

**Sexual Misconduct:**

- Any sexual conduct directed against another person, forcibly and/or against that person's will; OR where the victim is incapable of giving consent.

**Sexual Assault:**

- Forcible Sex Offenses: any sexual act directed against another person, forcibly and/or against that person's will; OR not forcibly or against the person's will where the victim is incapable of giving consent
- Non-Forcible Sex Offenses: unlawful, non forcible sexual intercourse



MIAMI UNIVERSITY

## *Sexual Misconduct Examples*

**Examples:**

- Forcible Fondling;
- Forcible Sodomy;
- Incest;
- Indecent exposure;
- Non-consensual sexual contact;
- Non-consensual sexual intercourse;
- Rape;
- Sexual activity occurs while a person is incapacitated or unable to consent;
- Sexual assault/misconduct with an Object;
- Sexual exploitation;
- Sexual violence/abuse;
- Unwanted kissing; and,
- Threat or coercion is used.



MIAMI UNIVERSITY

7

**Exhibit 41, page 8**

## *Relationship Violence*
## *Including Domestic Violence and Dating Violence*

**Domestic and Dating Violence Statistics:**

- Every 9 seconds in the US a woman is assaulted or beaten.
- 57% of students who report having been in an abusive dating relationship indicated it occurred in college.
- 1 in 5 college women report actual physical abuse, sexual abuse, or threats of physical violence.
- 43% of dating college women report experiencing some violent and abusive dating behaviors, including sexual, technology, verbal, or controlling abuse.

www.ncadv.org


MIAMI UNIVERSITY

## *Relationship Violence*
## *Including Domestic Violence and Dating Violence*

**Domestic Violence:**

The term "domestic violence" includes felony or misdemeanor crimes of violence committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitating with the victim as a spouse, by a person similarly situated to a spouse of the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.


MIAMI UNIVERSITY

**Exhibit 41, page 9**

## Relationship Violence
### Continued

**Dating Violence:**

The term "dating violence" means violence committed by a person-
- Who is or has been in a social relationship of a romantic or intimate nature with the victim; AND
- Where the existence of such a relationship shall be determined based on a consideration of the following factors:
  - The length of the relationship.
  - The type of relationship.
  - The frequency of interaction between the persons involved in the relationship.


MIAMI UNIVERSITY

## Relationship Violence
### Examples

**Physical:**
- Grabbing;
- Hitting (with or without objects);
- Kicking;
- Pinching;
- Punching;
- Shoving;
- Slapping; and,
- Withholding sleep, food/drink, and/or medical care.

**Sexual:**
- Any sexual misconduct;
- Coerced sexual activity;
- Rape; and,
- Unwanted kissing/touching.

**Emotional:**
- Harassment;
- Insults;
- Intimidation;
- Menacing;
- Name-calling;
- Stalking; and,
- Threaten harm to partner, self, or others.

**Environment:**
- Controlling Finances;
- Destruction of property;
- Isolation from friends/family;
- Messing with school and/or work attendance; and, and/or assignments.


MIAMI UNIVERSITY

9

**Exhibit 41, page 10**

## Stalking

**Stalking:**

- 1 in 6 women & 1 in 19 men have experienced stalking victimization in their lifetime in which they felt fearful or believed that they or someone close to them would be harmed or killed.
- The majority of stalking victims are stalking by someone they know. 66% of female victims and 41% of male victims of stalking are stalked by a current or former intimate partner.
- More than half of female victims and more than 1/3 of male victims of stalking indicated that they were stalked before the age of 25.
- 46% of stalking victims experience at least one unwanted contact per week.

www.victimsofcrime.org



MIAMI UNIVERSITY

## Stalking Continued

**Stalking:**

The term "stalking" means engaging in a course of conduct directed at a specific person that would cause a reasonable person to....

    A. Fear for his or her safety or the safety of others; OR
    B. Suffer substantial emotional distress.



MIAMI UNIVERSITY

10

**Exhibit 41, page 11**

## Stalking Examples

Examples:

- Call your employer or professor;
- Constantly calls and hang up;
- Damage home, car or property;
- Leave unwanted items, gifts, or flowers;
- Show up at home/work unannounced or uninvited;
- Spread rumors about you;
- Unwanted text messages, letters, emails, telephone calls and voicemails;
- Use social networking sites and technology to track you; and,
- Wait at places you hang out.



MIAMI UNIVERSITY

## Miami University Code of Student Conduct Consent

Consent must be voluntary. An individual cannot consent who is substantially impaired by any drug or intoxicant; or who has been compelled by force, threat or force, or deception; or who is unaware that the act is being committed; or whose ability to consent is impaired because of a mental or physical condition; or who is coerced by supervisory or disciplinary authority. Consent may be withdrawn at any time. Prior sexual activity or relationship does not, in an of itself, constitute consent.



MIAMI UNIVERSITY

11

**Exhibit 41, page 12**

## *Miami University Response*
### *Understanding and being able to outline the reporting procedure.*

### Basics

- MUPD must be notified
- Deputy Title IX Coordinator for Student Sexual Assault will make contact
- Options for victim/survivors:
  1. Work with Coordinator for support/resources and/or;
  2. Report to police for possible criminal charges and/or;
  3. Complaint with OESCR
- Amnesty
  - Limited amnesty to students who have been the victim of sex-based offenses
- Protocol
  - Available online
  - www.miamioh.edu/campussafety/sexual-assault/protocol


MIAMI UNIVERSITY

## *Miami University Response*
### *Understanding and being able to outline the reporting procedure.*

| Immediate | Longer Term |
|---|---|
| - **Contact MUPD to disclose**; | - Deputy Title IX Coordinator will: |
| - Report MUST be made to University (Title IX) AND Police (Clery); |   - Review procedures; Discuss options; Provide information regarding services; Discuss accommodations; Accompany through the process; and, Ongoing point on contact. |
| - Emergency Notification MUST be completed quickly for certain crimes; | - Accommodations; |
| - Within 72 hours of the incident, encouraged to seek emergency medical care; and, | - Investigation by Dean of Students/Designee; |
| - Within 24 hours of receiving a report, the Deputy Title IX Coordinator will be in contact with the victim/survivor. | - Complaint with OESCR; and, |
| | - Legal Options. |


MIAMI UNIVERSITY

**Exhibit 41, page 13**

12







Know your Rights & Responsibilities!
(513) 529-7157



13

**Exhibit 41, page 14**

**2011**

| Name | Violation | | | |
|---|---|---|---|---|
| Antonio ▓ | 103A (Sexual Misconduct) | | | |
| Antonio ▓ | 103A (Sexual Misconduct) | | | |
| John T. ▓ | 103A (Sexual Misconduct) | | | |
| Patrick ▓ | 103A (Sexual Miscondcut) | | | |

**2012**

| Name | Violation | | | |
|---|---|---|---|---|
| Kayla ▓ | 103A (Sexual Miscondcut) | | | |
| Jacob ▓ | 103A (Sexual Misconduct) | | | |
| Tyler ▓ | 103A (Sexual Misconduct) | | | |
| Cornelius ▓ | 103A (Sexual Miscondcut) | | | |

**2013**

| Name | Violation | | | |
|---|---|---|---|---|
| Andrew ▓ | 103A (Sexual Miscondcut) | | | |
| Brett ▓ | 103A (Sexual Misconduct) | | | |
| Kevin ▓ | 103A (Sexual Miscondcut) | | | |
| Aaron S. ▓ | 103A (Sexual Miscondcut) | | | |
| Jacob B. ▓ | 103A (Sexual Miscondcut) | | | |
| Matthew ▓ | 103A (Sexual Miscondcut) | | | |
| Daniela ▓ | 103A (Sexual Miscondcut) | | | |

**2014**

| Name | Violation | | |
|---|---|---|---|
| Thomas ▓ | 103A (Sexual Miscondcut) | | |
| Alexander ▓ | 103A (Sexual Miscondcut) | | |
| Spencer ▓ | 103A (Sexual Miscondcut) | | |
| Jeremy ▓ | 103A (Sexual Miscondcut) | | |
| Robert ▓ | 103A (Sexual Miscondcut) | | |

**Exhibit 42, page 1**

# Miami University failed to protect student from rape, lawsuit claims

**BY:** Greg Noble (mailto:gregory.noble@wcpo.com)
**POSTED:** 4:28 PM, Nov 12, 2013
**UPDATED:** 6:39 PM, Nov 12, 2013

HAMILTON, Ohio – The rape of a Miami University student could have been prevented if the university had expelled the alleged attacker for prior misconduct, a lawsuit against the university claims.

Three years before the alleged attack, another woman had reported to Miami that the same man had raped her, and two years before, police had investigated him for secretly videotaping consensual sex with students and showing the videos to others, without the women's consent, according to the lawsuit filed by attorney Eric Deters.

But a search of Butler County court records Tuesday found no evidence that criminal charges were filed against the accused attacker in any of those instances – or in the rape accused in the lawsuit.

The suit claims two fraternity brothers told Oxford police about the videotaping and that the student was kicked out of the frat house as a result and moved into a dorm.

**Exhibit 43, page 1**

Acting on the tip, police searched his dorm room and found three such videos on his computer, the suit says.

The videos constituted evidence of voyeurism, an Oxford detective wrote in his report.

Then Miami University President David C. Hodge disagreed that in a letter

Receive top stories directly to your inbox.
Sign up for our Good Morning Tri-State newsletter.

close

Type your email

With all due respect, the Oxford police have already investigated this matter. We do not have any information to show that (name withheld by WCPO) committed any act of voyeurism on this campus or that the unidentifiable women on the videos on his computer were Miami students or were being recorded without their consent."

According to the suit, the father of the alleged victim wrote back to Hodge: "I am not sure why it matters at all if these were MU students being recorded, although the likelihood of it being non-students would seem remote. It is still a felony being committed."

WCPO is not naming the persons identified in the lawsuit.

Deters' client says she was raped in October 2011. The first rape complaint was reported to Miami in 2008, the suit says. Police conducted the voyeurism investigation in 2009, according to the police report.

**Exhibit 43, page 2**

One frat brother told police that the accused student showed him how he secretly videotaped sex in his room and that he had seen the videos. Officers confiscated beer and alcohol from the accused student's dorm room during their search, the police report said.

The suit charges that Miami should have expelled the alleged attacker for violating the Student Code of Conduct, and yet it did nothing to discipline the student until he allegedly attacked Deters' client.

Miami did expel him after she reported the rape, the university told 9 On Your Side on Tuesday.

The university issued this statement Tuesday in response to the suit:

"Miami University is committed to holding individuals accountable for their behavior, and to providing extensive support for victims of sexual assault. The safety of our students is our highest priority. The claim that the University failed to take appropriate action or was somehow negligent is simply not true. While the University does not believe it is appropriate to publicly discuss the details of the case, the University emphatically denies that it could have prevented the assault of (name withheld by WCPO).

"When a victim reports sexual misconduct, Miami University moves swiftly, offers a vast array of (support services) to the victim and, with the cooperation of the victim, takes appropriate disciplinary action if the accused is a student. Within days of receiving a report, the university will often summarily suspend the accused student pending resolution of the

**Exhibit 43, page 3**

disciplinary complaint. In (name withheld) case, Miami responded immediately and gave the accused student the maximum penalty and permanently dismissed (name withheld) from the university."

Deters did not immediately return a call from WCPO.

The suit, filed in Butler County Common Pleas Court, asks for punitive damages.

**See Miami's policy on sexual assault at**

http://www.miamioh.edu/sexualassault
(http://www.miamioh.edu/sexualassault)

Copyright 2013 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**Exhibit 43, page 4**

Monday, May 4, 2015 | 3:19 p.m.

Subscribe | ePaper

Updated: 9:11 a.m. Thursday, Nov. 14, 2013 | Posted: 5:38 p.m. Wednesday, Nov. 13, 2013

Q  👤  f  y

## Lawsuit: Miami U. failed to protect student from rape



Greg Lynch

By Lauren Pack

Staff Writer

A Cincinnati woman has filed suit against Miami University claiming her sexual assault could have have been prevented if the university had expelled her alleged attacker after an investigation into prior offenses.

The suit filed last month in Butler County Common Pleas Court by attorney Eric Deters claims three years before the alleged assault in 2011, another woman reported she had been attacked by the same male and that police had investigated him for videotaping sexual encounters with women.

Two fraternity brothers told Oxford police about the student surreptitiously videotaping sexual encounters with various students, and he was put out of the frat house moving into a dorm room, according to the suit.

When university and Oxford police searched the student's room in October 2009, they seized a number of items, including a computer and a smart phone. Three videos of his sexual encounters with females were also found, but faces of the women were not visible, according to the police report.

In February 2010, Oxford Police Detective Geoff Robinson wrote, "while there is evidence of voyeurism as evident in the computer forensic exam, identification of any victims does not seem possible at this juncture."

"At the time, Miami had in place a code of student conduct that specifically prohibited voyeurism, including the use of video recording devices," the suit says.

In a letter to the victim's father in January 2012, Miami University President David C. Hodge wrote, " To the best of our knowledge, the Oxford Police Department was unable to confirm there had been any non-consensual recordings of (the male) and unidentified partners' sexual encounters stored on (the male's) computer. While a person might suspect the recordings were not consensual, the law and our policies require that there be be credible and reliable evidence that a crime or violation of code of student conduct has been violated before we can impose sanctions."

The university issued a statement in response to the suit and said the student was expelled after the rape was reported.

