

# MIAMI UNIVERSITY

Date:        May 21, 2014

To:          Student Orientation Undergraduate Leaders (Souls)

From:        The Office of Equity and Equal Opportunity

RE:          Policy Prohibiting Harassment and Discrimination Training

Please find enclosed material presented to you today regarding Miami University Policy Information Manual 3.6, Policy Prohibiting Harassment and Discriminating Training. If you have any questions or concerns regarding the information presented please do not hesitate to contact the Office of Equity and Equal Opportunity. As a reminder please ensure you provide a copy of MUPIM 3.6 Policy Prohibiting Harassment and Discrimination to your students. Please report incidents of harassment and discrimination directly to the following office:

The Office of Equity and Equal Opportunity
    Kenya D. Ash, Director, Title IX Coordinator, Section 504 and ADA Coordinator
    Tandy L. Hamm, Associate Director
    Janet Fink, Administrative Assistant
    111 Hanna House
    219 E. Spring Street
    Oxford, OH 45056-2816
    (513) 529-7157
    (513) 529-7158 (Fax)
    www.MiamiOH.edu/oeeo

**Exhibit 75, page 1**

# Title IX Education & Awareness Program

Miami University takes the safety of our students seriously. Miami strives to create an environment and culture that is safe for all community members and is respectful of all individuals. Our programming starts with orientation in early summer for incoming students and their parents and extends into the first semester and beyond.

**Title IX of the Education Amendments of 1972** is a federal law prohibiting discrimination on the basis of sex in higher education. Sex discrimination includes sexual harassment and sexual violence (which includes sexual assault, domestic violence, dating violence, and stalking).

| Title IX Coordinator | Deputy Title IX Coordinator for Student Sexual Assault | Deputy Title IX Coordinator for Athletics |
|---|---|---|
| Ms. Kenya D. Ash | Ms. Rebecca Getson | Ms. Jennifer A. Gilbert |
| Director of the Office of Equity and Equal Opportunity, Section 504 and ADA Coordinator | Sexual Assault Response Coordinator | Associate Athletic Director / Senior Woman Administrator / Director of NCAA Compliance |
| 219 E Spring Street, Hanna House | 104 Health Services Center | Millett Assembly Hall |
| 513-529-7157 | 513-529-1870 | 513-529-3113 |
| ashkd@MiamiOH.edu | getsonra@MiamiOH.edu | gilberj2@MiamiOH.edu |

## Office of Equity and Equal Opportunity

The Office of Equity and Equal Opportunity ("OEEO") exists to provide an inclusive, equitable, working, living, and learning environment to members of the Miami University community. OEEO provides members of the university community a place to obtain guidance for providing equal opportunity in personnel matters, and to resolve issues of harassment and discrimination.

**Reporting Harassment and/or Discrimination**
Any individual who believes he or she is the victim of sexual harassment may report the behavior directly to OEEO. Alternatively, an individual may report the behavior to any of the following individuals: a department chair, a supervisor, a dean, an administrative head of office, the Assistant Vice President of Human Resources, the Assistant Provost for Personnel and Director of staff member of Academic Personnel Services, the Director of Intercollegiate Athletics or coaches.

## Office of Student Wellness, Sexual Assault Prevention & Response Services

The Office of Student Wellness Sexual Assault Prevention & Response Services ("SAPRS") offers consistent, relevant, and accurate risk reduction, awareness, and prevention information, resources, and education to the Miami University community; in order to prepare students for safe, effective, and caring leadership within & beyond the university. The SAPRS will responds promptly and effectively to reports of sexual assault, domestic violence, dating violence, and stalking.

**Reporting Sexual Misconduct/Assault, Domestic Violence, Dating Violence and/or Stalking**
Any individual who believes he or she is the victim of sexual misconduct/assault, domestic violence, dating violence, and/or stalking may report the behavior directly to the Sexual Assault Coordinator, Title IX Coordinator or any of the following, including Office of Ethics and Student Conflict Resolution (OESCR), the Director of Intercollegiate Athletics or coaches, Resident Assistants (RAs), Advisors to student organization or to any Campus Security Authority (CSA).



MIAMI
UNIVERSITY
OXFORD, OHIO · EST. 1809

Resources available on the back.

**Exhibit 75, page 2**

## Confidential Resources

- Student Counseling Services
  195 Health Services Center
  513-529-4634
- Student Health Services
  Health Services Center
  513-529-3000
- Dove House, YWCA Hamilton
  244 Dayton St, Hamilton, OH 45011
  1-800-618-6523
- Women Helping Women
  347 S. College Ave, Suite D, Oxford, OH 45056
  513-381-5610
  1-877-899-5610
- McCullough-Hyde Memorial Hospital
  110 N. Poplar St, Oxford, OH 45056
  513-523-2111

## Sexual Assault Prevention & Response Services

**Vision:**
The campuses, community, and individuals of Miami University will be free of sexual assault, domestic violence, dating violence and stalking within and beyond the university.

**Core Purpose:**
The Sexual Assault Prevention and Response Program respond to survivors of sexual assault, domestic violence, dating violence, and stalking while cultivating non-violent individuals and community in order to create an environment of safety, respect, and inclusion.

**Education:**
- Bystander Intervention
- Consent
- Domestic/Dating Violence
- Healthy Relationships
- Myths
- Reporting
- Resources
- Risk Reduction & Prevention
- Safety Planning: Emotional & Physical
- Sexual Assault
- Stalking
- The Healing Process

> **Messages for Survivors:**
> 1. I believe you.
> 2. It's not your fault
> 3. Resources are available

## Resources

- Miami University Police
  Police Services Center
  513-523-4321
- OESCR
  011 Warfield Hall
  513-529-1417
- Office of the Dean of Students
  108 Warfield Hall
  513-529-1877
- Office of Equity & Equal Opportunity
  Hanna House (East Spring St)
  513-529-7157
- Oxford Police Department
  11 S. Poplar St, Oxford
  911 or 513-523-4321
- Sexual Assault Prevention & Response Program
  104 Health Services center
  513-529-1870

## MARS & WAVES

- Miami University Student Organizations committed to ending and preventing Sexual Violence.
- Peer Education & Awareness Events/Activities

## WAVES
### (Women Against Violence Et. Sexual Assault)
- Advisor: Rebecca Getson, Sexual Assault response
- 513-529-1870

## MARS
### (Men Against Rape and Sexual assault)
- Advisor: Dr. John Ward, Assistant Director for Clinical and Men's Services
- mars@miamioh.edu

> **Sex-Based Offense protocol:**
>
> www.miamioh.edu/campus-safety/sexual-assault/protocol



**Exhibit 75, page 3**

 **MIAMI UNIVERSITY**
OXFORD OHIO

Office of Ethics and Student Conflict Resolution
9 Warfield Hall
Oxford, OH 45056-3629
513-529-1417

### UNIVERSITY DISCIPLINARY BOARD
### ANNUAL REPORT
### 2013-2014

Ron Scott, Chair
Glenn Muschert, Chair
Chris Taylor, Advisor

The University Disciplinary Board met to consider **10** cases during the 2013-2014 academic year.

**Fall 2013 semester:**

- During fall 2013, Disciplinary Board convened and heard **4** disciplinary cases.

**Spring 2014 semester:**

- During spring 2014, Disciplinary Board convened and heard **6** disciplinary cases.

**Training:**

- Disciplinary Board Training: September 12, 2013 and September 13, 2013
- Sexual Assault Case Training: September 19, 2013, September 20, 2013

**Exhibit 76**



☰    *Esquire*        🔍

MAR 25, 2015              WOMEN & MEN: THE ISSUE

# Occidental Justice: The Disastrous Fallout When Drunk Sex Meets Academic Bureaucracy

A drunk freshman boy met a drunk freshman girl in this dorm at Occidental College. When their sexual encounter collided with a panicked and pressured academic bureaucracy, it quickly became a disaster.

*E*    BY **RICHARD DORMENT**

f            🐦            📌            ✉️



ESQUIRE + EMILY SHUR

*Relations between the sexes have gotten a little tense. So, in "Women &*

Men," *a special section in Esquire's April 2015 issue*, we candidly address a complicated question that we should all be discussing openly: What is the state of relations between the men and women of America today?

More from the "Women & Men" special issue:

- *Nick Offerman and Chelsea Handler on Men, Women, and Genitalia*
- *Occidental Justice: The Disastrous Fallout When Drunk Sex Meets Academic Bureaucracy*
- *Do Men and Women Agree on What's OK When It Comes to Sex?*
- *9 Writers on Our Current Difficulties*
- *Stalked*

♀+♂

———————————

**On September 7, 2013, two freshmen** were gearing up for their third Saturday night at Occidental College. The small liberal-arts school in the Eagle Rock section of Los Angeles was just beginning its fall term, and after an unseasonably warm day that ran well into the 90s, the campus settled into one of those clear 70-degree nights that people plan their retirements around. In the southeastern corner of campus, under the red tile roof of Braun Hall, the hours ahead offered nothing but possibility.

ADVERTISEMENT - CONTINUE READING BELOW

**Exhibit 77, page 2**

The one freshman, John, eighteen years old and a slim six one, was good and drunk by sundown. He'd started drinking earlier in the day as part of a freshman-jock initiation. Shots, chugging, stupid human tricks—bonding and hallowed ritual to some, hazing to others—left him too drunk to finish the initiation, and around 11:00 P.M. a teammate escorted him back to the second floor of Braun. He would later describe that night as the drunkest he's ever been, and a neighbor from down the hall would describe his level of intoxication as a "shitshow." He was "slurring his words, stumbling over the others when he got up." *That* kind of drunk.