"Miami University is committed to holding individuals accountable for their behavior, and to providing extensive support for victims of sexual assault. The safety of our students is our highest priority. The claim that the University failed to take appropriate action or was somehow negligent is simply not true. While the University does not believe it is appropriate to publicly discuss the details of the case, the University emphatically denies that it could have prevented the assault of (the victim), the statement says.

"When a victim reports sexual misconduct, Miami University moves swiftly, offers a vast array of support services to the victim and, with the cooperation of the victim, takes appropriate disciplinary action if the accused is a student. Within days of receiving a report, the university will often summarily suspend the accused student pending resolution of the disciplinary complaint. In (victim's) case, Miami responded immediately and gave the accused student the maximum penalty and permanently dismissed (him) from the university.

The suit is requesting all compensatory and punitive damages. It is assigned to Judge Patricia Oney, but a court date has not yet been set.

More News

### You Might Also Like

- Health systems face off in Butler-Warren expansions
- #GarlandShooting: Latest photos, videos from the scene in Texas
- Baltimore mom faces backlash for slapping rioting son
- Former SEC football player charged with murder for child's death
- 1 injured in Madison Twp. crash
- Bar won't have liquor license revoked

### Promoted Stories

- A popular new site reveals the truth about anyone's past. Simply enter name and state to see what is available online. What will you learn today? (Instant Checkmate)
- This Guy Found a Trap Door In His New Apartment. What He Found Is Hauntingly Awesome. (Viral Nova)
- Black Mayor Is Voted In and a Small Town's Staff Empties Out (The New York Times)

**Exhibit 43, page 5**

- **12 Weirdest Celebrity Deaths Ever** (Answers.com)
- **At Home with Lynda Carter** (VIVE)
- **21 Smartest People In The World...#4 Will Shock You!** (Pressroom VIP)

Recommended by

## Comments

If you would like to post a comment please Sign in or Register

[                    ] [ Cancel ] [ Edit comment ]

5 Comment(s)
Comment(s) 1-5 of 5



- Posted by AndreaGlock at 6:47 p.m. Nov. 13, 2013
- Report Abuse

So, the plaintiffs believe that the university should be able to act on innuendo when the police cannot find evidence? As much as my heart bleeds for the victim here, this lawsuit seems unjustified on its merits.

- Posted by PRevere2013 at 8:38 p.m. Nov. 13, 2013
- Report Abuse

An attorney can't file a case on innuendo, they'd get disbarred.

There are police reports, witnesses, and video tapes. Universities don't have the same legal standard as the Court System does. This University is likely in for a battle on this one. The police officer said that their was evidence of voyeurism. Seems simple enough to me.

- Posted by willmuny at 9:27 p.m. Nov. 13, 2013
- Report Abuse

AndreaGlock: I notice you have a hard time comprehending what you read. On another note, conceal and carry might have prevented this.

- Posted by GoofyJim at 8:43 a.m. Nov. 14, 2013
- Report Abuse

Give me a break I usually do not agree with Andrea but come on. What happened to innocent till proven guilty? So what would you say if Miami did not let him go to school just because he was accused of doing something? I am sure of you people would then say how they cannot let him in school because he has not been proven guilty of such acts.

There should be no way this lawsuit should have any merit, but do to the stupidity of people today I would not be surprised to be proven wrong.



My point is no wonder costs are going out of control because if everyone and everything has to be worried about this kind of stuff they have to keep money back for whatever type of liability someone want to claim on a person or company.

- Posted by Commonsenseandreason at 3:39 p.m. Nov. 15, 2013
- Report Abuse

I have to agree with the majority. The police said there was evidence of voyeurism. Obviously that evidence did not amount to probable cause for arrest, nor enough for the prosecutor to take to a grand jury to seek indictment. If they University threw everyone out who had an accusation of some kind against them they would have far fewer students

The responsibility for this assault lies with the criminal and no one else. No one has the responsibility to protect you. It's unfortunate that government has allowed the university to take away tools that someone could use to defend themselves, such as a lawfully possessed fire arm. They are still not at fault.

5 Comment(s)
Comment(s) 1-5 of 5

**Exhibit 43, page 6**

41919 Deals | Business Spotlight | Contests | Healthwise | Home Pros | Skycam Network





**77°**
Broken Clouds
Lawrenceburg          FULL FORECAST

Search

# Lawsuit claims Miami failed to protect student from campus rape

*Posted: Nov 12, 2013 5:46 PM EST*
*Updated: Nov 12, 2013 10:21 PM EST*

**Posted by FOX19 Digital Media Staff**   CONNECT

OXFORD, OH (FOX19) - A Miami student claims she is the victim of rape on campus. Now, her family is suing the school for negligence and violation of the school's code of conduct.

The lawsuit states that the university is partially responsible for her rape, which happened back in 2011.

The victim's parents say that former student Antonio Charles should have been kicked out of the school for other offenses long before the alleged rape happened. The victim's father says he wants Miami University Administrators held responsible for a crime that the family claims would not have happened if the university took action.

The family says they decided to take action after criminal charges were dropped against Charles.

"Probably one of the most tragic circumstances in law and in our lives is when something can be avoided, and it's not," says the victim's attorney Eric Deters.

Deters says the school failed to expel Charles, even after Oxford Police opened several criminal charges against him. Before this rape, other females on campus told police that Charles videotaped them without consent during sexual encounters. The cases go as far back as 2009.

"His own fraternity kicked him out," explains Deters. "And these events were reported to the Oxford Police the Miami University Police, and then no action was taken. It's incredible. I mean, they didn't discharge the guy until after these events and I don't understand why they wouldn't have done something much sooner."

The victim and her family want damages.

Meanwhile, school administrators had this to say:

*"Miami University is committed to holding individuals responsible for their behavior and to providing extensive support for victims of sexual assault. The safety of our students is our highest priority. The claim that the University failed to take appropriate action or was somehow negligent is simply not true."*

While Miami University does not believe it is appropriate to publicly discuss the details of the case, the university empathetically denies that it could have prevented the assault.

The university must provide a legal answer to the lawsuit within 30 days of the filing. The civil case will proceed from there.

*Copyright 2013 WXIX. All rights reserved.*

## RECOMMENDED                    Promoted Links by Taboola

Cable TV Is Dying, Here's What Comes Next
The Motley Fool

Police: Woman in online relationship beats man with bat at first meeting

**Exhibit 43, page 7**

**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY OHIO**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **AMY MIRLISENA** | : | **CASE NO.** _____ |
| **11031 Grandstone Lane** | | |
| **Cincinnati, OH 45249** | : | **JUDGE** _____ |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **MIAMI UNIVERSITY, INC.** | : | |
| Serve: Robin Parker | | |
|       501 E. High St. | : | |
|       Oxford, OH 45056 | | |
| (Serve via Certified Mail) | : | |
| | : | |
| **Defendant** | : | |

---

## COMPLAINT WITH JURY DEMAND

COMES NOW Plaintiff, Amy Mirlisena, by and through undersigned counsel, and states the following as her Complaint:

### PARTIES & JURISDICTION

1. At all times relevant, Plaintiff, Amy Mirlisena (hereinafter "Ms. Mirlisena") was a resident of and domiciled in the City of Cincinnati, Hamilton County, State of Ohio.

2. At all times relevant, Defendant Miami University (hereinafter "Miami") was and is a not-for-profit educational institution doing business in the City of Oxford, Butler County, State of Ohio.

3. The subject matter of this Complaint arises out of acts and/or omissions of Miami occurring in the City of Oxford, Butler County, State of Ohio.

**Exhibit 44, page 1**

4. Butler County, State of Ohio is thus the proper venue to grant Ms. Mirlisena the relief she seeks.

## BACKGROUND

5. Ms. Mirlisena incorporates by reference each and every allegation contained within the above paragraphs, and further states:

6. On October 30, 2011, Antonio Charles (hereinafter "Charles"), a student of Miami, sexually assaulted Ms. Mirlisena.

7. Charles was a student of Miami from at least September 2009 to October 2011.

8. In 2008, a woman reported to Miami officials that she had been raped by Charles. (Exhibits 1 (p. 2) , 2, and 3).

9. In September 2009, Charles was turned into Oxford Police Department by two of his fraternity brothers for acts of criminal voyeurism in violation of Ohio Revised Code 2907.08. (Exhibits 4 and 5).

10. In September 2009, Charles was dismissed from his fraternity residence as a result of these voyeurism allegations, and subsequently moved into a Miami dormitory. (Exhibit 4).

11. During Oxford Police Department's voyeurism investigation, Miami and Miami University Police Department became aware through several witnesses' testimony that Charles had surreptitiously videotaped sexual encounters with various females and allowed others to watch such videos without the females' consent (Exhibits 4, 5, and 6).

12. In September of 2009, a fraternity brother of Charles alleged in his statement to Oxford Police that Charles had surreptitiously recorded numerous females, via a

**Exhibit 44, page 2**

process consistent with that described by a second fraternity brother to Oxford Police, while they were engaged in sex acts with Charles, and that Charles had shown these videos to many of his friends. (Exhibit 4).

13. In September of 2009, a second fraternity brother of Charles confirmed in his statement to Oxford Police that he had actually seen the allegedly voyeuristic videos, and described in detail the surreptitious process by which Charles recorded these videos, as described to him by Charles. (Exhibit 5).

14. In September of 2009, a female Miami student alleged in her statement to Oxford Police that Charles had acted in a manner consistent with the surreptitious process described by Charles' fraternity brother during a sexual encounter she had with Charles at the beginning of the 2009-2010 school year. (Exhibit 6).

15. Miami University Police Department became an active participant in the investigation of Charles' voyeurism charges.

16. In October of 2009, a warrant to search Charles' dormitory residence for evidence of offenses described in the warrant was issued to the Oxford Police Department. (Exhibit 7).

17. At that time, Miami University Police received a copy of the search warrant.

18. Miami University Police accompanied Oxford Police to execute a search of Charles' dormitory residence. (Exhibit 2).

19. Miami University Police accompanied Oxford Police during the seizure a number of items, including Charles' MacBook computer and Blackberry phone, to be searched for evidence of voyeurism. (Exhibits 2 and 8).

**Exhibit 44, page 3**

20. Following the seizure, a forensic examination of Charles' computer was conducted by a member of the Miami University Police Department. (Exhibit 9).

21. The examination of Charles' computer uncovered three separate video recordings of unidentified females, whose faces could not be seen in the videos, engaged in sexual conduct with Charles. (Exhibit 9).

22. The same forensic examination uncovered several video still shots, one of which featured the face of a female in the background. (Exhibit 9).

23. The Oxford Police Department's narrative report stated that there was evidence of voyeurism, as evident in the computer forensic exam. (Exhibit 10).

24. At that time, Miami had in place a Code of Student Conduct, which specifically prohibited voyeurism, including the use of video recording devices, as a Code One Offense subject to disciplinary actions. (Exhibit 11, Page 30).

25. At that time, Miami had in place a provision for the summary suspension of students by the University President if the President determines that the continued presence of the student on the University campus poses a significant risk of substantial harm to the health or safety of the student or to others. (Exhibit 11, Page 35).

26. At that time, Miami stipulated in its Student Handbook that a police report would be treated as a complaint for purposes of reporting suspected violations of the Code of Student Conduct. (Exhibit 11, Page 35).

27. According to Miami, disciplinary actions to impose sanctions are implemented when there is credible and reliable evidence that a violation of the Code of Student Conduct has been committed; the conduct does not, however, have to

**Exhibit 44, page 4**

constitute a crime or result in criminal liability for disciplinary action to ensue. (Exhibit 2, Page 2).

28. Disregarding both personal knowledge and police reports establishing that a violation of the Code of Student Conduct had been committed, Miami did not pursue disciplinary actions against Charles.

29. Based upon information and belief, Charles remained a student of Miami University after the 2009 voyeurism investigation.

30. Based upon information and belief, Miami received multiple reports of sexual misconduct involving Charles while he was a student of Miami; however Miami did not pursue disciplinary action on a single report until Ms. Mirlisena's reported incident in October 2011.

31. As a result of these underlying events, Ms. Mirlisena suffered inescapable sexual assault, severe and grievous pain and suffering, emotional distress, and discomfort.

## COUNT I – NELIGENCE

32. Ms. Mirlisena incorporates by reference each and every allegation contained within the above paragraphs, and further states:

33. Miami owed Ms. Mirlisena the duty to exercise ordinary care to protect her from foreseeable danger.

34. Miami was aware that Charles had a history of voyeurism and other sexual misconduct. (Exhibits 1 – 6).

35. Miami could therefore foresee and/or had reason to anticipate that Charles could perpetrate such a violent and heinous crime against Ms. Mirlisena.

**Exhibit 44, page 5**

36. Miami breached the duty it owed Ms. Mirlisena by failing to exercise the degree of skill, care, and diligence an ordinarily prudent university would have exercised under same or similar circumstances through: 1) failure to enforce Miami's Code of Student Conduct on Charles when he was investigated for voyeurism in September 2009; and 2) failure to protect Ms. Mirlisena from Charles' foreseeable and/or reasonably anticipated sexual misconduct.

37. For a period of at least 1 year, 6 months spanning November 2011 - May 2013, Ms. Mirlisena attempted to reconcile amicably with Miami via email. (Exhibits 13 – 15).

38. Ms. Mirlisena requested in her communications with Miami: 1) that the case of Charles be re-opened and further investigated; 2) that there be a review of Miami's handling of the numerous allegations of sexual misconduct against Charles; 3) that some form of restitution or compensation be afforded the victims who were victimized by Charles as a result of Miami's acts and omissions; and 4) that there be proactive and ongoing support for Charles' victims. (Exhibit 13).