## MORE FROM WOMEN & MEN: THE ISSUE



**NICK OFFERMAN AND CHELSEA HANDLER: THE ESQUIRE Q&A**



**STALKED: WHEN ONE MAN WOULDN'T GO AWAY**

The other freshman, Jane, one month shy of her eighteenth birthday and a mere five feet two inches tall, was rebounding from the previous night's hangover by shooting vodka and sipping screwdrivers at a small gathering in a friend's room. Around 10:15, she and some friends went looking for a party off campus, but once her preparty buzz turned into full-blown, falling-down drunkenness, she parted ways with the group and started to make her way back to her room on the third floor of Braun. One of the friends who helped get her back to the dorm would later say Jane had a hard time walking and, upon seeing a resident advisor, said, "I have to act

**Exhibit 77, page 3**

normal." *That* kind of drunk.

Once inside the dorm, Jane ran into John's roommate, who told her that John was having a little dance party in their room. Her interest piqued, she went into the room, and by the time John's roommate caught up with her a few seconds later, John and Jane were embracing. The roommate promptly left John and Jane alone, and minutes later, two of Jane's friends who'd been with her earlier in the evening came in to check on her. One of them would later describe the ensuing half hour as Jane "trying to kiss John and dance with him ... and John trying to get [the two friends] to leave." That friend also said that "Jane was grabbing John and trying to kiss him... . John was 'somewhat' responsive ... but 'also seemed pretty indifferent' to Jane's advances. [The friend] observed that John was 'not at all going for her ... it was not like he was grabbing her and pulling her onto the bed.' " Eventually, according to Jane's other friend in the room, "John and Jane laid down together on John's bed, with Jane on top of John ... 'getting really physical' ... [with Jane] 'kind of riding on top of John. Her hips were moving... . It looked like something sexual was going down.' " Her two friends convinced Jane it was time to go home, but not before she gave John her number. (The college would later commission an inquiry into the events of the night, with two independent investigators interviewing witnesses and summarizing their statements—and in some instances quoting them directly—in an official report. All observations attributed to witnesses in this story, as well as texts cited, are taken from that report.)

The two friends got her back to her room, put her to bed, and left. It was 12:31 A.M., and she got a text.

JOHN: The second that you're away from them, come back

JANE: Okay

JOHN: Get the fuck back here.

JANE: They're still with me o

JOHN: Make them leave. Tell them yoy want to sleep. I'dc. [I don't care.] Just get back here

JANE: Okay do you have a condom

JOHN: Yes.

JANE: Good give me two minutes

JOHN: Come here.

JANE: Coming

JOHN: Good girl.

JOHN: Knock when you're here

Seemingly aware of what was coming next, Jane texted a friend "I'm wasted" and "I'mgoingtohave sex now," and while she made her way down to John's room, she vomited in a trash can in the hallway before making it to the men's bathroom and, finally, John's room.

Later, John would say he remembers few specifics about the following hour, including the 12:39 A.M. text he sent to his roommate instructing him to "stay the fuck out of our room." He also put a piece of paper in the slot for the key card to the room, the millennial equivalent of the sock on the doorknob. Jane would say that she doesn't remember much either, except for when she told John she'd just thrown up and needed a piece of gum; and when she asked him again if he had a condom; and when she performed oral sex on him; and when John told her that his roommate had just walked in on them having sex. (His roommate would later tell

**Exhibit 77, page 5**

investigators that, based on what he was told to look out for during the sexual-assault-prevention training he received during orientation, what he saw when he walked in the room didn't look like sexual assault.) Later, when John went down the hall to use the restroom, a neighbor from down the hall knocked on John's door to check on Jane. According to the investigators' report, "He asked if she was okay. Jane responded, 'yeah.' [He] said he asked, 'Are you sure?' Jane replied, 'Yeah, I'm fine.' [He] said he asked Jane Doe a third time if she was okay, and she answered that she was." While the neighbor would also say that Jane answered "kind of unconvincingly" and she sounded "kind of sad," he said he "took her word for it." (Jane told investigators that she also remembers this exchange.) John returned from the rest room, and thirty minutes later Jane left his room.

ADVERTISEMENT - CONTINUE READING BELOW

At 1:57 A.M., John texted his roommate, "Our room is free, go back any time," and twenty minutes later Jane sent the following text message to two friends:

:)

John would later learn that he finished the night by talking to a female friend for a few minutes—about what he does not recall—and going to sleep. Jane, meanwhile, went back to her room, where, her roommate

8/7/2015    Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 11 of 60 PAGEID #: 3082

Occidental Justice: The Case About What Didn't Happen at Occidental Academic Burea...

would later say, she "was not making sense, was slurring her words, could not unbutton her clothing... ." However, when Jane's roommate went to take a shower, Jane got out of bed and made her way to the common room in another dorm. Her roommate eventually found her in her pajamas, "sitting on a couch on some guy's lap," as her roommate put it, and joking about Nascar. Her roommate got her out of there, stating later that Jane was incoherent.

## MORE FROM ESQUIRE



**OUR CURRENT DIFFICULTIES: 9 ESSAYS ABOUT MEN AND W...**



**STALKED: WHEN ONE MAN WOULDN'T GO AWAY**

John and Jane would both wake up the next day extremely hungover and uncertain about what had happened. Later in the day, Jane would learn she was no longer a virgin. Three months later, John would find out he'd been expelled.

\*\*\*

**Before *Rolling Stone* and UVA,** before Jameis Winston and Florida State, before a slight young woman began hauling a mattress around Columbia University, there was Title IX, the landmark 1972 statute establishing that no student in a federally financed education program can be discriminated against or deprived of equal access to education because

of his or her gender. For decades Title IX was known mostly for its impact on college sports, and though the law technically covered incidents of harassment and violence, sexual assaults on college campuses were generally matters left to the discretion of college administrators. "Most schools were not thinking of these cases as being about Title IX," says Nancy Cantalupo, a professor at Georgetown Law and a vice-president at the National Association of Student Personnel Administrators. "They were just thinking about them as being a part of their student disciplinary process."

That all began to change in 2011, when the Office for Civil Rights in the Department of Education, which is charged with enforcing Title IX compliance, sent out what it calls a "Dear Colleague" letter informing any college that receives federal funding—that would be almost all of them— that it must treat sexual-assault claims as potential federal civil-rights violations or risk losing their funding. The decision effectively put colleges in the law-enforcement business, and it also provided a powerful tool to a new generation of activists across the country who were fed up with how administrators too often blamed or dismissed victims of sexual assault on campus.





The night after their drunken encouter, John and Jane sat outside Braun Hall and, according to John, talked for two hours about what had happened the night before – which both claimed they couldn't really remember.

ESQUIRE + EMILY SHUR

In the spring of 2013, two professors at Occidental, Caroline Heldman and

**Exhibit 77, page 8**

Danielle Dirks, filed two complaints against the school, under Title IX and a related law, on behalf of the recently formed Oxy Sexual Assault Coalition (OSAC), alleging Occidental had mishandled investigations and underreported incidents of sexual assault for dozens of women. OSAC's list of grievances is disturbing, including: "two of three respondents found responsible for multiple rapes have been invited back on campus, exposing a new crop of students to known predators"; "administrators telling survivors after meeting their assailants, 'he didn't seem like the type of person who would do something like that' or 'he didn't seem like a rapist' "; and a college administrator "telling a group of male athletes that most of the cases of alleged rape at Oxy are 'girls getting back at their ex-boyfriends.' " There were allegations that critics of the administration were being intimidated and that their e-mails were being secretly monitored, both charges that Occidental would deny. Under intense pressure from both the OCR—which was investigating the potential Title IX violations and could, theoretically, withhold Occidental's federal funding—and campus activists, the college president, Jonathan Veitch, promised to make amends and turn Occidental into a national leader in fighting sexual assault, in part by revising its policies on investigating such offenses and expanding its definition of sexual assault.

John was only vaguely aware that all this was going on when he made his decision to attend Occidental. "I'd heard about it, but I had this kind of 'it won't affect me' mentality," he says, sitting in the shaded area outside a Starbucks in a sunny part of California last November. "College has this built-up reputation as being the best years of your life. You're gonna get a great education, you're gonna meet amazing people, you have the social and moral liberty to indulge yourself. It's built up as that in our society, and it was definitely that way for me."

Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 1 of 60 PAGEID #: 3085

Fourteen months since that night, John has agreed to speak in detail for the first time about his experience at Occidental. With a pristine white zit just above his mouth and little evidence of ever having shaved, he's a young nineteen, and in between bites of a bagel and sips of some chai concoction, he spoke a little about his life before college: born and raised in California to religious parents; an A student who drank a little but not much in high school; a varsity athlete in a prep-school sport; a highly social kid who, in the words of his father, never clung to his mother's leg when entering a new room. He'd applied to Occidental in part because his grandparents had met there as students and in part because he liked its international-relations program, and when he was accepted, he crossed his other options off the list.

ADVERTISEMENT - CONTINUE READING BELOW

John—not his real name, as he prefers to remain anonymous—arrived on campus at the end of August and, like all incoming students, attended the mandatory orientation seminars. "Absolutely mandatory," he says today. "And due to the fact that they'd just been hit with this major Title IX suit a couple months earlier, our orientation was absolutely dominated by sexual assault." When the presentations turned to alcohol and its role in sexual assaults, John recalls, "the line is basically that you have to get consent. If someone's incapacitated, if someone's passed out, [they] can't give consent. That was pretty clear." Nothing about signs of potential incapacitation beyond obvious unconsciousness? None that he can recall,

**Exhibit 77, page 10**

John says. "Even now it's murky on where the line is between drunk and incapacitated." (Occidental declined to clarify how its orientation distinguished between intoxication and incapacitation either during 2013 or after.)