39. Miami's failure to honor Ms. Mirlisena's requests or to take any meaningful action whatsoever served to delay successful resolution of this matter and prevent closure and healing for Ms. Mirlisena.

40. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of Miami, Ms. Mirlisena was caused to be sexually assaulted, sustain severe and grievous pain and suffering, emotional distress, and discomfort.

**Exhibit 44, page 6**

## COUNT II – BREACH OF MIAMI UNIVERSITY'S
## 2009-2010 CODE OF STUDENT CONDUCT

41. Ms. Mirlisena incorporates by reference each and every allegation contained within the above paragraphs, and further states:

42. Miami's Code of Student Conduct for 2009-2010 specifically states that voyeurism, including the use of video recording devices, is prohibited sexual misconduct subject to disciplinary actions (Exhibit 11, Page 2).

43. Miami's policy requires that violations of the Code of Student Conduct be supported by a preponderance of the evidence in order to establish responsibility (Exhibit 11).

44. Miami was informed by the Miami University Police Department and Oxford Police Department that one of its students was suspected of surreptitiously videotaping sexual encounters and divulging the videos to others without consent of the persons in the videos.

45. Miami had reliable and credible evidence adduced as a result of the voyeurism investigation to enable Miami to initiate disciplinary action against Charles, in accordance with its Code of Student Conduct.

46. Miami failed to pursue disciplinary actions against Charles, even with a greater weight of the evidence establishing that the offender had violated Miami's Code of Student Conduct.

47. As a result of the aforementioned breach of the Code of Student Conduct, Ms. Mirlisena was caused to be sexually assaulted, sustain severe and grievous pain and suffering, emotional distress, and discomfort.

**Exhibit 44, page 7**

## COUNT III - PUNITIVE DAMAGES

48. Ms. Mirlisena incorporates by reference each and every allegation contained within the above paragraphs, and further states:

49. Ms. Mirlisena was caused to sustain severe and grievous pain and suffering, emotional distress, and discomfort as a result of Miami's acts and/or omissions as alleged in this Complaint.

50. Ms. Mirlisina was caused to feel unsafe suffer crying fits as a result of Miami's acts and/or omissions as alleged in this complaint (Exhibit 12).

51. Ms. Milisina's academic progress and course schedule at Miami was significantly disrupted via dropped and incomplete classes as a result of Miami's acts and/or omissions as alleged in this complaint (Exhibit 13).

52. Pursuant to Ohio Revised Code 2315.21, Ms. Mirlisena hereby brings this separate cause of action for punitive damages for the reckless, wanton, and/or malicious acts or omissions of the Defendant, which proximately, and in fact, was a substantial factor in causing the injuries and damages as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Amy Mirlisena, demands judgment against Defendant, Miami University, for all compensatory and punitive damages, plus costs, as well as all other relief to which she may be entitled.

**Exhibit 44, page 8**

Respectfully Submitted,


Eric C. Deters (0038050)
Eric C. Deters & Partners, P.S.C.
635 West Seventh Street, Suite 401
Cincinnati, OH 45203
Phone: (513) 729-1999
Fax: (513) 381-4084
*Attorney for Plaintiff*


## JURY DEMAND

COMES NOW Plaintiff, Amy Mirlisena, by and through undersigned counsel, and

demands a trial by jury for all issues.


Eric C. Deters (0038050)


**Exhibit 44, page 9**



Dear Dr. Hodge,

I know we have not communicated since May, but please do not take the lack of communication on my part as evidence of my dropping my intention to continue to pursue this matter. I do not intend to drop this matter until it comes to a resolution acceptable to me.

I refer to your letter of May 3, 2012. You state:

> With all due respect, the Oxford Police have already investigated this matter. We do not have any information to show that Mr. Charles' committed any act of voyeurism on this campus or that the unidentifiable women on the videos on his computer were Miami students or were being recorded without their consent. The OPD chose not to reopen the

The MU police and more particularly Miami University had ample information to show that Mr. Charles committed acts of voyeurism. MU had the 3 videos which MU Detective Schneider discovered during his analysis, showing what appeared to be acts of voyeurism.  In addition you had police reports that contained testimony of Mr. Charles methods and illicit behavior.

> digital exam. Det. Schneider was able to recover 3 videos of ████ engaged in sexual encounters with females. The videos do not have faces of the females involved and do not appear to be the complainant, Kristin Fitzgibbon.

These acts and how they were committed were described in detail by one fraternity brother of Mr. Charles as evidence in the Oxford police report and search warrant, which MU police had a copy.

Oxford Detective Robinson's final report even states that there was evidence of voyeurism:

> While there is evidence of voyeurism as evident in the computer forensic exam identification of any victims does not seem possible at this juncture.

In addition, MU Police and MU had signed police reports from Mr. Furse stating just how these videos were made, and that Mr. Charles had bragged about his clandestine sexual escapades. In these reports, there are statements mentioning that multiple other people had viewed and been told the same illicit story by Mr. Charles.  You also had the original complainant that spoke to how Mr. Charles had

**Exhibit 44, page 10**

acted just as Mr. Furse had described (that Mr. Charles had earlier explained to him)

Date: 02/26/2010          Time: 14:02:40

> On September 28, 2009 I met with Dan Furse in reference to a video he had viewed at ████████. Furse stated that ████████ showed him a video recording of ████████ engaged in sexual activity with various females. Furse explained that ████████ had described how he had surreptitiously recorded women that he had brought back to his room at ████████.

> On September 29, 2009 I met with one of the original complainant's in the Voyeurism report, Kristin Fitzgibbon. Fitzgibbon told me that on 2 different nights she engaged in sexual conduct with ████████. During both of those encounters Fitzgibbon stated that ████████ made use of his computer before they engaged in sexual activity. She stated that the screen was blanked out so that she could not see what he was doing. Fitzgibbon verified to me that she did not give ████████ permission to record her in any fashion. Fitzgibbon was told that she was one of the girls in ████████ videos by friends who had seen the videos.

In addition to all of the above you had Mr. Charles illegally possessing alcohol on campus, which I believe, but do not have record of, would have been a second alcohol offense for Mr. Charles.

> recovered. There was also beer and intoxicating liquor found and seized during the search. The computer, digital devices and storage medium were turned over to Det. Schneider, Miami University Computer Forensic Examiner, for exam.

I don't know what the MU's policy was at the time regarding second alcohol offenses, but given the voyeurism accusations and the earlier rape reported, I can only imagine how any individual who had these items reported on his record would have dealt with in the MU disciplinary process.

On top of all of this you had the previously reported offense where a Ms. Magee was reportedly raped by Mr. Charles a year earlier, although I understand that Ms. Magee did not pursue disciplinary action or charges after this was first reported to MU personnel.  Having said this, MU still had the report, which should have been part of MU records on this individual.

So to say that MU did not have ample information to start and pursue disciplinary action against Mr. Charles in 2009 is disingenuous. MU had:

- Sample videos of voyeurism as described by Mr. Charles to Mr. Furse.
  Evidence of voyeurism as described by Detective Robinson.

**Exhibit 44, page 11**

- A likely victim of such an act who could testify as to Mr. Charles modus operandi.
- Un-interviewed other individuals that could have testified along Mr. Furse who Mr. Charles shared his videos and illicit exploits with.
- Evidence of beer and intoxicating liquor.
- A report of previous illicit sexual behavior.

My beef with the University all starts and finishes with the fact that Mr. Charles should have been brought through the MU disciplinary process AT THAT TIME and was not. I find it **unbelievable** that Mr. Charles would have remained a student had he been dealt with at that time. Given that belief, Amy's and Suzanne's attacks lay at MU's feet. Miami University's failure to act and unwillingness to acknowledge and apologize for this failure is **unconscionable.** I do not blame the MU police, as you state in your letter, but rather, I blame MU for not making this an MU disciplinary action...just the presence of alcohol should have dictated that. How can you possibly say otherwise!!! I believe MU Police accompanied Oxford Police on this search, so MU's knowledge of the presence of alcohol cannot be disputed.

Finally, you mention in your letter you can't be sure if these were MU students being recorded without their permission:

With all due respect, the Oxford Police have already investigated this matter. We do not have any information to show that Mr. Charles' committed any act of voyeurism on this campus or that the unidentifiable women on the videos on his computer were Miami students or were being recorded without their consent. The OPD chose not to reopen the

I am not sure why it matters at all if these were MU students being recorded although the likelihood of it being non-students would seem remote. It is still a felony being committed as described by Mr. Charles to Mr. Furse himself. MU had Mr. Furse, who stated that Mr. Charles had bragged that he had done exactly that; videotaped women without their knowledge, and apparently there were many more that could have testified to the same facts. MU had Ms. Fitzgibbon who reported as to Charles' methods as described by Mr. Charles to Mr. Furse.

**Exhibit 44, page 12**

I am attaching the redacted Oxford Police report on this incident. I suggest you read it multiple times, as I have. I also suggest that you view the videos that were found on Mr. Charles computer. While I have yet to view these videos, they have been briefly described to me...women being tossed around like rag dolls...at least one in a semi-conscious state. Once you have done this, I suggest we meet to discuss this once last time, before I pursue other methods to get the resolution I seek.

Sincerely,

John Mirlisena

P.S. I have begun to review some of the information I received from MU. It appears to me that MU has under-reported sex crimes in some prior years. To what extent, I have yet to quantify.



 **MIAMI UNIVERSITY**

OFFICE OF THE PRESIDENT

210 Roudebush Hall
Oxford, OH 45056-3653
513-523-2345
513-529-3911 FAX
www.muohio.edu

January 25, 2012

John Mirlisena
11031 Grandstone Lane
Cincinnati, OH 45239

Dear Mr. Mirlisena,

Thank you for your patience as we collected and reviewed records and consulted with a number of people across campus and Oxford in response to the concerns raised in your email. Your questions have also provided the opportunity to examine our processes connected with student discipline and critical incidents involving sexual assault. Before turning to those issues, though, let me express our deep concern for Amy. I know she returned to school only to face some challenges that caused her to return home before the end of that first week. If there is anything we can do to assist Amy now that she has returned to campus, please let us know.

We deeply share the concerns you have raised and welcome this opportunity to describe what we have found and how we intend to proceed in the future. Please understand that, as with any significant student issue, the University is constrained in its ability to communicate about specific students by a federal law known as the Family Educational Rights and Privacy Act (FERPA). FERPA protects the privacy of students' education records, including disciplinary records, by setting forth strict limitations governing the release of information about students. So to put it more directly, there are some things that federal law prevents us from disclosing to you. Despite these limitations, I want to respond to your email as fully as I can.

It is also not unusual for the victim of a student-on-student sexual assault to tell someone at the University what happened, yet not be willing to disclose her identity or to pursue a formal investigation of the complaint. Without revealing the identity of the victim and/or the willingness of the victim to participate in the process, our ability to pursue criminal charges or University disciplinary action against the alleged offender is severely constrained.

You asked us to clarify the role of the Miami University Police (MUPD) in the investigation and disposition of the 2009 voyeurism report regarding Antonio Charles filed with the Oxford Police Department. At the request of the Oxford Police Department, MUPD officers assisted Oxford Police officers in serving a search warrant on Mr. Charles and an MUPD officer assisted the Oxford Police Department by performing a digital exam of the computer

**Exhibit 44, page 14**

January 25, 2012
Page 2

seized by Oxford Police from the residence hall room of Mr. Charles. To the best of our knowledge, the Oxford Police Department was unable to confirm there had been any non-consensual recordings of Mr. Charles' and his unidentified partners' sexual encounters stored on Mr. Charles' computer. While a person might suspect the recordings were not consensual, the law and our policies require that there be credible and reliable evidence that a crime or violation of the Code of Student Conduct has been committed before we can impose sanctions. Crimes must be proven beyond a reasonable doubt and violations of the Code of Student Conduct must be proven by a preponderance of the evidence.

As part of our investigation, and as you suggested, we also reviewed our records and identified each woman who had previously reported having had unwanted contact with Mr. Charles. Dr. Susan Mosley- Howard, Dean of Students, contacted each woman and informed them of the University's finding that Mr. Charles violated Miami's Code of Student, *Section 103 Sexual Misconduct or Assault* and had been dismissed from the University. We did not identify Amy or otherwise disclose the events leading up to his dismissal.

Dr. Mosley-Howard offered support to each person with whom she spoke and offered to assist the student in pursing criminal charges. While I believe each was appreciative of our efforts, none consented to having their identity revealed or indicated any willingness to pursue criminal charges. We must be respectful of the decision of victims of sexual assault to control the manner in which he or she elects to respond to the incident.

Because Mr. Charles has already been permanently dismissed from the University, there is no additional disciplinary action that can be taken against him by the University. I understand from your email that because of her concern, Amy has contacted another victim. If Amy wants to reach out to the women with whom we spoke, we can, with Amy's written permission, pass along her contact information to anyone with whom we spoke who is willing to receive it. In fact, I believe Dr. Mosley-Howard is already facilitating this with Amy.

We are also meeting with the Oxford Police Department to determine whether we can provide any further assistance in their investigation of Mr. Charles.