## MORE FROM ESQUIRE



**HOW HILLARY CLINTON TROLLED THE GOP DURING THE DEB…**

**THE REPUBLICAN DEBATE WAS A SORRY MESS**

He knew Jane a little from around the dorm and from a class they had together. "I had seen her two or three times in class. I had one conversation with her. I really didn't know her at all." And then came his initiation night. "There were a variety of drinking games, like you had to drink a certain amount of alcohol in a certain amount of time, then you had to do push-ups and run to another house. There were four challenges, and I made it through three because I was throwing up so much."

John says he remembers almost nothing from the following hours back at his dorm. "Nothing specific. I woke up and I was like, *wow*. Like, *what?*" He checked his text history and put the pieces together, slightly mortified by what he was reading. ("When I look in the mirror, do I see that person [from the texts]? No. That was me extremely, extremely intoxicated.")

Jane—also not her real name—told investigators that she woke up on

**Exhibit 77, page 11**

Sunday morning still a little drunk and saw a number of missed calls and "freaked out voice mails" from the friend to whom she wrote "Imgoingtohave sex now." Reading through her text messages, she began to suspect what had happened, but she wasn't certain until later in the day, around seven, when she met with John's neighbor from down the hall —the "Are you okay?" one—who confirmed what happened. (John's roommate told investigators that he'd met with Jane earlier in the day, around 3:00 P.M., and told her that she'd had sex with John, though Jane never mentioned this meeting in her statements.) Around 11:00 P.M., she bumped into John and, according to the investigators' report, "asked him bluntly, 'Did we have sex last night?' He told her that they did. But when she asked how he knew, he said he did not remember having sex with her. He said that he concluded they had sex, because he found her belt and earrings, he saw his text messages, and he found a used condom." (Jane, through her attorney, declined to comment for this article and has never spoken publicly about that night or its aftermath. All statements and recollections attributed to her are from the investigators' report.)

After this initial encounter, John says, they met up again later that night and spoke for a while outside their dorm. "We just sat outside Braun Hall and talked for like two hours. I was like, 'Wow, we had sex last night and I don't really know you,' and she was like, 'I don't really know *you*.' And we just talked it through. I mean, it's awkward, but we had a pretty decent conversation and basically chalked it up to a drunken mistake. We left things very good right then.

"That was Sunday night, and Monday, the next day, I was sitting in class and she wasn't there," he says. "And halfway through the period—there's a whole bunch of open seats—she walked in. I was at the far side of the

**Exhibit 77, page 12**

classroom. We made eye contact, she came over and sat next to me."
John's roommate, who was also in the class, told investigators that it
looked like the two were getting along normally. "I thought it was weird
after I learned of the complaint," he said. "Why sit next to him if he
assaulted you?"

Attorney Gloria Allred at a press conference in April 2013 with Occidental students who
complained that the college violated federal standards for dealing with their claims of rape or
sexual assault.

AP + NICK UT

Jane was late for class because, acting on advice from her roommate,
she'd gone to the campus health center to speak to a counselor about
Saturday night. According to Jane's statement to investigators, the
counselor listened to her story and responded: "That sucks a lot." Jane
then met with the resident survivor advocate, who advised her to go get a
rape kit performed at a local clinic. The advocate also told her that since
she was seventeen, the doctor would have to alert the authorities. As Jane
did not want to involve the police, she instead went to class and sat next to
John because, as an advisor would later report, she "didn't want to make a
big deal of it." (The advisor also reported that she told her she "felt fine
sitting next to him" and that he "genuinely seems like a good person"—
which may have been plain statements of fact or, as some would later
contend, evidence she was in denial, which is not uncommon among
trauma and abuse victims.) After class, she approached her professor,
Movindri Reddy, and over two conversations, told her everything that had
happened. Reddy suggested she speak to someone.

**Exhibit 77, page 13**

8/7/2015  Case: 1:15-cv-00605-MRB-Doc #: D41-4 Filed: 01/26/16 Page: 18 of 60 PAGEID #: 3089

ADVERTISEMENT - CONTINUE READING BELOW

Jane and John would text later that night:

JOHN: What did you guys talk about? [referring to a group dorm meeting]

JANE: Making good decision. Which I found somewhat fitting.

JOHN: Ahaha that is definitely fitting. I think I'm gonna take a long break from alcohol here ...

JANE: I might join you on your stint of sobriety

JOHN: Dooo itttt. I'm gonna be sober all week, I need to focus on school and get my head on straight.

JANE: Do you feel guilty?

JOHN: Yes. I was blackout drunk but I still feel terrible about what happened. I'm so sorry that everything happened this way, I wish it was more special for you.

JANE: Okay

JOHN: I don't know. I'm not angry that stuff happened between us, I just wish we had known each other more.

JOHN: I'm glad that we're still talking :)

JOHN: Sigh. I hope none of that came across the wrong way. I want you to know that I'm not a bad guy.

JANE: I think I'm still trying to think through everything. And I'm not doing a great job

**Exhibit 77, page 14**

## MORE FROM ESQUIRE



**THE 'OTHER' KIDDIE TABLE AT THE KIDDIE TABLE DEBAT...**

**THE REPUBLICAN 'KIDS' TABLE' DEBATE WAS, WELL, WEI...**

"I thought we were just kinda gonna have an awkward friendship moving forward," John says. "Unbeknownst to me, she'd been talking to a lot of people. You know, counselors."

One of those counselors was Danielle Dirks, the professor who'd helped file the Title IX complaint the previous spring and the someone that Reddy suggested she speak to. According to Dirks's statements to investigators, when Jane first told Dirks her story, Dirks called what happened to Jane "rape," to which Jane replied, "Oh, I am not calling it rape yet." According to Jane's statements to investigators, Dirks told her that John "fit the profile of other rapists on campus in that he had a high GPA in high school, was his class valedictorian, was on [a sports] team, and 'from a good family.' " Dirks would also tell the investigators that Jane's behavior matched "the dozens of other survivors [of sexual assault] I have met with on campus"; that Jane had been in "a strong state of denial" about the nature of the event; that John was "acting in the same way all these other young men [involved in sexual assaults] have acted by checking in on Jane after the incident, and seeking to manage her by being nice in a manner ... described as 'disingenuous.' "

(Dirks did not respond to requests to be interviewed for this story, but she told the Web site Business Insider in May 2014 that "regarding my alleged statement on the 'profile of a rapist' at Occidental, the College's investigative report misrepresents my statements and contains factual errors regarding my involvement in the case." Whether Jane misrepresented to investigators what Dirks told her, or whether investigators made a mistake when recording Jane's testimony, and whether it bothered the college that a key witness in its investigation, the person whose handwritten notes from meeting with the accuser were submitted as evidence, is now alleging factual errors and misrepresentations in the final report is unknown. Occidental declined to comment on Dirks's claims or anything else regarding the details of the case, citing pending litigation. However, Dirks elaborated on her view of male college students in general to New York magazine in September: "Research, [Dirks] says, shows that only a small percentage of college guys truly don't know where the line is—'and, for them, if you tell them to get verbal consent, they don't push so hard.' She pauses. 'But the rest of them —and I know it's hard to think of our brothers, our sons, like this—are calculated predators. They seem like nice guys, but they're not nice guys.' ")

Over the following week—as she continued speaking with Dirks and, as she relayed to investigators, her roommate "pushed her to realize that she had been sexually assaulted"—Jane started to develop what she described as emotional problems. Nightmares. Problems focusing. Flashbacks to that night. According to the investigators' report: "Jane Doe stated that she decided to report what had happened when she realized how much it had affected her emotionally, while seeing no reaction from John. She noted that he attended his classes without difficulty, and she 'saw that he

**Exhibit 77, page 16**

Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 21 of 60 PAGEID #: 3092

wasn't fazed by what had happened at all.' "

Jane told investigators that since the incident with John, "navigating around corners with right angles 'scare[d] the hell out of me [because] I don't know what is around the corner.' " She also said that she heard John was "going on about how much he hates women." (John denies saying anything like this.) And she told investigators, "It scares me that he still goes out and still goes to party. I don't think anyone should have to go through what I have gone through."

About ten days after the event, Jane decided she would report the incident to both the campus and criminal authorities. (At Occidental, like nearly all colleges, a student can choose both options, one option, or neither—there is typically no requirement that the accuser or the college alert the local police that a potential crime occurred—though in Jane's case, because she was under the age of eighteen at the time of the incident, Occidental policy would have likely required administrators to contact the authorities whether she wanted them to or not.) Jane was ready to call it rape.

\*\*\*

**"I was walking on campus with some friends at around 9:30,"** John recalls of the night when his life as a normal Occidental student effectively ended. "I got a call on my cell phone from an unknown number and I picked it up. It was the Title IX director of the school, saying, 'You need to get all your stuff and get out of the dorm. We're gonna have officers take you somewhere.' She was being extremely legalistic, telling me that there's a complaint against me but not really clarifying what it is. And I remember just being like, 'Tell me what's going on.' And she was just like, 'We really can't.'

**Exhibit 77, page 17**

"I called my dad right away," John says, "and I was like, 'You should go outside. I have something to tell you.' "

John's father called a family friend, an attorney in Los Angeles named Mark Hathaway, and after learning the extent of the allegations over the next few days, according to John, they started "looking over the text-message evidence. It was like, logically, there's no way they could expel me."