We have been engaged since last spring in a campus-wide effort to continue to improve our education of students to help them avoid sexual assault, and our response and support of students who have been assaulted. This past fall the University implemented an enhanced sexual assault protocol that we believe have improved our procedures. As you know, the University can and will discipline students for sexual misconduct irrespective of whether the conduct constitutes a crime, a police report is made, or criminal charges are pursued. We believe that our efforts should not include

January 25, 2012
Page 3

hiring a private investigator as you suggest. Such a serious investigation should be and is the responsibility of police officers.

Sexual assault of students continues to provide a difficult challenge to universities. We believe our greatest weapons in addressing sexual assault is education to help students avoid dangerous situations, to support and assist victims in reporting sexual assault, and taking action against the offender. We are strongly committed to partnering with parents and family members and supporting them in being a part of the preventative education and supportive interventions. Our efforts in this regard are relentless and on-going.

I hope I have provided information that clarifies our processes and the situation. I am also willing to meet with you should you wish to do so. In the meantime, please let Amy know that we have staff available and willing to assist her.

Sincerely,

David C. Hodge
President
hodgedc@muohio.edu

**Exhibit 44, page 16**

EXHIBIT 3 3933

From: John Mirlisena <jmirlisena@yahoo.com>

To: "Hodge, David" <hodgedc@miamioh.edu>

Cc: "dcrain@fbtlaw.com" <dcrain@fbtlaw.com>; "masonda@miamioh.edu" <masonda@miamioh.edu>

Sent: Monday, January 21, 2013 9:28 PM

Subject: Re: Response to your letter to Don Crain

Dr. Hodge,

I just wanted to follow up with information that I believe is compelling.

I made a public records request to get the attached information. Unfortunately, a similar request made to Miami University police to get access to records of the first reported rape was refused by Robin Parker on the following grounds, which in itself defies logic, (but I did not pursue it at the time):

Records maintained by the MUPD fall into two general categories: records created by MUPD for law enforcement purposes which are subject to Ohio's Public Records Act and records created by the MUPD for a non-law enforcement purpose which are education records protected by the Family Educational Rights and Privacy Act (FERPA). FERPA protected records may not be released without the written consent of the student who is the subject of the records or as otherwise provided by federal law ( 34 C.F.R. 99.31)

I have reviewed the records you requested and believe the records were created for a non-law enforcement purpose.

How a rape charge falls under "education records" and covered by FERPA and is not for law enforcement purposes is beyond ridiculous, but that is for another day. This would be a battle easily won in court.

What is persuasive in the attached is that one gentleman reported that Antonio Charles showed him videos and told him how he videotaped these women without their knowledge. Also compelling, is the fact that one women reported that these same actions were performed by Charles during their encounter. While her video was not found, videos of others were found. This information was more than enough to get Charles dismissed immediately from his fraternity and kicked out from his lodging.

With the prior account of Ms. Magee in Miami's files, and this new account of Voyeurism reported to Oxford police, and known to Miami U. police, there is no good reason that a disciplinary hearing was not held and Charles was not kicked off campus. There clearly was enough real and anecdotal evidence. This should have been game, set, and match for Charles, but instead he was left on campus to rape other women, including my daughter and Ms. Jennison on the same weekend in 2011. I believe there were many others from my independent review.

**Exhibit 44, page 17**

Finally, I attach a picture of Charles and a freshman student at West Texas A&M. He has apparently affiliated himself with a fraternity there and may have enrolled there himself. I am sure you are glad this is not your daughter. The picture is from last week. He has quite a record with underclass women doesn't he, but with no criminal record, he keeps on smiling!

Thanks again,

John Mirlisena

From: "Hodge, David" <hodgedc@miamioh.edu>

To: John Mirlisena <jmirlisena@yahoo.com>

Cc: Debbie Mason <masonda@miamioh.edu>

Sent: Tuesday, February 26, 2013 4:18 PM

Subject: A meeting

Dear Mr. Mirlisena,

We have completed thoroughly reviewing all of the issues that you raised in your emails. I would welcome the opportunity to meet with you to discuss our review.

With your permission, I would also include our VP for finance, who is responsible for our police, and the dean of students. We want to be sure that we fully understand your concerns and that we can answer all of your questions.

I have asked my assistant, Debbie Mason, to work with you to arrange a time for us to meet.

Thank you.

David Hodge

**Exhibit 44, page 18**



**EXHIBIT**

4

# OXFORD POLICE DEPARTMENT

## Statement Form

Report No. _____
Event No. _____
Call Time _____
Officer _____

Name (printed) Ethan Konstantin       Date of Birth 05-06-1988

Date 9-22-09

Statement Sophmore [redacted] has been known to film girls while engaging in sexual acts in his room. He opens his laptop with the screen facing his couch, then turns off the screen while the built in video camera is on. He has done this w/ multiple people + has shown the videos to many friends. videos + pictures were taken/recorded on his black mac book & blackberry. This has been going on for at least 9 months and some pictures/videos may have been deleted. He has been kicked out of his residence [redacted] and has until wednesday to move out (wednesday, Sept. 23rd). He was told repeatedly by friends to stop but didn't, instead bragged of his videos and that the subjects did not know they were on camera.

[redacted lines]

Signature [signature]       Telephone 571-544-5245

Address 5835 N 26th St Arlington VA 22207

E-Mail Konstaer@husmo.edu       Cell Phone same

00006

**Exhibit 44, page 19**

EXHIBIT
5
10 2933

# OXFORD POLICE DEPARTMENT



## Statement Form

Report No. _____
Event No. _____
Call Time _____
Officer _____

**Name** (*printed*) DAN FURSE

**Date of Birth** 7/13/1990

**Date** 9/28/09

**Statement:** I SAW CLIPS OF THE VIDEOS ON ▓▓▓▓
COMPUTER THROUGH PHOTO BOOTH ON HIS MAC. HE
DESCRIBED THE ROOM TO ME THAT WHEN A GIRL COMES
BACK WITH HIM HE GOES TO PUT ON iTUNES AND
WHILE HE DOES THAT HE PRESSES SET, TO WHICH AUTOMATICALLY
STARTS THE VIDEO CAMERA.

Q WHAT IS ON THE VIDEOS
A. SEXUAL ACTIVITY BETWEEN ANTONIO AND VARIOUS
GIRLS.

**Signature** _____     **Telephone** _____
**Address** 102 N. TALLAWANDA
**E-Mail** FURSEDN@MUOHIO.EDU     **Cell Phone** (847) 682-2044

. 00009

**Exhibit 44, page 20**



# OXFORD POLICE DEPARTMENT

## Statement Form

EXHIBIT
6
2013 10 2333

| | |
|---|---|
| Report No. | 1542 |
| Event No. | 27773 s |
| Call Time | 1690 |
| Officer | 37 |

**Name** (printed) Kristin Fitzgibbon          **Date of Birth** 4/8/1991

**Date** 9/22/09

**Statement** Met [redacted] the 2nd night of school at a party. He was extremly clingy, and always wanted to hang out with me after that. I saw him a few nights later and kept buying me drink after drink, and that night he brought me back to his room and we engaged in sexual actions.

After this night he always wanted to hang out with me and was very obsessul I didn't want to be around him anymore and haven't spoken to him in 2 week.

Yesterday 9/21/09 I was told by one of his friends that he got kicked out of the fraternity for secretly video taping girls he has hooked up with without their knowledge.

Today 9/22/09, I was informed by one of his friends in the frat that one of these videos may have been of me. I thought this was the case yesterday when Erwin told me how he did it. → He would go over to his computer screen and turn on music but at the same time turn the camera on on his computer and dim the screen so no one could see that he was videotaping. (He did this that night with me) with the computer.

**Signature** [signature]          **Telephone** 203.241.6044
**Address** 116 Anderson Hall
**E-Mail** Fitzgikf@muohio.edu          **Cell Phone**

00007

**Exhibit 44, page 21**

EXHIBIT

7

BUTLER COUNTY AREA ONE COURT
BUTLER COUNTY OHIO
CRIMINAL DIVISION

IN THE MATTER OF THE
AFFIDAVIT FOR SEARCH WARRANT
RE: THE INVESTIGATION OF: VOYEURISM and PANDERING OBSCENITY

SEARCH WARRANT

To the Police Chief of the Oxford Police Department greetings.

 Whereas an affidavit for a search warrant having been made under oath by Det. Geoff Robinson, a peace officer of the City Of Oxford Police Department of the State of Ohio the Court finds;

1. There is probable cause to believe that ████████████ and others yet known, have committed and are committing offenses in violation of the Ohio Revised Code 2907.08, Voyeurism and Ohio Revised Code 2907.32, Pandering Obscenity.

2. There is probable cause to believe that evidence pertaining to the aforementioned offenses will be obtained through the search and seizure of computers, computer data and other electronic data in storage as well as other items detailed below.

3. In particular the evidence seized will reveal the details of the involvement of the participants, identities of victims, evidence of the alleged violations, records of the alleged transactions or transmissions, and places that criminal activity occurred as well as other information concerning the ongoing criminal conspiracy, the object of which is stated above.

Said affidavit is attached hereto and incorporated herein, and these are, therefore, to command you in the name of the State of Ohio, with the necessary and proper assistance, to enter, in the daytime or nighttime into the residence located at: ██████████ ████████████████████████ is described as a 3 story red brick university dormitory structure. ████████ is secured by a wood door marked with the numbers ████ on the door.

In the county aforesaid, and there diligently search for and or seize the goods, chattels or articles, to wit:

1. Computers-defined as central processing units, computer motherboards, hard drives, floppy drives, removable and re-write able media, tape and digital drives, internal and external storage devices, video display units or receiving devices, scanners, printers, modems, any and all connecting cables and devices, input devices such as "web cams" video cameras, audio recording devices, disc's both

**Exhibit 44, page 22**

2 1 3 1 0 2933

COUNTY
COURTS

audio, video and digital, any memory devices such as smart media, memory sticks, or any other form of memory or device utilized by the computer or it's devices. Any computer software, programs and source documentation, computer logs. (This description constitutes the definition of a computer system as that term may be used throughout this document.) And all computer related accessories not specifically mentioned herein, all equipment having been used in violation of Voyeurism Ohio Revised Code 2907.08 and Pandering Obscenity Ohio Revised Code 2907.32.

2. Any documentation and/or notations referring to the computer, the contents of the computer, the use of the computer or any computer software and/or communications. All information within the above listed items including but not limited to machine readable data, all previously erased data, and any personal communications including but not limited to e-mail, chat capture, capture files, correspondence stored in electronic form, and/or correspondence exchanged in electronic form as indicative of use in obtaining, maintenance, and/or evidence of said offense.

3. Any financial records, or receipts kept as a part of and/or indicative of the obtaining, maintenance, and/or evidence of said offense; financial and licensing information with respect to the computer software and hardware.

4. All of the above records, whether stored on paper, on magnetic media such as tape, cassette, cartridge, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic address books", personal digital assistants, smart media, memory cards, memory sticks, calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records. All items having been used in violation of Voyeurism Ohio Revised Code 2907.08 and Pandering Obscenity Ohio Revised Code 2907.32.

All items to be searched and seized having been used in obtaining, maintenance, and/or evidence of said offense.

Given under my hand this _29_ day of _Oct_, 2009        1:50 PM

_____
Judge, Butler County Area One Court
Criminal Division

· 00015

**Exhibit 44, page 23**



EXHIBIT
8

# Oxford Police Department
## Oxford, Ohio
### Search & Seizure Receipt

Date: 11-3-09
Time: 0015

Listed below are items and/or taken and removed from property located at _____

██████████████████████████

under the control of ██████████████ + FREDERICK H. HOFFMAN IV

(Owner, Renter, Tennant or Others)

Items removed and in the custody of the Oxford Police Department:

1. CANON POWERSHOT SD950 CAMERA - DESK - MAIN TOP
2. BLACK APPLE IPOD - MIDDLE SHELF DESK
3. 8GB IPOD TOUCH w/ BLACK CASE - MAIN TOP - DESK
4. BLACK BOUND JOURNAL - DESK MIDDLE SHELF
5. 5 HOMEMADE CD's - MIDDLE DESK SHELF
6. MEMOREX CD-R IN PLASTIC CASE - DESK DRAWER
7. VERIZON WIRELESS BLACKBERRY - CHARLES PERSON
8. CANON POWERSHOT SD960 CAMERA - CHARLES PERSON
9. 3 BOTTLES SAM ADAMS, 4 BOTTLES BLUE MOON - REFRIDGERATOR
10. SONY MINI DVD RW - BACKPACK
11. BLACK BAG W/SILVE IBOOK & ACES - BACKPACK
12. RED ZIP DISK - DESK - MAIN SHELF
13. VERBATIM DVD-R - JACKLESS - CLOSET INSIDE RINGER DVD SLEEVE
14. DVD-R - CHILDISH PRONUNCIATION - BLACK BINDER, CRATE, CLOSET
15. ~~~~~~~~~~~~~~~~~~~~

A copy of this receipt was given to: ██████████████████
Address: ██████████████
Date/Time: 11 3 09  0109

Witnessed by: _____    _____

Signature of Officer



EXHIBIT
9



# Miami University Police
4945 Oxford-Trenton Rd
Oxford, Ohio 45056
513-529-2222



## DIGITAL EXAMINATION REPORT SUMMARY
### REPORT 09-012
### DATE Dec 15, 2009

| CASE INFORMATION | |
|---|---|
| **CASE NAME:** Voyeurism | |
| **USSS FILE #:** | |
| **OTHER AGENCY CASE #:** 091542 | |

| EXAMINER INFORMATION |
|---|
| **NAME:** Det. Walter Schneider |
| **AGENCY:** Miami University Police |
| **PHONE:** (513) 529-8347 |

| CASE AGENT |
|---|
| **NAME:** Det. G. Robinson |
| **AGENCY:** Oxford Police Dept |
| **PHONE:** (513) 524-5258 |

## ATTACHED REPORTS
- Computer A Report

## CASE SYNOPSIS
I was contacted by Det. Robinson to complete a forensic exam on a computer suspected of containing videos of unknowing females. Robinson served a search warrant on ▓▓▓▓▓▓▓ and his residence and took his Laptop, 2 cameras, thumb drive, 7 CD/DVD recorded devices, 30 GB I-pod, and an I-pod touch.