ADVERTISEMENT - CONTINUE READING BELOW

Around the time Jane filed her complaint with Occidental, she went to the LAPD, where, according to her statement to investigators, she was asked by a desk officer "if John forced her into his room, and when she said 'No,' the officer stated, 'Well then, it's not rape.' " Jane went home distressed. (According to a representative from the LAPD, this was a procedural error and not how accusations of sexual assault are typically handled. It is also a prime example of exactly what women fear they will encounter if they go to the police.)

Despite the initial encounter, LAPD detectives visited Occidental several days later and told Jane that they would investigate the case. Six weeks later, after collecting evidence—including the text messages exchanged by John and Jane—and interviewing witnesses (except for John, who, on the advice of his attorney, declined to be interviewed by the officers), they found insufficient evidence to charge John with a crime. According to the

**Exhibit 77, page 18**

Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 23 of 60 PAGEID #: 3094

Charge Evaluation Worksheet completed on November 5, filled out and signed by the deputy district attorney, "witnesses were interviewed and agreed that the victim and suspect were both drunk, however, that they were both willing participants exercising bad judgment… . Specifically, the facts show the victim was capable of resisting based on her actions… . More problematic is the inability to prove the suspect knew or reasonably should have known that she was prevented from resisting in that state. It would be reasonable for him to conclude based on their communications and her actions that, even though she was intoxicated, she could still exercise reasonable judgment… ."



Occidental–of which seventy-seven-year-old Thorne Hall is the symbolic center–is awaiting rulings from the federal government on complaits of its handling of sexual-assault cases.

ESQUIRE + EMILY SHUR

## MORE FROM ESQUIRE



**PHOTOS: HIROSHIMA, 70 YEARS AGO AND TODAY**

**BOUNTY HUNTERS RAID HOME OF PHOENIX POLICE CHIEF**

A little over a year later, the investigating officer (who asked that her name be withheld, explaining that she doesn't want to appear in Web

**Exhibit 77, page 19**

searches about this case and potentially dissuade victims from speaking to her) remembered the case clearly: "We had these really bad text messages that supported a consensual encounter," she says. "Even though everything pointed to her being intoxicated, she still had enough frame of mind to send these text messages saying, 'I'm on the way. I'm coming. I'm coming. Do you have a condom?' So his state of mind is, she's saying yes… . How was he supposed to know that she did not want to give consent? And if he's intoxicated, then that kind of falls under the same category: Was *he* able to give consent? There's a whole bunch of different factors that went into this.

"Based on the evidence," she adds, "I don't think he committed a crime."

\*\*\*

**When he stepped up to a podium at the White House last September** to launch "It's On Us," a campaign to combat sexual assault on college campuses, President Obama said, "An estimated one in five women has been sexually assaulted during her college years." That statistic—which quickly took hold in conversations around the issue— stems primarily from a 2007 study commissioned by the National Institute of Justice in which 19 percent of female students reported experiencing a completed or attempted sexual assault during their four years in college, with sexual assault defined as ranging from forced vaginal sex to "forced kissing or fondling." The findings were based on Web surveys of students at two unnamed public universities, and they more or less mirror the findings of a few other studies over the past few decades.

However, the lead author of the NIJ study, Christopher Krebs of RTI

**Exhibit 77, page 20**

International, a research organization in North Carolina, is the first to point out the limitations of his data. "We don't think our data are nationally representative. We've never described them in that way or claimed that they are," he says by phone from his office outside Raleigh. And since data on the prevalence of college sexual assault is widely considered soft (due especially to varying definitions of sexual assault as well as an estimated 90 percent nonreporting rate among victims), it's easier to understand the Obama administration's actions as less the urgent response to a growing crisis and more the logical extension of its long-held sympathies. "There really has not been an increase in incidents," says Brett Sokolow, a lawyer and the founder of the National Center for Higher Education Risk Management, which consults with colleges and universities on their sexual-assault policies. "The catalyst was a shift in priorities for a new administration coming into office."

"When I started here at the White House," says Lynn Rosenthal, who joined the Obama administration in its early days as the White House advisor on violence against women and left her position in January, "the vice-president asked me to look at all the data about violence against women and girls, and he wanted to know what was different from fifteen years ago, when we passed the Violence Against Women Act." (Then-senator Biden was instrumental in the passage of the 1994 bill, which helped contribute to a staggering 67 percent decrease in reported rates of domestic violence between 1993 and 2010.) "And when we looked at the data, the high rates of both dating violence and sexual-assault experience by women in the sixteen- to twenty-four-year-old age group just really stood out. The vice-president looked at this data and said, 'This is where we need to be working. If we can make a difference here, we can make a difference.'"

**Exhibit 77, page 21**

Concentrating on college campuses made sense for the administration, as the women at risk were of college age and it was also where the administration had some direct control. "The federal government has no jurisdiction over rape," explains Senator Claire McCaskill, a former sex-crimes prosecutor who is leading the charge on a bill to strengthen the process by which colleges measure and report incidents of sexual assault. "But it has jurisdiction over campus sexual assault via Title IX."

The 2011 Dear Colleague letter "was the first time the administration called sexual violence specifically a civil-rights issue," says Catherine Lhamon, the current assistant secretary for civil rights at the Department of Education. And in threatening to cut off funding to a college or university that the OCR determined was unable or unwilling to enforce Title IX, the administration literally made a federal case of campus rape. College administrators were officially on notice, and the stakes for noncompliance—loss of money to cover financial aid and scientific R&D, among other federal funds, as well as the very bad publicity that comes with being on the OCR's hit list—couldn't be higher.

In addition to requiring every college to employ a dedicated Title IX coordinator to oversee compliance, the Dear Colleague letter recommended schools provide "holistic and comprehensive victim services" to accusers (counseling, etc.) and stipulated that colleges must apply a "preponderance of the evidence" standard to its proceedings rather than the higher "clear and convincing" standard or even the highest "beyond a reasonable doubt" standard used in criminal cases. (Although some experts estimate that 80 percent of colleges were already using the preponderance-of-the-evidence standard prior to 2011, it became the national standard thereafter.) The preponderance standard dictates that

**Exhibit 77, page 22**

any judge or jury be only 50.1 percent sure that the accused is responsible, and it typically applies to civil cases in which monetary damages (rather than jail time) are what's at stake.

ADVERTISEMENT - CONTINUE READING BELOW

While advocates of the shift to preponderance say it merely brought campus investigations in line with other Title IX investigations and civil proceedings, it also considerably lowered the bar for achieving a finding of "responsible," or guilty, against the accused. "It should not be harder for a victim to prove that she was assaulted than it is for the person she's accusing to prove the assault didn't occur," explains Sokolow. "A preponderance [standard] creates a level playing field, whereas with any higher standard, it technically privileges men. It makes it harder for a victim to prove that a male assaulted her." Besides, Sokolow says, "Colleges aren't really addressing rape. They're addressing sexual violence as a civil-rights violation and as a form of discrimination, and their definitions are much broader."

**Exhibit 77, page 23**

## MORE FROM ESQUIRE





**STEPHEN KING WROTE A CAMPAIGN SLOGAN FOR DONALD TR…**

**BILL CLINTON PROBABLY HAS DONALD TRUMP ON SPEED DI…**

This shift helped spur reports to campus authorities—by nearly 50 percent, with the number of sexual-assault reports on college campuses across the country jumping from 3,177 in 2011 to 4,721 in 2013. (At Occidental, it increased by more than 400 percent, from twelve incidents in 2011 to sixty-four in 2013.) However, there was no comparable shift in the number of reports to the police. "It should surprise no one that students are choosing to go to colleges" before criminal authorities, says Joseph Cohn, the policy director with the Foundation for Individual Rights in Education (FIRE), an advocacy group for free speech and due-process rights on campus. "Complainants are being told by well-intentioned victims' advocates that law enforcement doesn't really have an interest in doing this for you, and you'll be put under intense scrutiny and they'll cross-examine you and they won't believe you. On campus, there's a lower standard of evidence, and you'll get a much easier outcome with much less scrutiny." In a Senate roundtable on sexual assault last year, Alexandra Brodsky, a prominent sexual-assault activist and herself a sexual-assault survivor, confirmed as much: "When I reported violence to my school, five, six years ago now, I was explicitly told not to go to the

police—that it wouldn't be worth it and would be emotionally draining... . I know I would never have come forward if I had been forced into that option."

In the case of John and Jane, how the LAPD and the district attorney's office interpreted and acted on the evidence would have no bearing on the campus investigation. Occidental, using its own standard of proof and its own policies and definitions, was in charge.

\*\*\*

**"I went into monk mode,"** John says of the days and weeks following Jane's formal complaint. "Like: I'm just not gonna feel things, which is easier said than done... . Like, I'm nineteen. I just left home. My mom's poring over details of me having sexual intercourse with a girl. I felt like I was a kid that got completely thrown around by a bunch of people with high-powered doctorate degrees and a lot of institutional power."

John was being investigated for two potential violations of the school's student conduct code—sexual assault, and nonconsensual sexual contact. (The former is defined by Occidental as "having or attempting to have sexual intercourse with another individual: by force or threat of force; without effective consent; or where that individual is incapacitated"; the latter is a broader definition and encompasses inappropriate touching, kissing, and the like.) He also received a "stay away" letter from the school's dean of students' office, directing him to avoid contact with Jane. "On a small campus of two thousand people," he says, "everyone knew. I would get death stares daily." Jane, according to her attorneys and investigators, continued to struggle with anxiety and fear, with Dirks reporting Jane telling her that "at one point, [she] sat unable to move for

**Exhibit 77, page 25**

twenty minutes on a bench on campus."