## SUMMARY OF EXAMINATION
While I was unable to recover the specific videos, I was able to recover several video stills where ▓▓▓ was using his computer to record things on his bed. There is one picture with the face of a female in the background. I found 3 videos of ▓▓▓▓ recording his sexual encounters with females (no face visible in each)

## DISPOSITION
All evidence was inspected. I imaged all devices that I could examine. These devices were returned to the Oxford Police Department property officer. The image of the inspected computer was transferred to and stored on drobo, as 09012, voyeurism.

Exhibit 44, page 25

Run; 26-FEB-2010 15:01     CITY OF OXFORD POLICE

NAR01 · Run By: ROBINSON,GEOFF



Agency: 00                    NARRATIVE REPORT

OFF Number: 00-000200901542-000   Narr Sfx: 0000   Reporter: ROBINSON,GEOFF
      Date: 02/26/2010              Time: 14:02:40

---

On September 28, 2009 I met with Dan Furse in reference to a video he had
viewed at ███████████. Furse stated that ██████████ showed him a
video recording of ██████ engaged in sexual activity with various females.
Furse explained that ██████ had described how he had surreptitiously recorded
women that he had brought back to his room at ███████████.

On September 29, 2009 I met with one of the original complainant's in the
Voyeurism report, Kristin Fitzgibbon. Fitzgibbon told me that on 2 different
nights she engaged in sexual conduct with ███████████ During both of
those encounters Fitzgibbon stated that █████████ made use of his computer
before they engaged in sexual activity. She stated that the screen was blanked
out so that she could not see what he was doing. Fitzgibbon verified to me
that she did not give ██████████ permission to record her in any fashion.
Fitzgibbon was told that she was one of the girls in ████████ videos by
friends who had seen the videos.

On November 3, 2009 a search warrant was executed at ███████████ residence of ████
██████████ Subsequent to that search warrant an iMac laptop, 2 digital
cameras, a blackberry, and an assortment of digital media storage devices were
recovered. There was also beer and intoxicating liquor found and seized during
the search. The computer, digital devices and storage medium were turned over
to Det. Schneider, Miami University Computer Forensic Examiner, for exam.

On February 26, 2009 I received a final copy of the digital examination report
summery as well as a digital copy of photos and videos found during the
digital exam. Det. Schneider was able to recover 3 videos of ████████ engaged
in sexual encounters with females. The videos do not have faces of the females
involved and do not appear to be the complainant, Kristin Fitzgibbon.

Contact will be made with ███████████ to advise him of the findings of the
computer exam and have him pick up his property as it is no longer needed for
this investigation.

While there is evidence of voyeurism as evident in the computer forensic exam,
identification of any victims does not seem possible at this juncture.

Recommend cleared by Exception

Det. Geoff Robinson #43

00028

**Exhibit 44, page 26**

29

EXHIBIT
II

# PART 2 Code of Student Conduct

## Introduction

The Code of Student Conduct at Miami University is intended to foster and protect the central purpose of the University: the free and open exchange of ideas. This Code applies to Miami's undergraduate and graduate students, student organizations, fraternities and sororities. Students are subject to this Code of Student Conduct beginning at summer orientation, during academic terms for which they are enrolled, during breaks between terms, during University holidays and vacations, and during periods of suspension. The Code of Student Conduct outlines the rights and responsibilities of students, behaviors prohibited on and off campus, possible sanctions, and the procedural rights of students and student organizations.

The Code embraces several important values: the rights of free speech and peaceable assembly; the freedom of inquiry and the right to make constructive criticism; the central importance of honesty to this community; and the desire that all students participate on campus in an environment that respects differences of culture, gender, religion, race, age, sexual orientation, gender identity, national origin and ability.

Students who have questions about the Code of Student Conduct should call the Office of Ethics and Student Conflict Resolution at 529-1417. All references to University offices are deemed reference to the most closely analogous offices at Miami University Hamilton (Student Services), and Miami University Middletown (Student Affairs), and the Voice of America Learning Center (Director's Office).

## The Code of Student Conduct

This Code applies to all undergraduate students, graduate students, and student organizations of Miami University. The Code of Student Conduct primarily prohibits misconduct on University premises (buildings or grounds owned, leased, operated, controlled, or supervised by the University, including the Oxford campus, Miami University Dolibois European Center [see Appendix A], the Miami University Hamilton campus, the Miami University Middletown campus, and the Voice of America Learning Center; but may address off-campus conduct when the behavior or the presence of the individual, in the University's sole judgment, impairs, obstructs, or interferes with the mission, processes, or functions of Miami University. Students should be aware that Miami University reserves the right to review and take disciplinary action based on conduct occurring off campus or between academic periods.

Any student or organization that, after a full hearing of the facts, is found responsible for violating the Code will be assessed an administrative fee of $50 per incident.

If a student breaks a law that also violates the University standards of conduct, that student may be held accountable by both civil authorities and the University. The University may, at its sole discretion, elect to pursue disciplinary action against the student prior to, at the same time as, or following criminal proceedings, even if criminal charges involving the same incident are pending, have been dismissed, or were reduced.

## Standards of Conduct

In order to promote a safe and civil campus environment, Miami University expects each student to follow the standards of conduct. The severity of the offense, prior disciplinary history, whether an offense was committed against a person intentionally selected by reason of their race, religion, national origin, gender, sexual orientation, gender identity, disability, or age, and other relevant circumstances will be considered in determining the appropriate disciplinary action.

## "1219" Procedures

Ohio Revised Code Sections 3345.22 and 3345.23 procedures are commonly referred to as "1219" proceedings. The initiation of a "1219" proceeding against a student does not prohibit the University from taking University disciplinary action against that same student under the Code for the same conduct that gave rise to the "1219" proceeding. A student arrested for any of the defined offenses will automatically be subjected to the "1219" proceedings which are summarized below.

After a hearing which will be held no more than five days after arrest (continuances may be granted, which may not exceed a total of ten days), students arrested for one of the offenses defined in Ohio Revised Code 3345.23(D) are subject to immediate suspension from the University. Students convicted of any of the offenses enumerated in Ohio Revised Code 3345.23(D) are subject to automatic dismissal from Miami University. Students suspended or dismissed under these "1219" procedures are not permitted on University property without the express permission of the President or the Board of Trustees. Students dismissed upon conviction may be readmitted or admitted to any other Ohio tax-supported college or university, at the discretion of the college or university's board of trustees, but only after the lapse of one calendar year following dismissal and only upon terms of strict disciplinary probation (see Ohio Revised Code 3345.22 and 3345.23 for full text of the statutes and see Appendix B of the *Code of Student Conduct* for list of defined offenses of violence).

**Exhibit 44, page 27**

30

# STUDENT CONDUCT REGULATIONS

## CHAPTER 1. Code One Offenses

A student who is found to have committed a Code One offense and who previously has been found to have committed a Code One offense or to have previously committed three Code Two offenses will normally be recommended to receive a minimum sanction of suspension. However, a student can be suspended or dismissed for a single violation.*

More than one sanction may be imposed for a single violation. A single act may constitute a violation of more than one regulation. Being under the influence of drugs or alcohol will not diminish or excuse a violation of the Student Conduct Regulations.

The standard of evidence used to determine responsibility is a "preponderance" of evidence. This determination is based on the greater weight of the evidence and does not require a standard beyond a reasonable doubt.

*Please note that there are additional minimum penalties in the case of alcohol-related offenses and dishonesty offenses.*

### 2.1.A  Interfering with a University Function (101)

University functions, on or off campus, are defined to include teaching, research, administration, disciplinary proceedings, University activities, public safety, and public service functions. This section also includes authorized non-university functions when the act occurs on University premises. Actions that interfere with, obstruct, or disrupt University functions are prohibited (see Part 5, Chapter 6 guaranteeing the right of expression of students).

### 2.1.B  Dishonesty (102)*

Intentionally furnishing false information or omitting relevant or necessary information to gain a benefit, to injure, or to defraud is prohibited. Using or possessing false or altered identification (including driver's licenses and Miami University identification cards) is prohibited. Students may not use another person's University identification card for any purpose. Examples of prohibited behavior include forgery, alteration, or falsification of any University documents or records, or misrepresentation of University credentials. These include grade transcripts, student identification, computer records, and other official documents. Using a forged or altered document is also prohibited, even if someone else made the changes. Student identification cards are University property and must be shown or surrendered when requested by a University official in performance of his or her duty.

*If the student has been found responsible for a previous act of academic dishonesty or for previously violating Section 102 (Dishonesty) of the Code of Student Conduct, the automatic sanction will be suspension for at least one semester.*

### 2.1.C

**2.1.C.1    Sexual Misconduct or Assault (103A).** Intentional or reckless acts that cause or reasonably could cause physical or mental harm to any person are prohibited including non-consensual sexual conduct or contact. Some examples of prohibited behavior include sexual harassment, voyeurism (including the use of video recording devices), indecent exposure, rape (including acquaintance or date rape) and physical contact for the purpose of sexual gratification with another without their consent.

*Miami University also has developed a sexual offense protocol that explains how incidents of sexual assault are handled. Miami University will make changes in the victim's academic and living conditions upon request. Both the accuser and the accused are entitled to the same opportunity to have others present during the disciplinary proceeding.*

*Copies of the sexual offense protocol are available in the Office of Ethics and Student Conflict Resolution, Women's Center, Office of the Dean of Students, the Miami Police Department, and the Oxford Police Department.*

**2.1.C.2    Other Physical or Mental Abuse or Harm (103B).** Intentional or reckless acts that cause or reasonably could cause physical or mental harm to any person are prohibited. Actions that threaten or reasonably could cause a person to believe that the offender may cause physical or mental harm are also prohibited. Some examples of prohibited behavior include murder, assault, battery, stalking, telephone harassment, computer harassment, threats, intimidation, physical assault or abuse, verbal abuse, and any other conduct that threatens the health or safety of any person.

*Note: A student, who after a full hearing of the facts for a violation of Section 2.1.C.1, Sexual Misconduct or Assault, is found not responsible may be found responsible for a violation of Section 2.1.C.2, Other Physical or Mental Abuse or Harm.*

### 2.1.D  Damage, Theft, or Unauthorized Use of Property (104)

Intentional or reckless conduct that results in damage (including tampering or defacing), theft, or unauthorized use of property of the University or of any other person or entity is prohibited. The unauthorized use of University property for personal gain is also prohibited. Students may not use University property for any activity prohibited by federal, state, or local law or these regulations. Examples of prohibited behavior include gambling on University property, theft, vandalism, and possession of property known to be stolen.

**Exhibit 44, page 28**

The unauthorized use, distribution, duplication, or possession of any access device including keys or access cards issued for any University building, laboratory, facility, or room is prohibited.

### 2.2.C  Failure to Comply (203)

Failure to comply with the directions of University officials (including Resident Assistants) acting in performance of their duties is prohibited.

### 2.2.D  Complicity (204)

Conspiracy to commit, solicitation of another to commit, aiding or abetting the commission of, or attempting to commit any conduct which is prohibited under Code Two offenses of the Student Conduct Regulations is prohibited.

# CHAPTER 3. Sanctions

Sanctions may be imposed singly or in combination on individuals or student organizations. Disciplinary action by the University does not preclude the possibility that a separate criminal prosecution or civil action may also be taken; in addition, unlawful conduct off campus may be grounds for University disciplinary action. Student organizations in violation of University regulations are subject to equivalent sanctions.

A student found to have violated any Code One regulation will be subject to sanctions ranging from dismissal to written reprimand. If a student previously found responsible of committing a Code One offense is found responsible of committing another Code One offense, the University will normally recommend a minimum sanction of suspension. If a student previously found responsible of committing three Code Two offenses is found to have committed a Code One offense, the University will normally recommend a minimum sanction of suspension.

**No sanction will be imposed until all appeals are completed (see Chapter 5 Appeals – Code One Offenses).**

The various sanctions are defined as follows:

### 2.3.A  Dismissal (301)

Dismissal prohibits the student from ever attending Miami University. A student may not be re-admitted to the University after dismissal.

### 2.3.B  Suspension (302)

Suspension prohibits the student from attending Miami University for the duration of the suspension, which shall not exceed a period of more than five calendar years following its effective date. The Dean of Students or designee will determine the effective date of the suspension (either immediate suspension or at the close of the current semester, for a minimum of one subsequent semester, not to include summer terms). A student who has been suspended must petition for re-enrollment. Academic credit earned elsewhere during a period of disciplinary hold will not be accepted in transfer. Incomplete grades may not be removed during periods of non-registration including suspension (non-academic) or dismissal.

### 2.3.C  Disciplinary Probation (303)

Disciplinary probation indicates to a student that his or her behavior has resulted in a sanction close to suspension. It is imposed for a definite period of time and may include disciplinary restrictions. A student on probation may be required to meet periodically with a person designated by the Office of Ethics and Student Conflict Resolution.