The college hired an outside agency, Public Interest Investigations, to oversee its inquiry, with two independent investigators interviewing ten witnesses, including Jane. John declined to speak with them, although he and Jane both agreed to turn over their texts. At Occidental, as at many colleges, neither the accused nor the accuser is permitted to have an attorney present during questioning, which campus authorities believe is the best way to keep bickering and blowhards out of what's supposed to be a private, speedy deliberation. However, any testimony given to the private investigators can be considered fair game in criminal investigations, and because of the LAPD inquiry, John's attorney advised him to decline to be interviewed by campus investigators.

John and Jane were each able to choose an advisor to help guide them through the process, and Jane's was Movindri Reddy, the professor who had first put her in touch with Danielle Dirks. John, however, had a more difficult time trying to find someone. "I'm at a new place, and I don't know any of the staff. My lawyer pulled up a list of people with Title IX training, because they were the only ones who could serve as advisors. I just kind of went down the list. Most of the people I asked said no." (Five Occidental staffers declined to be his advisor.) "Eventually I found a nice lady who worked in dining services to sit with me. She'd previously served on a panel, and she said my chances of winning were extremely good."

According to college policy, "Formal resolution of a complaint ... will occur through the use of a Conduct Conference"—which is recommended for uncontested accusations—"or a Hearing Panel ... which typically consists of three members drawn from a pool of trained faculty and

**Exhibit 77, page 26**

campus administrators." However, Occidental determined that John would not face a hearing panel but rather a single external adjudicator, Marilou Mirkovich, a local lawyer specializing in employment law. (Occidental's policy permits it to appoint an external adjudicator at its sole discretion. It declined to explain its decision, either to John's attorney or to Esquire.)

ADVERTISEMENT - CONTINUE READING BELOW

To Mirkovich, the hearing needed to resolve four issues: Did John and Jane have sex? Did Jane, at the time of the incident, appear to give consent? Was Jane too drunk—and in fact incapacitated—to provide consent? And did John know, or should he have known, that she was incapacitated? John and Jane were allowed to make opening statements. Witnesses were called and questioned. And John, who'd entered the proceedings confident of his chances, says he grew uncomfortable as the hearing unfolded. "I was in a room full of women, and there's a crying girl with a lengthy speech about how I sexually assaulted her, and she broke down in tears," he says. "And looking around, I saw the look on all these women's faces, and they're relating. My adjudicator, hired by the school, I saw the look on her face and I'm like, *That's not good.*" (Occidental has no policy about the optimal male-female balance of such proceedings, meaning, in theory, Jane could just as easily have been placed in a room full of men.)

**Exhibit 77, page 27**

## MORE FROM ESQUIRE



**REPUBLICAN CANDIDATES RANKED BY VERY IMPORTANT MET…**

**BREAKING DOWN THE JADE HELM CLUSTERF*CK**

Over the course of the six-and-a-half-hour proceeding, it was quickly determined that, yes, John and Jane had sex, and, yes, at the time, via text messaging, it was reasonable to conclude that Jane was giving consent. But was Jane too drunk to give consent—was she, in fact, incapacitated? And should John have known that Jane was so drunk that her consent was questionable, despite the fact that he himself was just as drunk?

To John, those questions began and ended with what he gleaned from the sexual-assault orientation: You're incapacitated and unable to give consent when you're passed out and you physically can't speak or indicate yes or no. To Scott Berkowitz, the president of the Rape, Abuse & Incest National Network (RAINN), incapacitation is about "being physically unable to resist or unable to speak. Generally it's understood to mean that drugs or alcohol have had such an effect on [a victim] that they're not in a position to express consent." To the state of California, incapacitation means "incapable of resisting because the victim … was unconscious or asleep [or] was not aware, knowing, perceiving, or cognizant that the act occurred."

**Exhibit 77, page 28**

None of these definitions mattered. The only definition that mattered to Mirkovich was Occidental's:

"Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity because s/he lacks conscious knowledge of the nature of the act (e.g., to understand the who, what, when, why, or how of the sexual interaction) and/or is physically helpless. An individual is incapacitated, and therefore unable to give consent, if s/he is asleep, unconscious, or otherwise unaware that sexual activity is occurring... . Evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impact an individual's decision-making ability; awareness of consequences; ability to make informed judgments; or capacity to appreciate the nature and quality of the act."

Mirkovich concluded that Jane's "successfully navigat[ing] herself, under her own power to [John's] room ... [indicates that she] had an awareness of where she was and that her motor skills were sufficiently intact." However, Mirkovich also concluded that because multiple witnesses describe her as "slurring her speech, stumbling, and not making sense ... [Jane's] decision-making ability was significantly impaired... . [She] was not aware of the consequences of her action and she did not have the capacity to appreciate the nature and quality of the act. Accordingly, [Mirkovich] finds [Jane] was incapacitated."

Did John know she was incapacitated? Mirkovich decided that even though John "was more intoxicated than he had ever been," and that "this level of intoxication so impaired [John's] ability to assess [Jane's] incapacitation that he did not have actual knowledge of [her]

**Exhibit 77, page 29**

Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 34 of 60 PAGEID #: 3105

incapacitation," his state of mind had no bearing. Occidental policy dictated that "being intoxicated or impaired by drugs or alcohol is never an excuse for sexual harassment, sexual violence ... and does not diminish one's responsibility to obtain consent." If a sober person would have known that Jane was too drunk to know what she was doing, Mirkovich reasoned, then John should've known that, too. (At press time, Occidental had refused to release a transcript of the hearing, so all of Mirkovich's findings come from her final report to the college. Mirkovich declined to speak with Esquire.)

Mirkovich declared John responsible for both violations. Occidental, like many colleges, had a variety of options for punishments, ranging from community service and censure to expulsion. (In 2010, the Center for Public Integrity found that a mere 10 to 25 percent of students found responsible for some degree of sexual assault were expelled. Occidental, for its part, once assigned a book report to a student found responsible for sexual assault.) However, John was given the most severe punishment: "permanent separation from the college."

"I was in shock," John says now. "I went from *There's no way I could lose* to *Wow, okay. I'm going to be living with my family again.*" Under Occidental's system, both students can appeal the decision on the grounds of procedural errors or the existence of new evidence. In his appeal, John cited, among other factors, the all-female makeup of the deliberations and Danielle Dirks's potentially prejudicial statements in the investigators' report (which Dirks herself now disputes), but the college found none of his objections qualified.

It was the middle of December, with winter break looming, and John had

**Exhibit 77, page 30**

to act quickly if he was going to transfer to another school before the next semester began. He contacted a small college in the Midwest he'd previously considered attending, and the college agreed to take him, unaware of what had happened at Occidental. It was not a world-class institution, but it would allow him to continue his education while his lawyer plotted his next move. He arrived on the first day in January, just a few weeks after his expulsion from Occidental, and immediately, he says,"I get called into the dean's office. They said, 'We got an anonymous call. Have you been expelled from Occidental for sexual assault?' I was like, 'How do you know this?' And they were like, 'We can't say. An anonymous phone call.' They rescinded their acceptance, and I flew back home the next day."(Officials at the college would only confirm that John had been accepted and that his acceptance had been rescinded.)

ADVERTISEMENT - CONTINUE READING BELOW

John had nowhere to go.

\*\*\*

**And so he sued,** mostly, he says, because Occidental left him no choice. "After learning that I would have trouble attending another institution, I had to press charges. I have to get an education." In February 2014, he filed suit with the L. A. Superior Court to ask for a Writ of Mandate, which would overturn the college's decision and clear John's record on the grounds he didn't receive a fair hearing.

**Exhibit 77, page 31**

Upon filing his petition, John also asked the court to stay the school's decision so he could apply to other schools without a mark on his transcript that may or may not be final.

## MORE FROM ESQUIRE



**ACTIVE SHOOTER SHOT DEAD BY POLICE AT TENNESSEE MO...**

**MITCH MCCONNELL WANTS TO END ALL THIS REPUBLICAN D...**

To make his case, John submitted the college's investigation and hearing reports as evidence, which made all of the internal documents, texts, e-mails, and deliberations part of the public record. (Occidental says that John or his lawyer had no right to remove these documents from the college's secure server or to make them public. Occidental requested the court seal all the files, and the court declined to do so.) The names of Jane and John are redacted, though none of the witnesses are so fortunate. After the documents became public, one of the female witnesses described to the Huffington Post that she received hate mail along the lines of: "What kind of a radical fucking man hating dyke are you?" and "Please, slice your goddamn wrists, nail your pussy shut and go wait tables before you harm someone else. It's bitches and whores like you who give women a bad name." (Neither Jane's friends nor any of the other witnesses we contacted responded to our requests for comment on this story. We have withheld their names for obvious reasons.)

**Exhibit 77, page 32**

Using these documents as evidence, John's attorney, Mark Hathaway, set about attacking the external adjudicator's decision: "It would be difficult to imagine a better documented case of consensual sex than this case, where the female student initiates the sexual contact, asks for a condom in writing, tells a friend she is going to have sex in writing, asks for a condom again when she gets to the room, tells friends she is 'fine' when she is having sex, willingly performs consensual oral sex, is interrupted by a roommate while having sexual intercourse and continues having intercourse, and then texts smiley faces to friends right after having sexual intercourse." All of this, Hathaway argued, demonstrated that Jane "had 'conscious knowledge of the nature of the act (e.g., to understand the who, what, when, where, why or how of the sexual interaction).' " Occidental, meanwhile, defended its procedures and policies as legal and fair, particularly given its prerogatives as a private university.