### 2.3.D  Disciplinary Restrictions (304)

Disciplinary restrictions may be imposed with or without suspension or probation. Disciplinary restrictions include but are not limited to:

1. Restrictions from participating in intercollegiate athletics, extracurricular activities, and residence life activities;
2. Restrictions in the right of access to campus facilities, including residence halls;
3. Monetary payments for purpose of restitution or to cover the expense of educational sanctions;
4. Required University service;
5. No contact/restraining orders;
6. Denial of financial assistance from programs funded by the University;
7. Removal from or reassignment of University housing;
8. Required attendance at educational/assessment programs, such as anger management workshops and comprehensive substance abuse assessments;
9. Administrative hold on access to specified University documents;
10. Loss of University privileges, including but not limited to parking;
11. Suspension of the opportunity to study abroad.

**Failure to complete a sanction will result in a hold being placed on a student's ability to register for subsequent semesters or to change a class schedule. Students are able to drop and withdraw from a course(s) per University policy as noted in Section 1.2.C.**

**Exhibit 44, page 29**

34

## 2.3.E  Penalties for Alcohol Violations (305)

**2.3.E.1    Intoxication or Negative Behavior Involving the Use of Alcohol (305A)** (see Section 2.3.E.2 for disciplinary procedures for Prohibited Use of Alcohol). Any student who exhibits negative behavior associated with intoxication after using alcohol is in violation of this policy. Further, any student who, after consuming alcohol, destroys property, becomes physically violent, becomes aggressive, or refuses to cooperate with any University staff member, police officer, or person of authority who is performing his or her duties, is in violation of this policy.

Minimum Penalties:

a.  First Offense. The minimum penalty for a first offense is mandatory attendance at a four-hour substance abuse education program and a minimum charge of $200 to the student for the program as well as mandatory participation in a comprehensive substance abuse assessment and a minimum charge of $250 to the student for the assessment. Further intervention and an opportunity to participate in group sessions may be recommended by the counselor. There will be no additional charge to the student for participation in the group sessions at the Student Counseling Service.
b.  Second Offense. Suspension from the University, either immediately or at the close of the current semester, for a minimum of one subsequent semester (not to include summer terms).

If a student is suspended as a result of alcohol violations and subsequently returns to Miami University, another violation of the alcohol policy may result in dismissal. Registration for subsequent semesters will be withheld until the student complies with the penalties assessed for the first offense. If a student has been officially found to have committed an alcohol offense and two calendar years have elapsed without a subsequent finding for such an offense, a prior offense will be considered in determining the current penalty but the minimum penalty is not mandatory. For multiple violations of the Student Conduct Regulations, additional penalties may be warranted and imposed in accordance with normal University disciplinary procedures.

**2.3.E.2    Prohibited Use of Alcohol (305B)**

Minimum Penalties:

a.  First Offense. The minimum penalty for a first offense is required attendance at a two-hour substance abuse program designed to acquaint students with their civil and legal responsibilities as well as the personal and career implications of alcohol and other substance abuse. There will be a minimum charge of $150 to the student for the program.
b.  Second Offense. The minimum penalty for a second offense is mandatory participation in a comprehensive substance abuse assessment and a minimum charge of $250 to the student for the assessment. Further intervention and an opportunity to participate in group sessions may be recommended by the counselor. There will be no additional charge to the student for participation in the group sessions at the Student Counseling Service.
c.  Third Offense. Suspension from the University, either immediately or at the close of the semester, for a minimum of one subsequent semester (not to include summer terms).

If a student is suspended as a result of alcohol violations and subsequently returns to Miami University, another violation of the alcohol policy may result in dismissal. Registration for subsequent semesters will be withheld until the student complies with the penalties assessed for the first or second offenses. If a student has been officially found to have committed an alcohol offense and two calendar years have elapsed without a subsequent finding for such an offense, a prior offense will be considered in determining the current penalty, but the minimum penalty is not mandatory. For multiple violations of the Student Conduct Regulations, additional penalties may be warranted and imposed in accordance with normal University disciplinary procedures.

**2.3.E.3    Multiple Alcohol Violations Involving Prohibited Use of Alcohol and Intoxication.** The minimum penalty for any combination of three alcohol violations is suspension from the University, either immediately or at the close of the semester, for a minimum of one subsequent semester (not to include summer terms).

## 2.3.F  Penalties for Dishonesty Violations (306)

Minimum Penalties:

1.  First Offense. The minimum penalty for a first offense is completion of an ethics and integrity education program and a minimum charge of $200 to the student for the program.
2.  Second Offense*. Suspension from the University, either immediately or at the close of the current semester, for a minimum of one subsequent semester (not to include summer terms).

*If the student has been found responsible for a previous act of academic dishonesty or for previously violating Section 102 (Dishonesty) of the Code of Student Conduct, the automatic sanction will be suspension for at least one semester.

If a student is suspended as a result of dishonesty violations and subsequently returns to Miami University, another violation of the dishonesty policy may result in dismissal. Registration for subsequent semesters will be withheld until the student complies with the penalties assessed for the first offense. For multiple violations of the Student Conduct Regulations, additional penalties may be warranted and imposed in accordance with normal University disciplinary procedures.

## 2.3.G  Written Reprimand (307)

Written reprimand is an official notification that the behavior of the student or student organization has been unacceptable. Authorized staff members of the Office of Residence Life and New Student Programs or the Office of Ethics and Student Conflict Resolution may issue a

**Exhibit 44, page 30**

written reprimand without a hearing for violation of Code Two regulations. Written reprimands will be placed in the student's official disciplinary file.

## 2.3.H Summary Suspension (308)

The President or designee may summarily suspend a student, student organization, or fraternity or sorority; prohibit the same from any or all appropriate portions of University premises, University-related activities, or registered student organization activities; and/or permit the student, student organization, or fraternity or sorority to remain only under specified conditions for the interim period prior to a disciplinary hearing. A student may also be summarily suspended pending adjudication of felony criminal charges. A summary suspension will be imposed whenever the President or designee determines that the continued presence of the student on the University campus poses a significant risk of substantial harm to the health or safety of the student, to others, to the stability or continuance of normal University functions, or to property.

Before making such a determination, the President or designee shall notify the student of the reasons that the summary suspension is being considered and provide the student with an appropriate opportunity to respond to the President or designee. The purpose of the response is to address only:

1. the reliability of the information concerning the student's conduct; and
2. whether or not the conduct and surrounding circumstances reasonably indicate a significant risk as described above.

If in the President or designee's judgment, the student's continued presence on campus poses a significant danger to the University community, the student may be immediately suspended prior to the process described above. The President or designee will make a reasonable effort to provide the notification and response procedures within 24 hours after the notice of suspension has been delivered. If the student fails to appear at the hearing, the hearing officer will make the determination based upon the available information.

# CHAPTER 4. Hearing Procedures — Code One Offenses

## 2.4.A Complaint and Notice

**2.4.A.1 Complaint.** Any person, agency, organization or entity may make a complaint to the Office of Ethics and Student Conflict Resolution alleging a violation of a Code One regulation by a student or student organization. The University will treat a police report or citation as a complaint.

**2.4.A.2 Notice.** The Office of Ethics and Student Conflict Resolution or designee or Office of Residence Life and New Student Programs, after reviewing a complaint or on its own initiative, may initiate the disciplinary process by giving the accused student or student organization written notice of the alleged violation(s). The notice may be sent to the mailing address and/or e-mail address listed with the University information system or the address on the complaint. Notice also may be delivered in person by law enforcement personnel or by University staff. The written notice shall describe the alleged violation(s) and inform the student or student organization about the reported circumstances underlying the alleged violation(s).

For complaints alleging Code One violations in which suspension is not a proposed sanction, the student will not be afforded an opportunity for a procedural review.

The notice will contain the proposed sanction(s) for the violation and the following statement:

*If you dispute the allegations, you may request a hearing before Student Court or an administrative hearing. If you do not request a hearing within five University working days of the date of this notice, you will be deemed to have committed the violation and the proposed sanction(s) will be imposed. If you request a hearing, the administrative hearing officer or Student Court may (if you are found to have committed a violation) impose any sanction from written reprimand to disciplinary probation (for minimum mandatory sanctions see Sections 2.3.E.1, 2.3.E.2, and 2.3.F of The Student Handbook).*

## 2.4.B Procedural Review

The purpose of the procedural review is to review the charges, provide an explanation of the disciplinary process, discuss the student's or student organization's options, and advise the student or student organization regarding the potential sanction(s) for the alleged violation(s). The accused student or an authorized student representative of the student organization shall attend the procedural review, which will be conducted by a judicial staff member in the Office of Ethics and Student Conflict Resolution on the Oxford campus, Student Services on the Hamilton campus, or Student Affairs on the Middletown campus. In the Office of Ethics and Student Conflict Resolution, the judicial staff member will be the Director or Associate Director of Ethics and Student Conflict Resolution or designee. On the Hamilton campus, the judicial staff member will be the Assistant Director of Student Services or designee; on the Middletown campus, the judicial staff member will be the Associate Dean for Student Affairs or designee.

The judicial staff member shall determine and advise the student or student organization of the proposed sanction(s) during the procedural review. If an accused student or student organization (through an authorized student representative) fails to appear at the procedural review, the student may be deemed to have committed the violation and the sanction(s) set forth may be imposed or the matter may be scheduled for a hearing at the discretion of the judicial staff member. Procedural reviews may be rescheduled at the discretion of the judicial staff member.

## 2.4.C Selection of Hearing Option

**Exhibit 44, page 31**

36

A student or student organization must, no later than two University working days from the time of the procedural review or if there is no procedural review five days from receipt of the notice, select one of three options and return the Page Two Option Form to the Office of Ethics and Student Conflict Resolution.

The options are:

1. Admit to the charge(s) and agree to accept the imposition of sanction by the Office of Ethics and Student Conflict Resolution; or
2. Request an administrative hearing before the Director of Ethics and Student Conflict Resolution, Associate Director, or designee, Associate Dean for Student Affairs/Student Services on the regional campuses or designee, or Director of Residence Life and New Student Programs or designee (as applicable); or
3.a. Request a hearing before Student Court if suspension or dismissal is not a potential sanction; or
3.b. Request a hearing before the Disciplinary Board if suspension or dismissal is a potential sanction.

The Office of Ethics and Student Conflict Resolution encourages students charged in the same incident and who have chosen the same hearing venue to have their cases consolidated for hearing. The Office of Ethics and Student Conflict Resolution reserves the right to require consolidation for a hearing when students charged in the same incident have chosen the same hearing venue.

If the accused student or student organization fails to timely notify the judicial staff member of the option selected, an administrative hearing will be scheduled.

## 2.4.D  Hearing

**2.4.D.1    Administrative Hearings (404A).** The administrative hearing officer or designee will schedule and conduct the hearing and will determine from the weight and credibility of the statements and evidence presented whether the student or student organization has violated the Student Conduct Regulations.

a.   The hearing shall commence not sooner than three University working days after the request for a hearing.
b.   The complainant and the accused student or authorized representative of the accused student organization are entitled to be advised at the hearing by another person of their choice. They are each entitled to bring an attorney, at their own expense, to the hearing. This attorney may act as an adviser to the complainant, the accused student, or student organization subject to the constraints imposed by the administrative hearing officer.
c.   The hearing shall be closed to the public. Both the complainant and the accused are entitled to bring two persons for support to the hearing. The University may accommodate concerns for personal safety, well-being, and/or concerns regarding confrontation among the complainant, the accused and other witnesses during the hearing by providing separate facilities, by using a visual screen or by permitting participation by telephone, videophone, closed circuit television, video conferencing, written statement or other means.
d.   The accused shall have the right to file with the administrative hearing officer a written response to the charges. Any response must be filed and a copy delivered to the Office of Ethics and Student Conflict Resolution at least 24 hours prior to the hearing. The administrative hearing officer shall have the right to determine the acceptability of testimony and other evidence during the hearing and may place time limitations on testimony and on closing arguments. Character witnesses may be called prior to the recommendation of sanction(s) in the event the student is found to have committed a violation of the Student Conduct Regulations.
e.   The accused and the complainant shall have the right to submit evidence and question adverse witnesses who testify in the matter. If the University elects to accept a witness's written statement in lieu of live testimony, the identity of the witness and his or her statements shall be fully disclosed to the other side and they shall be given the opportunity to respond to such statements. Witnesses other than the complainant and the accused shall be present only when they are giving testimony. The administrative hearing officer has the right to control all questioning of witnesses and may require that all questions be conducted by the hearing officer.
f.   The hearing shall be recorded on equipment supplied by the University. Either the complainant or accused may make provisions for a stenographic report of the hearing, subject to their own payment of the cost; or as the parties may agree, in advance in writing, to share the expense of the stenographic report. If a stenographic report is made, a copy shall be supplied to the University at no cost.
g.   The University may elect to present the case on behalf of the complainant. In rare instances, the University may elect to present the case using a licensed attorney. In that event, the accused will be given notice and an opportunity to be represented by an attorney at the student's or student organization's own expense.
h.   The only persons entitled to be present at the hearing are the complainant, the accused (each with an adviser of his or her choice and a maximum of two persons for support) and personnel from the Office of Ethics and Student Conflict Resolution.

If the administrative hearing officer or designee determines that a violation of the Student Conduct Regulations has occurred, he or she will impose the appropriate sanction(s). If an accused student or student organization fails to appear at a scheduled administrative hearing and the absence is not excused, the hearing may proceed without the presence of the accused. Hearings may be rescheduled at the discretion of the administrative hearing officer.