In deciding whether to issue the stay, Judge James Chalfant told John's attorney and the lawyer representing Occidental that "[John's] got a pretty strong position... . I would think an eighteen-year-old boy who gets these texts would think she's fully capable of consenting." The court is expected to issue its final decision in May, but Chalfant granted John's request for a stay: "Why wouldn't it be in the public interest to stay this scarlet letter that's being attached to his transcript until such a time as there is a final decision on the merits?"

A few weeks after filing with the Superior Court, in an apparent effort to show Occidental's inconsistent application of its own sexual-assault policies, John filed a sexual-assault complaint against Jane Doe with Occidental. He claimed she did not obtain his consent prior to performing oral sex on him—as he doesn't even recall this happening, and nobody

**Exhibit 77, page 33**

ever asked Jane whether she received consent from John, he believes it should be subject to the same scrutiny under which he was investigated. (Sexual intercourse, as it's defined in the Occidental policy, includes oral sex, and there is no statute of limitations on when an accuser can file a claim.) However, because he would not meet with the university's investigator without his attorney present—just as he wouldn't meet with the investigator during the earlier investigation without his attorney present—the school declined to hear his complaint, citing his "inconsistent assertions, the timing of [his] complaint, and [his] failure to cooperate in the initial assessment process."

With Occidental refusing to investigate John's accusation of sexual assault, John's lawyer then filed a Title IX complaint against Occidental with the Office for Civil Rights in mid-October. The OCR, which receives many complaints but only commits full investigations to a fraction of them, has yet to determine whether it will look into John's case.



Occidental students on sexual-assault-awareness night, the day after students and alumni filed their Title IX complaint.

ESQUIRE + EMILY SHUR

ADVERTISEMENT - CONTINUE READING BELOW

**Exhibit 77, page 34**

8/7/2015    Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 39 of 60 PAGEID #: 3110

***

**"The current system is,** on the whole, poor and improving," says Sokolow, the risk-management consultant, which turns out to be the nicest thing anybody has to say about how colleges are handling sexual-assault allegations. (The new documentary *The Hunting Ground* captures the appalling and unethical ways that many colleges continue to treat women who report sexual assaults.) "The Department of Education has created a square-peg/round-hole phenomenon by asking colleges to take on a function that is simply not innate, or intuitive, for those who work on college campuses. And I think what's happening on a lot of campuses is they're feeling the pressure of OCR to push things forward that really should not be."

## MORE FROM ESQUIRE



**FRIEDMAN ASKS A QUESTION, WE ASK 10**    **CRAWLING FROM THE WRECKAGE**

"These investigations are hard to do even for trained law-enforcement professionals," says Berkowitz of RAINN. "So many schools turn them over to people with minimal training, and the process is just set up in such a way that it's really hard to investigate the truth of the crimes. And colleges just are not very good at it."

"Imagine a student is murdered on a college campus," says David Lisak, a psychologist who has studied sexual assault—including cases at colleges and in the military —for more than two decades. "Nobody thinks that colleges should investigate and adjudicate the case. Well, rape is really not that much less serious. Rape is a very serious, violent crime ... so do I think that universities are equipped right now to do a proper investigation? No."

Under the current guidelines recommended by the Office for Civil Rights, schools have considerable leeway in how they structure their investigation and adjudication processes. Some rely on multiperson hearing panels and some rely on what's called the single-investigator model; some colleges have more expansive definitions of assault than others. And some provide more protections to the accused than others, an issue that has gained prominence as increasing numbers of accused students file lawsuits against their former colleges for unfair hearings.

Last October, twenty-eight professors at Harvard Law School wrote an op-ed in *The Boston Globe* detailing their objections to Harvard's recently enacted sexual-assault policies, which they believe "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and ... [jettison] balance and fairness in the rush to appease certain federal administrative officials." (Harvard's policies align with both the guidelines issued by the OCR and Occidental's policies.) One of the signers, Nancy Gertner, writing recently in *The American Prospect* and describing herself as "an unrepentant feminist," argued that "just because the legal system has moved away from the view that all rape accusations are contrived does not mean it must move to the view that none are."

**Exhibit 77, page 36**

Janet Halley, another cosigner and a prominent feminist legal scholar, explained the larger issue this way: "Thing number one: We want to have workplaces and educational settings where sexual abuse is absent," she says by phone from

her office in Cambridge. "Thing number two: When we're charging somebody with a violation of norms that are morally and legally important, we need to understand that we are bringing a major accusation against them, one that can destroy their career, their peace of mind, and their reputation. And three, we need to remember that the legitimacy of the sex-harassment system will be squandered if we don't try to do both."

Halley finds fault with many of Harvard's policies, including the preponderance standard. "Every legal lever has been ticked in the direction of the accuser and against the [accused]… . I think it's almost in bad faith to be arguing that we 'need' [the preponderance standard] because we have to get equality of the parties. It's called going too far." What's more, she doesn't buy the idea that because there is no prospect of losing one's liberty, the preponderance standard is appropriate. "The idea that what we're talking about here is just a civil sanction, the equivalent of money damages, is unreal to me. When we expel or suspend a student and put that on the transcript, it's going to be very hard for that person to go to any other institution of higher education." (In a letter rebutting John's appeal to Occidental, Jane's lawyers wrote, "Ms. Jane Doe was raped by … John Doe," citing the adjudicator's "well-reasoned, thirteen-page opinion," which suggests just how empty the distinction really is between sexual assault as a breach of student conduct and rape as a criminal offense.)

Like both Halley and Gertner, Joseph Cohn of FIRE thinks the preponderance standard doesn't reflect the true gravity of the circumstances, and "since [the accused] can potentially be expelled and branded a rapist, the right to counsel in these hearings seems like it should be required." The recent Violence Against Women Act reauthorization included a provision that, starting in July 2015, all schools need to allow both students to have the advisor of their choice, including lawyers, throughout the process. However, it's up to the schools whether the lawyer can speak or not, and any lawyer could effectively be reduced to what more than one expert has described as a "potted plant."

With active, participating attorneys comes the prospect of heightened scrutiny of everyone involved—including the accuser, who at present can be shielded from having to answer questions from either the accused or the accused's representative. Critics of the current system believe that without meaningful scrutiny through cross-examination, there is no way to achieve a faithful verdict. "Sexual assault advocates will argue," Gertner wrote in *The American Prospect*, "it will be traumatic for the [accuser] to confront [the accused], even if only through her representatives rather than directly. It will be traumatic for the [accuser] to be asked to repeat her story over again… . These arguments, however, assume the outcome—that the [accuser's] account is true—without giving the accused an opportunity to meaningfully test it."

ADVERTISEMENT - CONTINUE READING BELOW

Or, as Cohn put it, "The way we sort through fact and fiction in any process that's fair is by putting accusations through scrutiny. We can do things that try to make it less difficult [for the accuser], but it can't be avoided." Nobody is suggesting a "Did you order the code red?" level of questioning, but merely a guarantee that the accused (or his representative) can ask reasonable questions of the accuser (if not directly then through a representative) about the accusations. At Occidental, as at many colleges, those accused can submit questions for the accuser (and vice versa) to the hearing coordinator, who then has the discretion to choose which questions he or she will ask. John says that of the thirty-eight questions he submitted to his hearing's coordinator, the ones he most wanted the coordinator to ask—like how Jane could remember performing oral sex on John but not remember having intercourse, or how she could remember John telling her, while they were having intercourse, that his roommate had just walked in on them yet not actually remember having intercourse—were never asked, and nobody bothered to tell him why.



President Obama signing a memo establishing the White House Task Force to Protect Students from Sexual Assault, in January 2014.

ESQUIRE + EMILY SHUR

## MORE FROM ESQUIRE

  

**HERE ARE 15 THINGS THAT LOOK SURPRISINGLY LIKE DON...**

**CHRIS CHRISTIE ADMITS TO USING BIRTH CONTROL, BOAS...**

**\*\*\***

**The thing is:** The system, as it was designed and reformed over the past few years, worked here. The OCR investigation of Occidental created a campuswide, historically high sensitivity to allegations of sexual assault. The college exercised its discretion broadly, without transparency—a lone adjudicator instead of the three-person panel; an expansive, extralegal definition of incapacitation; the selective choice of which questions Jane had to answer—just as the federal guidelines allow. The criminal burden of proof proved too high a barrier for Jane to meet, but the college's lower preponderance standard delivered the desired outcome for her. And John's expulsion, with a potential mark on his transcript for sexual assault, is likely to result in a life of diminished opportunity. There were no mistakes at Occidental, and if John's experience with college justice sounds reasonable—if it sounds fair—then this is all much ado about some kid getting exactly what he deserved.