**2.4.D.2    Disciplinary Board Hearings (404B).** The University Disciplinary Board will be composed of ten faculty members, endorsed by the chair or co-chairs of the Board and appointed by the President; eight undergraduate students, who are juniors or seniors, nominated by Associated Student Government and appointed by the President; and two graduate students, nominated by the Dean of the Graduate School and appointed by the President. The Disciplinary Boards on the regional campuses in Hamilton and Middletown will be composed of six faculty members appointed by the President and four undergraduate students who have earned at least 30 semester hours and are in good academic standing, nominated by the Associated Student Government on the respective campus and appointed by the President. The chair or co-chairs of the Disciplinary Board will be members of the faculty and will serve three-year terms. Except for the chair or co-chairs, who will serve three-year terms, all members will serve one-year terms. Quorum for University Disciplinary Board hearings is defined as at least three faculty members and two students. If the accused student is a graduate student, one of the student members shall be a graduate student.

**Exhibit 44, page 32**

In cases in which the accused student or student organization is entitled to and has timely requested a hearing before the Disciplinary Board, the Office of Ethics and Student Conflict Resolution shall schedule the hearing.

a. The hearing shall commence not sooner than three University working days after the request for a hearing.

b. The accused shall have the right to file with the Disciplinary Board a written response to the charges. Any response must be filed and a copy delivered to the Office of Ethics and Student Conflict Resolution at least 24 hours prior to the hearing.

c. The complainant and the accused student or authorized representative of the accused student organization are entitled to be advised at the hearing by another person of their choice. They are each entitled to bring an attorney, at their own expense, to the hearing. This attorney may act as an adviser to the complainant or the accused student or student organization, subject to the constraints imposed by the Disciplinary Board.

d. The hearing shall be closed to the public. Both the complainant and the accused are entitled to bring two persons for support to the hearing. The University may accommodate concerns for personal safety, well-being, and/or concerns regarding confrontation among the complainant, the accused and other witnesses during the hearing by providing separate facilities, by using a visual screen or by permitting participation by telephone, videophone, closed circuit television, video conferencing, written statement or other means.

e. The chair, or a member of the Disciplinary Board designated by the chair to preside, shall have the right to determine the acceptability of testimony and other evidence during the hearing and may place time limitations on testimony and on closing arguments. Character witnesses may be called prior to the recommendation of sanction(s) in the event the student is found to have committed a violation of the Student Conduct Regulations.

f. The accused and the complainant shall have the right to submit evidence and question adverse witnesses who testify in the matter. If the University elects to accept a witness's written statement in lieu of live testimony, the identity of the witness and his or her statements shall be fully disclosed to the other side and they shall be given the opportunity to respond to such statements. Witnesses other than the complainant and the accused shall be present only when they are giving testimony. The Disciplinary Board has the right to control all questioning of witnesses and may require that all questions be conducted by the Board.

g. In rare instances, the University may elect to present formally a case using legal counsel. If the University elects to present a case using legal counsel, the accused will be given notice of the decision and will also have the opportunity to be represented by legal counsel.

h. The hearing shall be recorded on equipment supplied by the University. Either the complainant or the accused may make provisions for a stenographic report of the hearing, subject to their own payment of the cost; or as the parties may agree, in advance in writing, to share the expense of the stenographic report. If a stenographic report is made, a copy shall be supplied to the University at no cost.

i. Both sides shall be given a reasonable opportunity to present a closing statement.

At the close of the hearing, the Disciplinary Board shall deliberate privately as to whether the accused violated the Student Conduct Regulations. Boards will seek to reach consensus in adjudicating cases. In the event there is not consensus, a majority vote (the chair voting) will determine the outcome. In the event of tie votes, the report of the Board will be that no judgment was rendered. If a tie vote does occur, the Office of Ethics and Student Conflict Resolution will have the option of referring the case to another Disciplinary Board hearing in which the case is heard by Disciplinary Board members not present at the previous hearing. Within ten calendar days after the close of the hearing, the Disciplinary Board shall report its findings. If the Board determines that the accused violated the regulations, it will provide a written recommendation of the sanction to be imposed.

**2.4.D.3    Student Court Hearings (404C).** Hearings before Student Court shall follow the same procedures as are followed by the Disciplinary Board. The Student Court will consist of 15 undergraduate students and up to two alternate undergraduates. Student Senate confirms the Student Court appointments. The term of office will be for one calendar year beginning on the last day of second semester or until resignation or removal. Quorum for Student Court hearings is defined as at least five students. If the accused student is a graduate student, one of the student members shall be a graduate student. The Student Court will handle all cases referred to it by the Office of Ethics and Student Conflict Resolution.

**2.4.D.4    Notification (404D).** The Office of Ethics and Student Conflict Resolution will notify the student or student organization of the decision (in writing) of the outcome of the hearing and will also notify the student or student organization, if responsible, of the sanction(s) imposed.

**2.4.D.5    Administrative Fee.** Any student or organization that, after a full hearing of the facts, is found responsible for violating the Code will be assessed an administrative fee of $50 per incident.

# CHAPTER 5. Appeals — Code One Offenses

## 2.5.A   University Appeals Board (501)

**2.5.A.1**    Following the suspension or dismissal of a student or student organization, the accused student or student organization and the Office of Ethics and Student Conflict Resolution or the Office of Residence Life and New Student Programs have the right to file a written appeal with the University Appeals Board within five University working days of the written notification of the disposition of the matter by the Office of Ethics and Student Conflict Resolution or Office of Residence Life and New Student Programs. The appeal should be addressed to the chair of the University Appeals Board and should state the basis for the appeal and should include all supporting documents. Regardless of campus origin, all appeals should be submitted to the Office of Ethics and Student Conflict Resolution on the Oxford campus. During the period of appeal, all sanctions, except for summary suspension, will be held in abeyance.

**Exhibit 44, page 33**

38

a. The University Appeals Board shall be composed of five faculty, three undergraduate students, and one graduate student, all of whom shall be members of the University Senate and shall be appointed by the President. Quorum for the University Appeals Board is defined as three faculty members and two students.

b. The function of the University Appeals Board shall be as follows: to hear appeals of undergraduate academic misconduct cases in accordance with the undergraduate academic integrity regulations published in *The Student Handbook*; to hear appeals in student disciplinary cases, in accordance with the Student Conduct Regulations published in *The Student Handbook*.

**2.5.A.2**  Appeals may be filed for the following reasons:

a. Inappropriate sanction;
b. Procedural defect in the adjudication of the case;
c. New evidence.

**2.5.A.3**  The Appeals Board will meet in closed session(s). The Appeals Board, in considering an appeal, shall find the appeal to have merit or not have merit by majority vote, within the parameters set forth below:

a. If the appeal alleges that the sanction was inappropriate and the Appeals Board finds the sanction to be inappropriate, the Appeals Board may increase or reduce the sanction.
b. If the appeal alleges that there was a defect in procedure or new evidence is presented and the Appeals Board finds that there was a defect in the procedure or new evidence was presented which was sufficiently substantial to have affected the outcome, the Appeals Board will order a new hearing.

The Appeals Board will notify (in writing) the accused and the Office of Ethics and Student Conflict Resolution of its decision within ten working days of its receipt of the appeal from the Office of Ethics and Student Conflict Resolution. If the Appeals Board requires additional time, the Vice President for Student Affairs may extend the time limit. The extension shall be in writing and shall include the reason for the extension, and copies shall be forwarded to both the complainant and the respondent. If a new hearing is ordered, the new hearing will be held before the original hearing authority.

## 2.5.B  Vice Presidential Review (502)

In the case of a suspension or dismissal, the accused student, the accused student organization, or the Office of Ethics and Student Conflict Resolution or the Office of Residence Life and New Student Programs may request the Vice President for Student Affairs or designee to review a decision. A request for review must be presented to the Office of the Vice President for Student Affairs in writing within three University working days of the receipt of the written notification of the decision of the Appeals Board. The request should state the basis for the request and include all supporting documents.

**2.5.B.1**  Requests for a Vice Presidential review may be filed for the following reasons:

a. Inappropriate sanction;
b. Procedural defect in the adjudication of the case;
c. New evidence.

**2.5.B.2**  The Vice President or designee may elect to review or not review a decision. In cases where the Vice President elects to review a decision, the Vice President or designee shall find the appeal to have merit or not have merit within the parameters set forth below:

a. If the appeal alleges that the sanction was inappropriate and the Vice President finds the sanction to be inappropriate, the Vice President may increase or reduce the sanction.
b. If the appeal alleges that there was a defect in procedure or new evidence is presented and the Vice President finds that there was a defect in the procedure or new evidence was presented which was sufficiently substantial to have affected the outcome, the Vice President will order a new hearing.

The Vice President will notify the parties in writing of either the decision not to review or to review the matter and, if reviewed, the Vice President's disposition of the matter on review.

**2.5.B.3**  The decision of the Vice President or designee to change a sanction or sustain the finding of the Appeals Board is final. The result of any new hearing ordered by the Vice President or designee may be appealed only as detailed in Section 2.5.A. If a new hearing is ordered, the new hearing will be held before the original hearing authority.

# CHAPTER 6. Hearing Procedures — Code Two Offenses

## 2.6.A  Complaint and Notice (601)

**Complaint.** Any person, agency, organization, or entity may make a complaint to the Office of Ethics and Student Conflict Resolution alleging a violation of a Code Two Regulation by a student or student organization. The University will treat a police report or citation as a complaint. The Office of Ethics and Student Conflict Resolution will refer the following matters to the Office of Residence Life and New Student Programs for disciplinary action if the accused student lives in a residence hall:

1. Allegations of Code Two violations occurring in or in areas adjacent to residence halls;
2. Allegations of Code Two violations occurring in dining halls;
3. Such other disciplinary matters as it deems appropriate.

2009-2010 Student Handbook

**Exhibit 44, page 34**



From: John Mirlisena <jmirlisena@yahoo.com>

To: "hodgedc@muohio.edu" <hodgedc@muohio.edu>

Cc: "mosleygs@muohio.edu" <mosleygs@muohio.edu>

Sent: Tuesday, January 24, 2012 11:33 PM

Subject: Follow Up

Dear Dr. Hodge,

I hope your semester has started well for you.

Unfortunately, I can't say the same for my Amy. As I type this email she is crying to me on the phone, sitting in the basement of Collin's dorm so 'no one can hear her cry'. She says she wants to come home (but she really doesn't); she simply has lost her "safe place," and needs to be comforted. I'm not sure if she will make it through the semester, but I sure hope she does. This criminal act has left her deeply scarred, and with a criminal case approaching, things are likely to get worse before they get better. Sadly, however much I might try, there is very little I can do to ease her pain.

I relate this to you because I believe this all could have been prevented if MU had done its job at the outset. As much as I have been impressed with the support that Amy has received from Dr. Howard and Amy's teachers, I can't help but think that this should never have happened in the first place.

You previously stated that you hoped to respond to my earlier email in 'early January'. It's been nearly 6 weeks since our initial correspondence, and while I have tried to be patient, that patience is now waning. I would have hoped by now to have received at least an update regarding the progress of your investigation.

Thanks again for reviewing this matter,

John Mirlisena

**Exhibit 44, page 35**

EXHIBIT
13

From: John Mirlisena <jmirlisena@yahoo.com>

To: "dcrain@fbtlaw.com" <dcrain@fbtlaw.com>

Sent: Saturday, December 15, 2012 10:45 AM

Subject: Miami University Student- Amy Mirlisena

Mr. Donald Crain

Chairman of the Board

Miami University

Dear Mr. Crain,

My name is John Mirlisena and I am a parent of Amy Mirlisena, a sophomore at Miami University. For your information only, I am currently Ohio Regional President for First Bank, a St. Louis based bank. Through that role and previous positions, I am business acquaintances and friends of a handful of attorneys at Frost Brown. Through my brief review of your website, I found these people we may know in common: Bill Robinson, Ed Adams, Jane Shea and Reid LeMasters.

My daughter, Amy was raped by another student, Antonio Charles, during the early morning hours of October 30, 2011. A December 2011 hearing at Miami held Antonio Charles responsible for the attack, and expelled him permanently from the University. Unfortunately, I believe this crime should not have taken place at all if the University had done its job. Mr. Charles was well known to the University, and both Miami and Oxford police and I believe the University failed to act on prior incidents involving Mr. Charles, which left this predator on Campus to rape my daughter and assault another young lady the same weekend. There may be as many as a dozen more victims, but without further review, we will never know.

Attached is most of my communication with the school, including letters and emails exchanges with Dr. Hodge and others. I am not satisfied with the response I have received to date from Dr. Hodge and the university, and therefore my reason for the reaching out to you. Be sure that I will continue my outreach until I am content that the school has sufficiently answered my concerns. My primary concerns are a:

- Lack of an "exhaustive" and "independent" investigative review of how the various incidents with Antonio Charles were handled by the school, and what changes could be made to make sure a predator like Mr. Charles does not fall through the cracks again.
- Lack of an "exhaustive" and "independent" review of University and University Police processes.
- Lack of proactive and ongoing support for victims of these crimes.
- Lack of discussion of remuneration, restitution, or compensation for the victims because of the University's failure to act. In our case, it appears that the incident will have a long term impact on my daughter, including extending her time at Miami by at least a year to finish her education

because of dropped and incomplete classes as she deals with the psychological aspects of this traumatic incident.