If, however, something about this doesn't sound quite right, and if the L. A. Superior Court judge ultimately finds John's "strong position" from the

**Exhibit 77, page 40**

hearing is enough to overturn Occidental's ruling, then there will be more and more conversations (and lawsuits) about whether colleges, with their myriad competing interests (reputation and ranking, building endowment and protecting athletic programs), can ever be competent and trustworthy stewards of justice. Whether everyone might be better served by a better-funded, better-trained police force that uses advanced police work (see page 94) to investigate all claims of sexual assault (and if it doesn't, it'll have to answer to the elected officials who have to answer to voters). Whether more prosecutors might be convinced to stop limiting themselves to slam-dunk cases—as many critics claim—and start taking more chances to try putting sexual assailants behind bars (and face removal from office if they refuse to do so). Whether colleges might be allowed to leave the actual investigation and adjudication to law-enforcement experts while still providing sustained, on-the-ground support and guidance for the accuser and the accused. Or, ideally, all of the above, anything that would treat sexual assault as far too serious an accusation for jerry-built adjudication—and too terrible an offense to treat as less than a crime. Such an approach would also benefit women who don't go to college and face a 30 percent greater risk of being assaulted between the ages of eighteen and twenty-four than do their college-attending peers, according to one recent study of the Department of Justice's National Crime Victimization Survey data from 1995 to 2011.

\*\*\*

**"No one here knows,"** John says, finishing his chai. He's enrolled at a college not far from the Starbucks—unlike a great many other schools he wanted to attend, this college didn't require what's called a transfer registrar report from Occidental, which would have indicated his

expulsion. (He had to supply his transcript, which, because of the order of stay from the Superior Court, is clean for now.) And unlike his experience at the small midwestern college he attended for approximately one hour, no one's phoned in an anonymous tip yet. "I haven't been called into the dean's office, but it's always in the back of my mind."

His case is on the L. A. Superior Court docket at the end of May. If the judge finds in his favor, his family may pursue additional litigation against Occidental to cover its legal fees, which amounted to $76,000 as of February. He still has friends attending Occidental, though not his former roommate—who declined to comment but who has transferred to a less politically toxic campus, John says—and none of the other witnesses from that night. He doesn't know what they think of him, if they think of him at all, though he likes to remember what one of them—Jane's close friend, one of the friends who pulled her out of John's room to begin with—told investigators: "I think Jane was just as much a part of this as John.... She could have said, 'No,' or she could have just not responded to his texts, or just not gone back down to his room."

Jane, meanwhile, remains at Occidental, though the *Los Angeles Times* reported last spring that she had taken some time off and was in therapy for what her lawyer characterized as post-traumatic stress disorder. She'll likely be there still this fall, when a few hundred lucky teenagers, the Occidental class of 2019, arrive on campus, the years in front of them filled with nothing but possibility.

## A FEW QUESTIONS, ANSWERED.

### What about the police?

Law-enforcement agencies have a terrible reputation among victim advocates for their unwillingness and/or inability to build a case against alleged sexual assailants. Among the efforts to fix how police departments handle sexual-assault cases, few show as much promise as Carrie Hull's. A detective with the Ashland, Oregon, police department, Hull launched a program in 2013 called You Have Options, and she's seen sexual-assault reports to the police more than double (especially among the students at nearby Southern Oregon University) in just a year. You Have Options takes the best parts of what many colleges offer students—support, guidance, and the ability to set the scope and pacing of the investigation (hence the Options)—and combines them with the rigors of a full-blown police investigation. "It's a training issue for law enforcement," says Hull, who's currently in touch with fifty-three police departments across the country on You Have Options training. "You have to give anybody who is interviewing a victim of trauma, particularly sexual trauma, in-depth training on how to do a trauma-informed interview… . Then you have to actually get out of your chair and take that really good information that you often get from these interviews and start corroborating it." Background checks on suspects, forensic interviews, wiring an accuser so she might surreptitiously record a confession from an assailant: "We're not doing anything that is not being done in any other caseload. We're just using it within a sexual-assault caseload… . That's the stuff the DA needs" to build a case.

### What about Yes Means Yes?

Over the past year, California has enacted, and New York's governor has proposed, affirmative consent laws for colleges that receive state funding, and these so-called "yes means yes" statutes require unambiguous verbal agreement between two students before any sexual activity as well as between

**Exhibit 77, page 43**

various levels of sexual activity. Setting aside how realistic such requirements are, these laws do little to obviate the he-said-she-said nature of most sexual-assault cases, and they also do nothing to clarify the "How many beers is too many?" guessing game, as Rebecca O'Connor of RAINN recently put it, that clouds whether someone is able to offer meaningful consent. Even going so far as to dictate that *any* alcohol consumption is enough to nullify consent would at least clear up the confusion that affirmative consent measures have left in place. Drastic, maybe, but impossible to misunderstand.

## What about alcohol?

There are growing efforts, and countless creative ideas, to try to minimize alcohol's role on college campuses and the part it plays in sexual misconduct. While there is only one known cause of rape—rapists—it is impossible to overstate the role that drinking to excess plays in putting everybody involved in potentially dangerous situations. Limit beer at sanctioned parties to cans, as UVA decided in the fallout from the *Rolling Stone* scandal. Ban hard liquor, per Dartmouth. Lower the drinking age so staff or security personnel could supervise parties. Open up sorority houses to take away fraternities' home-field advantage. Encourage marijuana use. "I would never have [gone back to John's room] if I had been sober," Jane told investigators, and John says alcohol basically annihilated his better judgment. It's hard to say they're wrong.



43  **COMMENT**
Join the conversation ⌄

## ESQUIRE MARKETPLACE

| | | |
|---|---|---|
| Men's Short Hairstyles | Healthy Breakfast Ideas | Official Credit Report |
| Take a Depression Test | Early Signs of Cancer | Felony Assault |
| Drug Rehab Facilities | Lose Belly Fat Now | 10 Best SUVs |

## RECOMMENDED

**Alyssa Arce Is a Woman We Love of Instagram**

**The Women We Love in 70 Summer Bikinis**

**10 New Haircuts for Tom Brady... and Most Balding Men**

# What do you think?

**15 Comments**

Sort by   Newest



Add a comment...



**Tom Brown**

This was unfair to John. I'm all for punishing legitimate cases of sexual assault, but this was not one of them IMO. From the evidence presented they both had prescriptions, it's clear

**Exhibit 77, page 45**

not one of them IMO. From the evidence presented here and in other descriptions, it's clear what went on here if you just swap "he" for "she" and "John" for "Jane." If they're going to state that mutually drunk sex that at least one partner regrets later is a sexual assault, then at least be consistent and expel both of them for the same thing: mutual sexual assault. Ridiculous.

Like · Reply · 👍 1 · Jul 7, 2015 3:05pm



**Brian Black** · Purdue University

I guess this means women can't be held accountable for a DUI either. When is our society going to grow a pair of balls and put a stop to this shit?

Like · Reply · 👍 4 · Apr 29, 2015 5:21pm



**Dave Sauerwein**

I wonder... if the exact same situation were presented with the gender swapped, what would be the charges, and what would be the outcome?

Like · Reply · 👍 2 · Apr 13, 2015 1:37pm



**Bill Poser** · Massachusetts Institute of Technology (MIT)

In addition to the manifest injustice to John, Occidental is responsible for the trauma to Jane. Jane lost her virginity in an encounter which, though not filled with love and wonder as one might hope, was consensual and resulted only in slight awkwardness. Occidental convinced her that something terrible happened and caused the trauma from which she reportedly suffers.

Like · Reply · 👍 6 · Apr 7, 2015 2:07pm



**Amy E. Schwartz** · Washington, District of Columbia

This is what struck me most as a (female) reader. Do we really want young women to feel that their first sexual encounter, even if not exactly what they dreamed of, should be considered (by responsible adults and counselors all around her) such a trauma that she is at risk for PTSD, fear of turning corners, and so forth? It seems a return to the Victorian era with its double standards to take it as a given that a young woman's "first time" in and of itself, absent actual pressure or coercion, actually does constitute or produce so deep a trauma. It sure doesn't reflect the experiences narrated by the last few generations of women (feminist or otherwise).

Like · Reply · 👍 5 · Apr 11, 2015 2:59pm



**Matt Nadler** · Selwyn House School

My thoughts are that both Joe and Jane got caught up in a highly politicized mess.

Jane was confused after the encounter, and had several people, including authoritative adult staffers telling her she had been raped. I think most people (men and women) would suffer trauma after that - especially a 17 year old person.

Joe also suffers from a system that uses definitions of rape so broad that many of us would qualify (men and women) as rapists. When intoxication nullifies even affirmative consent such as Jane's text messages and actions as reported by witnesses confirm, the numbers of rapes... See More

MORE FROM

# WOMEN & MEN: AN ISSUE ABOUT OUR CURRENT DIFFICULTIES

WOMEN & MEN: THE ISSUE　　NEWS & POLITICS　　OCCIDENTAL COLLEGE



**MORE FROM WOMEN & MEN: AN ISSUE ABOUT OUR CURRENT DIFFICULTIES**

　　　　　　　

| Newsletter | Digital Editions | About Us |
|---|---|---|
| Media Kit | Press Room | Contact Us |
| Community Guidelines | Advertise Online | About Our Ads |
| Customer Service | Subscribe | Other Hearst Subscriptions |
| Give a Gift | Events & Promotions | Giveaways |
| Being Green | Why Did I Get This Ad? | |

**A PART OF HEARST DIGITAL MEDIA**

©2015 Hearst Communications, Inc. All Rights Reserved.

Privacy Policy　　Your California Privacy Rights　　Terms of Use　　Site Map

**Exhibit 77, page 47**

Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 52 of 60 PAGEID #: 3123

Exhibit 77, page 48

Case: 1:15-cv-00605-MRB Doc #: 41-4 Filed: 01/26/16 Page: 53 of 60 PAGEID #: 3124



# A double-standard on campus sexual assault hearings

By ASHE SCHOW • 7/24/15 12:14 PM

Across the country, young college men are being accused of sexually assaulting young college women based either solely on an accusation or occasionally on flimsy witness statements.