I am interested to hear your thoughts after you have had a chance to review the case(s).

Please respond so I know that you received my email.

I look forward to hearing from you further after you have had a chance to review this matter.

Sincerely,

John Mirlisena

513-254-8520

From: "Hodge, David" <hodgedc@miamioh.edu>

To: jmirlisena@yahoo.com

Cc: Debbie Mason <masonda@miamioh.edu>; "Crain, Donald L." <dcrain@fbtlaw.com>

Sent: Thursday, January 10, 2013 4:20 PM

Subject: Response to your letter to Don Crain

Mr. Mirlisena,

Don Crain, Miami University trustee, shared with me your December 12, 2012 e-mail correspondence. After discussing the details of your e-mail, we determined that I should provide you with the University's response.

First, let me again express our deep and sincere concern for Amy and the challenges she has faced, and continues to face. We understand this has been difficult for her, and we are committed to providing the assistance she needs. In that vein, I was disappointed to read that you believe we have a "lack of proactive and on-going support for victims of these crimes." We have provided Amy with significant support over the past year. Dr. Susan Mosley-Howard has made herself available to Amy and as far as we are aware, we have provided all of the assistance Amy has requested. This past semester, Dr. Susan Mosley-Howard arranged for Amy to withdraw from a course without any grade penalty beyond the University's deadline for doing so. She also arranged for Amy to take an incomplete in another course and for her to be given additional time to complete the coursework to remove the incomplete beyond the normal one-semester time limit.

**Exhibit 44, page 37**

We have a wide array of services available including psychological counseling through the Counseling Center and academic support in the form of tutoring. I encourage Amy to contact Dr. Terri Messman-Moore, who is assuming these support responsibilities for the University for Spring 2013 semester, if she is in need of additional support services.

As you know, Mr. Charles was permanently dismissed from the University in the fall of 2011 for his misconduct and there is no additional investigation or action that can be taken against him by the University. I do want to assure you, that if we are contacted by other universities where Mr. Charles seeks to enroll, the University will inform them that Mr. Charles was found responsible for violating Miami's Code of Student Conduct, Section 103A, Sexual Misconduct or Assault and was permanently dismissed from the University.

Sexual violence and rape cause devastating injury across this country and abroad. Universities - particularly residential universities like Miami - are deeply committed to finding ways to effectively prevent, reduce, and respond to sexual violence and rape. I will not repeat the information contained in my January 25, 2012 letter to you, but I believe that it addresses many of the concerns you raised in your email to Don Crain. I do, however, want to take this opportunity to provide you with an update on our on-going efforts to address sexual violence and rape. As you are aware, in the spring of 2011 we significantly increased our efforts to improve our education of students to help them avoid sexual assault and our response and support of students who have experienced assault. During the fall semester 2011, the University implemented an enhanced sexual assault protocol that we believe improved our procedures. This past semester, I appointed a Task Force for the Prevention of Sexual Assault that brought together people from across campus to engage in an open, honest and clear dialog about ways to inform and educate our community about sexual violence and rape. The Task Force issued its draft report just before the winter break. The Chair of the Task Force is scheduled to meet with the Executive Cabinet and me next week to discuss implementation of the Task Force recommendations.

We are in the latter stages of searching for a full-time employee to assume responsibility for leading Miami's efforts to educate our students about sexual violence and rape and provide support for students who have experienced sexual assault. We are also working to expand and enhance communication through regular meetings with representatives from the Miami University Police Department, the Oxford Police Department and those University employees who are tasked with addressing issues of sexual assault, including the Office of Ethics and Student Conflict Resolution.

Let me reiterate our deep concern for Amy as well as my willingness to meet with you should you wish to do so. Please assure Amy that we will continue to support her in every possible way and that she should contact Dr. Terri Messman- Moore at 513-529-1877 if she needs further assistance.

Sincerely,


David Hodge

**Exhibit 44, page 38**



**From:** John Mirlisena <jmirlisena@yahoo.com>
**To:** "mosleygs@muohio.edu" <mosleygs@muohio.edu>
**Cc:** "hodgedc@muohio.edu" <hodgedc@muohio.edu>
**Sent:** Tuesday, November 1, 2011 6:47 PM
**Subject:** Amy Mirlisena report

Dear Ms. Mosley,

After what I had reported last week to Dr. Hodge, and his quick response, we never dreamed we would be in a position to have to inform you today that Amy was raped by another student this past weekend. To say that Amy has been overwhelmed by the terrible things that have happened to her since arriving at Miami University is an understatement.

After meeting with you today to report that she indeed had been raped by **Antonio Charles**, we went on to meet with the Oxford police. You can't believe how shocked I was to hear that this same young man had a reported history of sexual misconduct that was apparently known to the University. To say that this disturbs me is also an understatement. This is the reason I have copied Dr. Hodge on my email to you.

Attached you will find a summary prepared by Amy summarizing what took place that evening and the next day. If you need anything else from Amy, she can be reached on her cell @513-252-4463.

While I am aware that there needs to be some due process, I am hoping/expecting that the perpetrator will be removed from school this week so Amy feels comfortable returning next week. We appreciate the consideration we have been given to date, and hope that this matter, as far as the school goes, can be handled very expeditiously!

Respectfully,

John Mirlisena

**Exhibit 44, page 39**

EXHIBIT

15

From: John Mirlisena <jmirlisena@yahoo.com>

To: "hodgedc@miamioh.edu" <hodgedc@miamioh.edu>

Sent: Friday, May 3, 2013 2:16 PM

Subject: Follow up

Dear Dr. Hodge,

While I am very disappointed with your response, I can't say I am surprised. I was confident this would be your response, but as a fair person, I thought I owed you the opportunity to do the right thing, given your prior good faith actions.

It is clear we are at a stalemate, and your resistance to take some responsibility leaves very few options.

I am highly confident that in the months to come, the University's response will change dramatically. Much like the in the Rutgers case, attitudes will change quickly once the facts are clearly viewed in the light of day. This will be the case here too.

It's simply sad that you and I couldn't work this out.

John Mirlisena



MARY L. SWAIN

FILED
CLERK OF COURTS
OCT 24 PM 2: 14

MARY L. SWAIN BUTLER COUNTY
BUTLER COUNTY CLERK OF COURTS
CLERK OF COURTS

PROVIDE SERVICE TO THIS INDIVIDUAL:
NAME _Miami University, Inc_
ADDRESS _Attn: Robin Parker_
_501 E. High St._
CITY _Oxford_ STATE _OH_ ZIP _45056_

Today's Date: _10-24-13_     Case No.: _____

Plaintiff: _Amy Murlisena_ -VS- Defendant: _Miami University, Inc_

## PRECIPE FOR SERVICE
## COURT OF COMMON PLEAS, BUTLER COUNTY, OHIO

TYPE OF SERVICE:

- ❏ Ordinary Mail
- ☑ Certified Mail
- ❏ Appointed Process Server

- ❏ Personal Service by Butler County Sheriff
- ❏ Foreign County Sheriff
- ❏ Residence Service

THE CLERK OF COURTS IS INSTRUCTED TO SERVE THE FOLLOWING DOCUMENTS:

REQUESTING ATTORNEY:
NAME: _Eric C. Deters_
ADDRESS: _5247 Madison Pike_
CITY _Independence_ STATE _Ky_ ZIP _41051_
PHONE: _(859) 363-1900_

**Exhibit 44, page 41**

**Kenya Ash**

| | |
|---|---|
| **Subject:** | OESCR- Training |
| **Location:** | OESCR |
| | |
| **Start:** | Tue 8/12/2014 1:30 PM |
| **End:** | Tue 8/12/2014 2:00 PM |
| | |
| **Recurrence:** | (none) |
| | |
| **Meeting Status:** | Accepted |
| | |
| **Organizer:** | Becca Getson |
| | |
| **Categories:** | Training |

Kenya- 15 minute presentation on University Obligations to OESCR hearing officers

**Exhibit 45, page 1**

**University Obligations**
**Title IX Coordinator**
**15 Minutes (1:30-1:45pm)**

**Title IX** of the Education Amendments of 1972 states that:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

Title IX protects people from discrimination based on sex in education programs and activities that receive federal financial assistance.  Examples of the types of discrimination that are covered under Title IX's sex discrimination prohibition include sexual harassment (sexual assault is a form of sexual harassment), the failure to provide equal opportunity in athletics, and discrimination based on pregnancy. To enforce Title IX, the U.S. Department of Education maintains an Office for Civil Rights, with headquarters in Washington, DC and 12 offices across the United States.

In 2011, the Office for Civil Rights issued a **Dear Colleague Letter** in order to explain that Title IX covers sexual violence and to remind schools of their responsibilities to take immediate and effective steps to respond to sexual violence.

The 2011 Dear Colleague Letter:

- Provided guidance on the unique concerns that arise in sexual violence cases, such as the role of criminal investigations and a school's independent responsibility to investigate and address sexual violence.
- Provided guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures.
- Discussed proactive efforts schools can take to prevent sexual violence.
- Discussed the interplay between Title IX, FERPA, and the Clery Act7 as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions facing the perpetrator.
- Provided examples of remedies and enforcement strategies that schools and the Office for Civil Rights (OCR) may use to respond to sexual violence.

Additionally, the 2011 Dear Colleague Letter outlined the following obligations for schools:

- Once a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate action to investigate or otherwise determine what occurred.
- If sexual violence has occurred, a school must take prompt and effective steps to end the sexual violence, prevent its recurrence, and address its effects, whether or not the sexual violence is the subject of a criminal investigation.
- A school must take steps to protect the complainant as necessary, including interim steps taken prior to the final outcome of the investigation.
- A school must provide a grievance procedure for students to file complaints of sex discrimination, including complaints of sexual violence. These procedures must include an equal opportunity for both parties to present witnesses and other evidence and the same appeal rights.
- A school's grievance procedures must use the preponderance of the evidence standard to resolve complaints of sex discrimination.
- A school must notify both parties of the outcome of the complaint.

In 2013, the president signed the **Campus SaVE Act** into law as part of the Violence Against Women Act Reauthorization.  Campus SaVE applies to every post-secondary institution participating in Title IV financial aid programs, which includes Miami.

Campus SaVE:

- Requires that incidents of domestic violence, dating violence, sexual assault, and stalking be disclosed in annual campus crime statistic reports. Additionally, students or employees reporting victimization will be provided with their written rights to:

**Exhibit 45, page 2**

- o Be assisted by campus authorities if reporting a crime to law enforcement
- o Change academic, living, transportation, or working situations to avoid a hostile environment
- o Obtain or enforce a no contact directive or restraining order
- o Have a clear description of their institution's disciplinary process and know the range of possible sanctions
- o Receive contact information about existing counseling, health, mental health, victim advocacy, legal assistance, and other services available both on-campus and in the community
- Clarifies minimum standards for institutional disciplinary procedures covering domestic violence, dating violence, sexual assault, and stalking to ensure that:
  - o Proceedings shall provide a prompt, fair, and impartial investigation and resolution and are conducted by officials receiving annual training on domestic violence, sexual assault, and stalking
  - o Both parties may have others present during an institutional disciplinary proceeding and any related meeting, including an advisor of their choice
  - o Both parties will receive written outcomes of all disciplinary proceedings at the same time
- Instructs colleges and universities to provide programming for students and employees addressing the issues of domestic violence, dating violence, sexual assault and stalking. Education programs include
  - o Primary prevention and awareness programs for all incoming students and new employees
  - o Safe and positive options for bystander intervention
  - o Information on risk reduction to recognize warning signs of abusive behavior
  - o Ongoing prevention and awareness programs for students and faculty
- Establishes collaboration between the U.S. Departments of Justice, Education, and Health and Human Services to collect and disseminate best practices for preventing and responding to domestic violence, dating violence, sexual assault, and stalking.

Miami has revised all relevant protocol, policies and procedures in order to ensure compliance with Title IX, the Dear Colleague Letter and Campus SaVE.

Miami must take sufficient action to fully eliminate a hostile environment based on sex, prevent its recurrence, and address its effects. Miami responds to all allegations of harassment and discrimination, including sex-based violence, in a timely manner, appropriately and with sensitivity and respect to the survivor, irrespective of whether the actions are potentially criminal in nature or there is a concurrent response and investigation by law enforcement.

Miami's Sexual Assault Response Coordinator/Deputy Title IX Coordinator responds to all reports of sexual assault, domestic violence, dating violence and stalking within 24 hours of the report. The SARC, Title IX Coordinator and Director of the Office of Ethics and Student Conflict Resolution meet biweekly to review all reports, to ensure that the response was appropriate and to determine if additional action, such as an investigation, needs to take place.

Miami has multiple individuals that are trained annually, on issues related to domestic violence, dating violence, sexual assault and stalking, to conduct prompt, fair and impartial **Title IX investigations**. The investigations are concluded within 30 days from the date of the report, unless additional time is needed to complete the investigation. Typically the investigation would be conducted by a staff member from the Office of Equity and Equal Opportunity.

The investigation would involve interviewing the survivor, witnesses and the accused and obtaining copies of the survivor's statement, witness statements, the police report and any other relevant documentation.

At the conclusion of the investigation, the investigator will make a determination, based on a preponderance of the evidence, whether there is reasonable cause to believe Miami University's Policy Prohibiting Harassment and Discrimination has been violated. Upon a reasonable cause finding, the investigator will send the report to OESCR for appropriate disciplinary action. The investigator may be called as a witness to the hearing.

**Exhibit 45, page 3**