No one is arguing that sexual assaults never happen. But the degree to which the definition has been broadened in order to "fix" the "epidemic" has ensnared many young students who are not the monsters the media would have you believe.

And the narrative being pushed by activists has been one of black and white, good and evil. According to them, accusers, mostly women, always tell the absolute truth, and the accused, almost universally men, are awful even if proven innocent. That double-standard has led to policies that treat accused students as guilty-until-proven-innocent. These policies also have to carve out special provisions that ensure accusers are innocent of sexual assault even when both parties would have a reasonable claim.

This double-standard has produced policies that state that an accuser who has been drinking alcohol (any amount) is absolved of anything they willingly consented to that night on the grounds that they wouldn't have done so sober. Conversely, accused students who were also drunk are not absolved of their decisions.

Notice the double-standard? If being drunk means you can't consent, presumably a drunk accused student would also be unable to consent, meaning that the two students essentially sexually assaulted each other. But of course findings such as this won't help schools prove to the Department of Education that they take accusations seriously, thus the one-sided policies.

We saw this play out recently at Amherst College, when a student who was in an alcohol-induced, black-out state received oral sex, only to be accused of sexual assault nearly two years later. The woman in that case claimed the accused forced her to perform the sexual act after she decided midway through she didn't want to do it anymore. The accused student, known as John Doe in the lawsuit who has since filed against the school, argued that he didn't remember the event since he also blacked out from inebriation.

Amherst's sexual assault policy states that "an individual may experience a blackout state in which he/she/they appear to be giving consent, but do not actually have conscious awareness or the ability to consent." Amherst went out of its way to prove that Doe was not in a blackout state when he received oral sex from his accuser, writing in its response to Doe's lawsuit that witnesses said Doe only looked "pretty drunk" and was able to leave the dorm where he was drinking and walk somewhere else using a pedestrian sidewalk.

Amherst quoted Doe's roommate as saying Doe was "function[ing] normally," "seemed fine" and did not appear "blacked out." This despite Amherst explicitly saying in its policy that one might not be

**Exhibit 78, page 2**

able to tell if someone else is blacked out or not.

Regardless, Doe's state of drunkenness — and the fact that he himself would not have been able to consent to sexual activity – did not matter to Amherst. All that mattered was the accuser's state of drunkenness and her claim that she withdrew consent at some point during the activity. It didn't seem to matter to Amherst that text messages from the accuser immediately after the event show her to be a willing participant who was in no way considering the event a sexual assault.

To really understand how this double-standard works, one must look at <u>another recent example</u> of campus sexual assault, this time occurring at Occidental College. In that case again, both students were drunk, meaning that if all things were truly equal, neither student could consent. But things are not truly equal when it comes to campus sexual assault, and even witness testimony that the accused student in that case was "slurring his words" and "stumbling" over other people did not matter.

At Occidental, the accused student even tried to bring forward a counterclaim of sexual assault in order to prove just how biased the system was. The school predictably dismissed his claim, in part due to "the timing"; he had filed his complaint after his appeal was denied and after he was punished with expulsion. The implication of course was that he wouldn't have filed his claim had he not first been accused.

If two people get into a fist fight, both can file charges — there's no "first to file" standard. If there is a clear instigator, the charges

**Exhibit 78, page 3**

against them might hold up better. For campus sexual assault, all that matters is who accuses — usually the woman, especially if she has had feminist professors or Title IX coordinators help her reinterpret a drunken hookup as rape.

That's exactly what happened at Occidental. The accuser, listed as Jane Doe in the lawsuit, felt bad about the evening and talked to a counselor. Eventually she spoke to Danielle Dirks, a Title IX advocate, who listened to Jane's story and told her it was rape. Jane responded by saying, "Oh, I am not calling it rape yet." Dirks then told her the accused "fit the profile of other rapists on campus in that he had a high GPA in high school, was his class valedictorian, was on [a sports] team and 'from a good family.'"

Of course, after hearing this, Jane filed a police report against the accused student (listed as another John Doe in his lawsuit). Police concluded that the sexual activity was consensual and that both students were drunk but appeared — through text messages and other evidence — to be able to knowingly consent. Not liking this outcome, Jane went to Occidental, whose private investigators came to the same conclusion after speaking with multiple witnesses.

Yet Occidental still went ahead with a panel of administrators who, despite a police investigation and witness testimony to the contrary, found the accused student responsible for violating school policy and expelled him.

In that case, Occidental went out of its way to show that she was too incapacitated to consent to sex. This despite text messages

**Exhibit 78, page 4**

showing consent from Jane — who initiated the sexual contact by sitting on the accused student's lap and kissing him — and despite that she was able to leave her dorm after tricking her roommate into thinking she was asleep, walk to another dorm, find the accused student's room, all while texting the accused student and her friend that she was going to have sex. Also, the accused student, who by all accounts was just as drunk, should have known this.

Had this been the previously mentioned fist fight, the clear indication that Jane was the initiator would have probably worked against her. But in the world of campus sexual assaults, that didn't matter.

So to recap: Schools go out of their way to prove that men who have been accused weren't too drunk to consent but that women who are accusing were too drunk. Policies are also written to ensure there are clear guilty and innocent parties, i.e., that the accuser is innocent and the accused is guilty, despite evidence showing that both were unable to give consent.

At some point this double-standard must be addressed — and ended.

**Exhibit 78, page 5**



The
Economist

**Sex crimes on campus**

# Professors as judges

**The folly of letting amateurs handle serious crimes**

Dec 6th 2014 | LOS ANGELES |  From the print edition

THE



uproar about sexual assaults on American college campuses is growing louder. Barack Obama has called them "an affront to our basic humanity". Several universities—including Johns Hopkins, San Diego State, Emory, MIT, Clemson and the University of Virginia—have shut

**Exhibit 79, page 1**

1/3

down or suspended parties at their fraternities in recent months. This week Wesleyan University in Connecticut banned a fraternity from holding social events for a year following two allegations of assaults at booze-fuelled revels. Meanwhile, 90 schools in 35 states are under investigation by the federal Department of Education for mishandling cases of sexual violence.

Rape and sexual assault in America have declined sharply since the mid-1990s, to 1.1 per 1,000 women per year (see chart). And students are no more likely to be assaulted than non-students of the same age, according to the Bureau of Justice Statistics (though its numbers are somewhat out of date). Yet activists insist that American campuses—and especially fraternities—nurture a "rape culture".

They often cite an estimate that one woman in five will be sexually assaulted during her time in college, which comes from a report prepared for the Justice Department in 2007. Sceptics doubt this estimate, noting that it was based on a small sample (an online survey of two universities) and used a broad definition of sexual assault, which included everything from rape to any kind of "unwanted sexual contact", as well as any encounter where one party was too intoxicated by alcohol or drugs to give informed consent.

Reports of horrific individual cases have brought extra attention to the issue. *Rolling Stone* recently published an account of an alleged gang-rape at the University of Virginia, where a student says she was attacked by seven men while lying on shards of a broken glass-topped table. The magazine appears not to have interviewed the (un-named) alleged perpetrators, so it is unclear how they respond to the charges*.

In 2011 the Department of Education sent colleges a letter warning that if they did not take steps to curtail sexual violence, they could be in violation of Title IX, a federal anti-discrimination law. It urged schools to set up committees to adjudicate complaints of sexual wrongdoing, even of heinous crimes such as rape. These committees often consist of untrained professors, administrators and students. The director of a campus bookstore served on a judgment panel for one college last year.

Under this system, defendants and victims have no right to legal counsel and no opportunity to cross-examine witnesses. Colleges typically determine guilt based on the civil "preponderance of the evidence" standard, meaning it is more likely than not that the perpetrator committed the crime, rather than the far tougher "beyond a reasonable doubt" standard, which is used in criminal courts. Panels cannot jail wrongdoers, but they can expel them.

Students on both sides of the fence have complained that these amateur tribunals are inept. A lawsuit this year alleged that Columbia University unfairly allowed perpetrators to remain on campus. Meanwhile male students at Vassar, Duke, and the University of Michigan have sued their schools, claiming that campus committees found them guilty of sexual misconduct when

**Exhibit 79, page 2**

they were innocent. At Harvard 28 law professors recently criticised the university's new sexual-assault procedures as lacking "the most basic elements of fairness and due process".

Critics of the system argue that crimes should be dealt with by the police and the courts. In colleges as in the wider world, most rape victims never report the attack to the police. Studies suggest that the vast majority of campus assaults are committed by a small fraction of college men who tend to rape over and over again. So campuses would be safer if these habitual offenders were swiftly identified and arrested, rather than just expelled—leaving them free to go to another college and rape again.

Other critics think that colleges—and the government—should regulate alcohol more realistically. Binge-drinking is common on campuses, and cited in many complaints of sexual transgressions. But because students under 21 have no legal way to obtain alcohol, they tend to party in places where there is no adult supervision nearby, such as in fraternity houses, which are not technically part of the university. The head of the University of Virginia notes that students at frat parties often have no idea how strong their drinks are. (At some parties, the hosts mix everything up in a trash can.)

The lack of adult supervision has had dire consequences: men in fraternities are three times more likely to rape than other men on campus, according to John Foubert of Oklahoma State University. If the drinking age were lowered, parties could be held on campus and colleges could supervise them better, critics say.

* On December 5th Will Dana, the managing editor of *Rolling Stone*, issued a note (http://www.rollingstone.com/culture/news/a-note-to-our-readers-20141205) to readers saying that the gang rape story they published may have been inaccurate.

From the print edition: United States

**Exhibit 79, page 3**